```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
                      Case No. 16-80107-CR-DTKH
 3
    UNITED STATES OF AMERICA,     )
 4                                )
         GOVERNMENT,              )
 5                                )
         -v-                      )
 6                                )
    GREGORY HUBBARD,              )
 7   DAYNE ANTANI CHRISTIAN,      )
    AND DARREN ARNESS JACKSON,    )
 8                                )
         DEFENDANTS.              )    West Palm Beach, Florida
 9                                )    December 6, 2016
    _____)
10

11     TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE PROCEEDINGS

12           BEFORE THE HONORABLE DANIEL T.K. HURLEY

13               UNITED STATES DISTRICT JUDGE

14

15   Appearances:

16   (On Page 2.)

17

18   Reporter                Stephen W. Franklin, RMR, CRR, CPE
     (561)514-3768           Official Court Reporter
19                           701 Clematis Street
                             West Palm Beach, Florida  33401
20                           E-mail:  SFranklinUSDC@aol.com

21

22

23

24

25
```

```
 1   Appearances:

 2   FOR THE GOVERNMENT          Edward Nucci, AUSA
                                 United States Attorney's Office
 3                               500 South Australian Avenue
                                 Suite 400
 4                               West Palm Beach, FL 33401
     -and-
 5                               Karen E. Gilbert, AUSA
                                 United States Attorney's Office
 6                               99 Northeast 4th Street
                                 Miami, FL 33132
 7   -and-
                                 Lawrence Schneider, ESQ.
 8                               U.S. Department of Justice
                                 1400 New York Avenue, Northwest
 9                               Washington, DC 20005

10   FOR DEFENDANT HUBBARD       Anthony J. Natale, AFPD, AND
                                 Vanessa Chen, AFPD
11                               Federal Public Defender's Office
                                 150 West Flagler Street
12                               Suite 1500
                                 Miami, FL 33130
13
     FOR DEFENDANT CHRISTIAN     Jack K. Fuchs, ESQ.
14                               1645 Palm Beach Lakes Boulevard
                                 Suite 1000
15                               West Palm Beach, FL 33401

16   FOR DEFENDANT JACKSON       Julie Prag Vianale, ESQ.
                                 Vianale & Vianale
17                               5550 Glades Road
                                 Suite 500
18                               Boca Raton, FL 33431

19                                    *  *  *  *  *

20

21

22

23

24

25
```

```
 1            (Call to the order of the Court.)

 2            THE COURT:  Good afternoon.  This is Judge Hurley,

 3   in West Palm Beach, and we're here today on case 16-80107,

 4   which is the case of the United States versus Mr. Gregory

 5   Hubbard, et al.

 6            Let me turn to allow counsel to make their

 7   appearances.

 8            Let me start with counsel for the Government.

 9            MR. NUCCI:  Ed Nucci, Your Honor.  I'm here with FBI

10   agents Paul Allen and Brian King.

11            THE COURT:  Thank you very much.

12            And let me turn now to counsel for Mr. Hubbard.

13            MR. NATALE:  Good afternoon, Your Honor.

14            Anthony Natale and Vanessa Chen on behalf of

15   Mr. Hubbard.

16            THE COURT:  Thank you.

17            And let me turn, if I might, to counsel for the

18   codefendants.

19            MS. VIANALE:  Good afternoon, Your Honor.

20            This is Julie Vianale on behalf of Darren Jackson.

21            THE COURT:  Thank you so much.

22            And let me turn to remaining counsel, if I might.

23            MR. FUCHS:  Good afternoon, Your Honor.

24            Jack Fuchs, standing in for Michael Salnick, on

25   behalf of Dayne Christian.
```

```
 1                 THE COURT:  Good afternoon.
 2                 Thank you all for making yourselves available on
 3     such short notice.
 4                 I suspect everyone has received a copy of
 5     Mr. Natale's unopposed motion to continue the trial,
 6     suggesting a trial date in October, and you will remember that
 7     we met some time ago, and I think we discussed a trial date in
 8     late March.  I guess it's the April-May -- the April or the
 9     May trial calendar, and I wanted to turn to Mr. Natale to be
10     able to speak to his motion.
11                 MR. NATALE:  Your Honor, the motion is based on the
12     following reasons why we need additional time.
13                 As of today, we've been provided with 285 hours of
14     recordings, and we have not been provided with -- and I'm not
15     trying to throw blame, I'm just telling you the situation.
16     And we have no transcripts of those.
17                 We have been able to review 172 hours of that.
18     There are 113 hours that remain to be reviewed, and the
19     Government just sent me a couple of minutes ago saying that
20     there is another disc that could have up to 12 calls and 12
21     hours of additional calls.
22                 Now, this presents us -- obviously the sheer volume
23     of it presents us with a time problem for people to listen to
24     them.  However, it's compounded, because Hubbard is not
25     allowed to listen to any of the recordings on his own.  He is
```

```
 1    presently held in SHU, and prior to that he was held at the
 2    Palm Beach County medical ward.  So the only time we can play
 3    any of the tapes for him to hear is if someone physically goes
 4    there and sits with him.  And so that has presented us with
 5    enormous time constraints.  The fact that we don't have
 6    transcripts compounds the matter.
 7          Now, the Government has informed us that they are in
 8    the process of figuring out which ones they want transcribed
 9    and how much they think it's going to cost to get those
10    transcribed, and obviously my office has informed me that
11    before I can order any transcripts, based on the procedures,
12    we have to have the total amount of transcript in hours, and
13    then we have to put it up for bid, because the amount is going
14    to be so large.
15          Obviously, if we knew what the Government was going
16    to use, that our time and expense would be reduced, but I
17    think through no fault of the Government's own, they can't
18    even respond to that.
19          THE COURT:  Well, maybe I ask you, is that true?  In
20    other words, what normally happens is the Government would
21    indicate that there's "X" number of hours of recorded
22    conversations, and the Government would indicate an intent to
23    utilize a specified number.  But wouldn't and don't you, as a
24    matter of course, then go through all the rest to determine
25    from a defense perspective whether there are other
```

1    conversations that would need to be utilized by the defense?

2            MR. NATALE:  Your Honor, absolutely, Your Honor.

3    I'm just trying to say that even that process was not -- you

4    know, we can't expedite because of the sheer volume.  And as

5    you may recall, we requested that we be given clearance.  The

6    Government said that there was no need for us to have

7    clearance.  And as a result, they have to go through or have

8    their people go through all of the tapes to decide which ones

9    they will be classified to give to us.

10           THE COURT:  Well, all the ones that you have

11   received thus far, is it reasonable to assume these have all

12   been declassified?

13           MR. NATALE:  Yes, yes.

14           THE COURT:  Okay.  And what you're indicating is

15   there's an issue with what you have, and apparently there's

16   some concern on your part that there may be others that you

17   have not received.

18           MR. NATALE:  That's correct.  Because we haven't

19   received a list if there are any recordings which they have

20   chosen not to declassify, and that they will in the future

21   file a CIPA -- excuse my accent, but a CIPA petition regarding

22   those.

23           THE COURT:  And for the court reporter who's present

24   and has not heard this before, would you just spell those

25   initials out?

1              MR. NATALE:  C as in cat, I as in Ivan, P as in

2    Paul, A as in act.

3              THE COURT:  And thus far, you've not received

4    anything like that, so I assume you believe at this point you

5    have all of the recordings that will be used, you just don't

6    know in that mass of material which ones does the Government

7    intend to offer.

8              MR. NATALE:  That's correct.

9              And we also don't know if there are ones which they

10   are going to submit to Your Honor to make a decision as to

11   whether they should be disclosed under Brady, Giglio or some

12   other -- that they're material to the defense based on the

13   sort of representations that we have made under seal to the

14   Court.

15             THE COURT:  Okay.  In other words, just to come back

16   here again, clearly, the Government unilaterally, in

17   fulfillment of its Brady obligations, will disclose

18   information to the defense, but you're suggesting that given

19   the broad background that you have asserted in your motion,

20   that you think that there may be other materials that the

21   Government might take a contrary view and then come to the

22   Court and say, out of an abundance of caution, we'll present

23   these to the Court, the Government doesn't think they're

24   Brady, but nonetheless wants to take that extra step, is that

25   what you're saying?

```
 1              MS. VIANALE:  That is what I've been led to believe.

 2              The other aspect of this gets to my -- the pending

 3    motion --

 4              THE COURT:  But can I stop you for a minute?

 5              But that has not happened yet, has it?

 6              MR. NATALE:  No, that has not happened.

 7              THE COURT:  Okay.

 8              MR. NATALE:  And the Government has not informed us

 9    that for the Court that they would be submitting any such

10    request.

11              THE COURT:  So is the problem -- the main problem

12    that you're dealing with -- and you may have some others on

13    the list, but is the main problem that you're dealing with is

14    that you've received this -- the hours of recordings, and you

15    have not had the ability to have them transcribed -- is it

16    your intent to have them all transcribed?

17              MR. NATALE:  No, Your Honor.  It is my intent to

18    only have the relevant ones to our defense transcribed.

19              THE COURT:  So you anticipate the Government is

20    going to have some transcribed, and then I take it you, or

21    someone on your staff, intends to listen to all of them, and

22    if there are others that you believe are relevant, you would

23    then have those transcribed, is that it?

24              MR. NATALE:  Absolutely.

25              THE COURT:  Okay.  What other problems are there?
```

```
 1          MR. NATALE:  Your Honor, the other thing is that
 2   based on your scheduling order, the December 15th is the time
 3   when all remaining disclosures are due, which is the wording
 4   of the order.  There appears to be a differing of opinion
 5   between myself and the Government.  I interpreted that to mean
 6   given the dates that we had, that that would include Brady
 7   Giglio and Napue.
 8          It appears that the Government does not construe
 9   that in that way, and that they will, I think, say they will
10   provide it to us when they anticipate they know what it is
11   that they think qualifies.
12          THE COURT:  Well, but Brady information is not due
13   until after cross-examination; isn't that correct?
14          MR. NATALE:  No, that's Jencks material.
15          THE COURT:  I see.  Okay.  So Brady you think is due
16   beforehand.
17          MR. NATALE:  Brady is absolutely due.  It's
18   exculpatory evidence or evidence that could lead to
19   exculpatory evidence.
20          THE COURT:  Yes, you're correct.  You're correct.
21   Okay.  So --
22          MR. NATALE:  And it's also necessary for
23   investigation.
24          THE COURT:  Uh-huh.
25          MR. NATALE:  And the same -- you know, which is part
```

```
1    of what we put in our motion, but also, Giglio and Napue, we
2    have reason to believe that there is -- there was more than
3    one confidential source, and our obligation would be to
4    investigate the nature and background in order to see what, if
5    any, impeaching information there might be regarding those
6    individuals, whether or not they're called, because it could
7    lead to the motivation towards what we see as our defense.
8              THE COURT:  Okay.  What other problems are you
9    facing?
10             So you've told me about the hours of tapes and then
11   the Brady issue and getting that down as to the date for that
12   disclosure.  What other issues do you face?
13             MR. NATALE:  The other issue is this, Your Honor.
14             I have filed a motion to be able to receive a copy
15   of a mirror image of the digital recorded information, either
16   by computers or cellphones of the codefendants.  And the
17   reason for that is I believe that it could potentially --
18   particularly in the light if any of them are going to be
19   witnesses against my client, but even if they're not, it could
20   provide information, which I have a good-faith reason to
21   believe that the codefendants had independent contact with the
22   confidential sources in this case, and they very well may have
23   had independent contact with other individuals at the same
24   time of the conspiracy, which I think would be relevant to the
25   degree that Mr. Hubbard, my client, didn't know that.
```

1          The Government has informed me that they believe --

2    well, I have filed a motion on that.  They have informed me

3    that they are going through that material, and that they will

4    provide me -- when I guess they choose -- if it's Giglio,

5    Brady, Napue or any other information.

6          My concern is that without them knowing the nature

7    of our defense, that that is not necessarily the best way for

8    it to be done.

9          The Government has also indicated that because these

10   items are in the possession of the Government, based on search

11   warrants that were looking for specific items, they feel that

12   they do not -- they would be prohibited on their own from

13   disclosing or providing us with that raw data and information

14   unless the codefendant counsels would agree.

15         I have already agreed that I would allow my client,

16   whatever he had, to have total access to any of the other

17   codefendants.  The codefendants' attorneys have decided at

18   this point that that is something that they have not indicated

19   that they would agree to.  So there's -- that presents me with

20   an additional concern and also additional time to go through

21   and look at that.

22         All of these --

23         THE COURT:  Well, or at a minimum, to litigate it if

24   it has to be litigated.

25         MR. NATALE:  Correct.  And I've already filed the

1    motion, Your Honor, and that's Docket Entry I believe it's 52.

2            THE COURT:  So you're essentially requesting to

3    receive a mirror copy of the electronic devices and the --

4    whatever's the appropriate word -- the drives, and so on, that

5    belong to the codefendants but that are now in the custody of

6    the United States Government.

7            MR. NATALE:  That's correct, sir.

8            THE COURT:  Okay.  Is there another issue that you

9    needed to raise?

10           MR. NATALE:  Well, yes.

11           I think that in regards to that, there are -- you

12   know, there would be a need for us to possibly have a forensic

13   expert.  But the substance of what we would find also affects

14   our -- our investigation as far as what we would investigate,

15   and since we have a deadline of February 24 for pretrial

16   motions, it is highly unlikely, at least in the last

17   conversations I had with the Government, that by that date we

18   would even have -- the Government would even have transcripts

19   of all of the recordings.  So we would not -- or have

20   disclosed whether there was some that there are -- that they

21   think are classified and they want the Court's opinion on

22   them.

23           So we are in a position where, you know, we have

24   worked, you know, very hard in this case, and I think both

25   sides have.  However, you know, realistically, discovery was

1    only begun to be provided in September, and I think, you know,

2    we're in a situation where we would not be able to know all

3    pretrial issues that would need to be filed by February 24th,

4    in light of the fact that some of those motions, at least one

5    of them, you know, is pending.

6              And I would also think, as sort of a footnote to all

7    of this, is that, you know, should there be an inclination

8    that the February 24th date is going to be in full force and

9    effect, then the Brady and Giglio and Napue disclosures

10   certainly should be ordered by December 15th so we would be

11   able to evaluate whether there are additional motions that

12   need to be filed based on that information.

13             THE COURT:  Okay.

14             MR. NATALE:  Because it --

15             THE COURT:  Does that complete the list of matters

16   that you're deeply concerned about?

17             MR. NATALE:  That, I think, and maybe on what would

18   come up, our efforts to fully investigate the case.

19             Now, we have been investigating the case based on

20   what we know and what we have, but some of this information,

21   the investigation can't go forward because we haven't had the

22   discovery completed.

23             THE COURT:  Okay.  I understand that.  Thank you.

24             I'd like to turn to -- before turning to the

25   Government, I'd like to turn to co-counsel, co-defense

```
 1    counsel, to see what their views are regarding the requested
 2    reset date of October, because as I understand it, all of the
 3    defendants in this case are pretrial detained.
 4            Ms. Vianale, did you want to speak to that?
 5            MS. VIANALE:  Yes, Your Honor, I'll be happy to on
 6    behalf of Mr. Jackson.
 7            We have, of course, received a motion, and we did
 8    tell Mr. Natale prior to his filing it that we didn't oppose
 9    the continuance, and we do not oppose a continuance.  I agree
10    with Mr. Natale with respect to the daunting task that we have
11    had and have of listening to these recordings.
12            THE COURT:  Uh-huh.
13            MS. VIANALE:  It's made more complicated --
14            THE COURT:  Is there a communal effort in that
15    regard?  Are all the defense lawyers listening together, or
16    you're doing this individually?
17            MS. VIANALE:  Well, no, no, we're doing it
18    individually, and then, of course, we have to do it
19    individually with our clients.  We can't get all the clients
20    together because they're all separated.  So we can't really
21    get together at the jail and listen to them.  And they all
22    have different interests, and they want to talk to us while --
23    so it doesn't work to do it jointly.
24            THE COURT:  Okay.
25            MS. VIANALE:  So we have to all listen to them, you
```

```
 1    know, to the extent certainly some of our clients are on them,

 2    and the balance of them, as well.  It's complicated by the

 3    fact that what I'm finding is that many of the recordings are

 4    not of terribly good quality in terms of being able to hear

 5    what they said.

 6              THE COURT:  Sure.

 7              MS. VIANALE:  Some of them are outdoors or in rooms.

 8    They're not, by and large, telephonic recordings.  They're by

 9    and large --

10              THE COURT:  Do you share Mr. Natale's assessment of

11    the problem?

12              MS. VIANALE:  I do.  No, I think it's a very

13    diligent task to get these listened to, and I am not confident

14    that we would be ready with respect to motions on

15    February 24th.  So I do agree that resetting the dates

16    probably is going to be necessary.  You might as well deal

17    with that now rather than wait until the dates are upon us.

18              THE COURT:  No, I agree with you in that regard.

19              Was there anything else you wanted to say before I

20    turn to Mr. Fuchs?

21              MS. VIANALE:  No.  Only that -- well, with respect

22    to Mr. Natale -- Mr. Natale's motion to have access to the

23    mirrored images of the electronic devices, my date to respond

24    to that motion hasn't arrived yet.

25              THE COURT:  Right.  I think that's premature, and I
```

```
 1   agree.  I think that's premature.  I think we should hold off

 2   on that.  That's a very interesting issue, but I think we

 3   ought to give everybody the opportunity to reflect on it and

 4   make their own judgments and then file their responses.

 5            Why don't I turn, then, to Mr. Fuchs just to see

 6   what he has to say.

 7            MR. FUCHS:  Thank you, Your Honor.

 8            We concur with the assessments of going through the

 9   discovery.  We don't oppose the dates suggested by Mr. Natale,

10   and Mr. Christian would agree to those dates.

11            THE COURT:  All right.  Well, thank you.  Thank you

12   very much.

13            Why don't I turn to Mr. Nucci for the Government's

14   view and assessment.

15            MR. FUCHS:  Okay.

16            MS. GILBERT:  Judge, if I may, this is Karen

17   Gilbert.  I had an issue with my security code.  So I've been

18   on since the beginning, but I didn't have a chance to announce

19   my appearance.

20            THE COURT:  Thank you.  Thank you so much.  I

21   appreciate that.  Sorry that we cut you out.  I didn't mean to

22   do that.

23            MS. GILBERT:  No, no problem.

24            MR. SCHNEIDER:  Judge, this is Larry Schneider.

25   I've also been on since the beginning, so I just wanted to put
```

```
 1   my appearance on.

 2           THE COURT:  Good.  Thank you both.  Appreciate it.

 3           Did either one of you want to speak to this before I

 4   turn to Mr. Nucci?

 5           MS. GILBERT:  Well, obviously the three of us speak

 6   as one voice, Mr. Nucci and Mr. Schneider and I, so obviously

 7   we'll be ready to answer whatever it is that you would like to

 8   propose or propound.

 9           THE COURT:  Let me turn, then, to Mr. Nucci to see

10   what he has to say.

11           MS. ROSEN-EVANS:  Okay.  Well, the -- we've agreed

12   that we've had no opposition to the continuance.

13           I want to make one correction.  The discs that we

14   have today, this 51 that Mr. Natale made reference to, it's

15   not 12 hours of materials, it's two hours and 31 minutes.  And

16   we sent it out originally, but it didn't copy.  So it was

17   blank, and that was just a technical glitch.  But we sent it

18   out timely, and we'll get it out.  It will be here today for

19   Mr. Natale to pick up, and then there's one -- the last thing

20   we have is about a 15-minute conversation that has to be

21   separated out from something which isn't discoverable at this

22   point.

23           So all of those things, those consensual

24   conversations, were declassified.  That's all of them.  And

25   they're, in essence, timely turned over --
```

```
 1              THE COURT:  I do understand, Mr. Nucci, though, that
 2   the Government has turned over all of the recordings at this
 3   point, but there are no transcripts, huh?
 4              MR. NUCCI:  That is correct.
 5              THE COURT:  And as I indicated, at least it's been
 6   my experience in the past -- and I'm not sure where this
 7   happens, whether it's at the discovery phase or much later --
 8   it probably is later -- usually the Government at some point
 9   is able to say we want to use this tape, this tape, this tape,
10   and so on, and everybody is on notice of that, and if there
11   are other tapes or other conversations that the defense has
12   listened to and they feel are relevant, they will arrange to
13   have those prepared, as well.
14              Is -- I take it the Government has not done that in
15   this case, huh?
16              MR. NUCCI:  That is correct.  We are in the process.
17   I mean, obviously our first task was to get out the discovery,
18   which really started on August 9th.
19              THE COURT:  Right.
20              MR. NUCCI:  That's when defense counsel got their
21   post-arrest statements and all.
22              So, I mean, that's been our primary goal, so that
23   they can do their defense, and obviously a great bulk of the
24   evidence would be the consensual recordings.
25              So we are in the process of going through all those
```

```
 1   hours and deciding which ones would be the best to play,
 2   deciding, you know --
 3              THE COURT:  When do you intend that that --
 4              MS. ROSEN-EVANS:  We're going to trial, and --
 5              THE COURT:  When do you expect that decision would
 6   be made and that the Government would be in a position to turn
 7   to the defense and say, here are the -- here are the
 8   conversations that we anticipate may be offered at trial?
 9              MR. NUCCI:  I might have to ask for a lifeline here,
10   Your Honor.
11              Ms. Gilbert?
12              MS. GILBERT:  Judge, if I may.
13              THE COURT:  But you know, let me just say to you, if
14   I might, I'm looking at the discovery -- at the scheduling
15   order, and, of course, it doesn't address that at all.  And so
16   it's something we really didn't talk about the last time.
17              So why don't I come back to whoever on the
18   Government's team wants to address this, but when do you think
19   you'd be in a position to make that type of a disclosure or a
20   representation?  It's not a disclosure, but it's simply an
21   updating of the -- from the mass of information, here's what
22   we think we're going to offer?  Any response on that?
23              MR. NUCCI:  Karen?
24              MS. GILBERT:  I'm sorry, Judge, I thought you only
25   wanted to hear from Mr. Nucci.
```

```
 1                THE COURT:  No, no.

 2                MS. GILBERT:  If I may --

 3                THE COURT:  I would like to hear whoever feels you

 4   can respond to it.

 5                MS. GILBERT:  Okay.  Great, great.

 6                Your Honor, as Mr. Nucci started to say, depending

 7   on if we have pleas from codefendants, that would certainly

 8   cut down the number of recording --

 9                THE COURT:  Let's not plan on that.  Let's not plan

10   on that at this point.  In other words, because we're trying

11   to look down the line, and we're making a judgment of if this

12   case goes to trial and everybody in it is going to go to

13   trial, when does the Government feel it's going to be in a

14   position to turn to the defense and say, of all the

15   information we've given you, here are the exhibits that we

16   think we're going to offer?

17                MS. GILBERT:  Well, exhibits in terms of calls, I

18   would think probably four to five weeks prior to trial.

19                THE COURT:  Uh-huh.  Okay.  All right.

20                MS. GILBERT:  The recordings are in English, so

21   everybody's sort of dealing with the same recording, right?

22                THE COURT:  I was under the impression that some

23   recordings may have been in Arabic.  Am I wrong on that?

24                MS. CHEN:  Your Honor --

25                MS. GILBERT:  Very, very few discussions, and it
```

```
 1   would not involve any of the defendants.  The source may
 2   have --
 3           MS. CHEN:  Karen, sorry, just to interject.
 4           Good afternoon, Your Honor.  This is Vanessa Chen
 5   from the Federal Public Defender's Office.  Just entering my
 6   appearance.
 7           THE COURT:  Thank you, Ms. Chen.
 8           MS. CHEN:  I'm Mr. Natale's co-counsel for
 9   Mr. Hubbard.
10           I just wanted to interject that on some of the
11   recording --
12           THE COURT:  Let me ask you to hold up, Ms. Chen, so
13   I can hear the lawyer who was speaking, but I'll be happy to
14   come back to you.
15           Let me turn back to counsel who was speaking to this
16   issue.
17           MS. GILBERT:  Yes, Judge.
18           THE COURT:  We were talking about when the list of
19   exhibits might be disclosed.  I think you were saying four to
20   five weeks before the anticipated trial date?
21           MS. GILBERT:  Yes, sir.
22           THE COURT:  Uh-huh.
23           MS. GILBERT:  And the recordings are in English.
24   And so counsel can listen to them just like we can.  There are
25   portions where there may be a very brief either greeting in
```

1  Arabic, or we have become aware that there were instances

2  where the source would take a phone call to a family member

3  and speak in Arabic.

4          So it's not a conversation involving the defendants.

5  And my understanding, other than sort of limited greetings and

6  prayers, the defendants do not speak Arabic.  So this is not

7  an instance where we have prolonged conversations between a

8  source and a defendant in a foreign language.

9          THE COURT:  Okay.  All right.

10         MS. GILBERT:  The conver --

11         THE COURT:  Thank you for that.  I appreciate that.

12         Now, let me turn Ms. Chen for a moment to see if she

13  needs to speak to that issue.  Ms. Chen?

14         MS. CHEN:  Yes, Your Honor.  Thank you.

15         And I just wanted to apologize to Your Honor and to

16  Ms. Gilbert for interjecting.

17         Ms. Gilbert is correct that the Arabic that is

18  spoken, it does seem to be in greeting, in prayers,

19  occasionally a phone call by the confidential source.

20  However, there are also instances -- and thus far we have

21  reviewed approximately two-thirds of the 285 hours provided

22  thus far -- in which the confidential source, along with our

23  client or some of the codefendants, listens to lectures that

24  are in Arabic and purports to translate the substance of those

25  lectures from Arabic to English.

```
1              And certainly from a defense perspective, unless and
2     until we're able to have our own independent translation, I
3     think we perhaps would be constitutionally ineffective for
4     merely relying upon the confidential source's interpretation
5     only.
6              THE COURT:  All right.  Thank you.
7              Mr. Nucci, could I turn back to you for a moment?
8              One of the issues that Mr. Natale mentioned is his
9     concern about the timely disclosure of Brady, Giglio, Napue
10    material.  It sounds to me like Mr. Natale's position has
11    merit to it, that there is a need to get this information out
12    as early as possible, and that's not really, unless we put it
13    under the concept of show complete remaining disclosures by
14    December 15th, it's not expressly addressed.
15             What is the Government's view at this point
16    regarding the disclosure of matters that we know now would be
17    classified as Brady or Giglio or Napue?
18             Did we lose Mr. Nucci?
19             MS. GILBERT:  Okay.  In light of that, may I answer,
20    Your Honor?  This is Ms. Gilbert.
21             THE COURT:  Yes.  What happened to Mr. Nucci, do we
22    know?
23             MR. NUCCI:  I'm sorry, I had the mute button on.
24    Usually I'm in court.  I can't press that button in court.
25             Look, our policy, our Department of Justice policy,
```

```
 1    is turn Brady information over reasonably as soon as we

 2    discover it, and I --

 3             THE COURT:  Well, let me just stop you, though, for

 4    a minute, if I might.  Did you understand the disclosure

 5    requirement in the schedule order to include Brady and Giglio,

 6    et cetera?

 7             MR. NUCCI:  Not per se.  It was more, to me, Rule 16

 8    discovery.  Because Brady -- whether you ordered it at a

 9    certain date, if I would have found Brady, say, a month ago,

10    unless there was some reason not to or we came ex parte to the

11    Court, our DOJ policy is to turn it over, unless there's some

12    reason not to that we address with the Court as soon as

13    practicable.

14             Giglio --

15             THE COURT:  Do you think that we need to set a date?

16    I think Mr. Natale would have no objection to your turning

17    things over early.  I think Mr. Natale, though, is concerned

18    about late disclosures, particularly when the defense is

19    attempting to fathom the parameters of the defense and to get

20    it lined up.

21             Would it make sense to have a deadline date for the

22    disclosure of Brady material?  Understanding that if something

23    else came out of the woodwork, clearly the Government's

24    obligation would renew at that point, but from your point of

25    view, does it make sense to set a discovery -- a Brady
```

```
 1    discovery disclosure date?
 2              MR. NUCCI:  No, it doesn't, because we're -- unless
 3    we go to the Court, we turn it over when we find it,
 4    generally.  And in something like this, it's -- we -- where
 5    we're still going through the electronics, through all the
 6    digital evidence, you know, that just can't be done in a day.
 7    And so we're -- you know, our job is to err on the side of
 8    turning it over.  So --
 9              THE COURT:  I understand that.  I understand that,
10    but hold on just a second.  I want you to just think this
11    through for a minute.
12              You seem to be saying to me that the Government's
13    policy is to turn it over as you find it.
14              MR. NUCCI:  Generally, yes.
15              THE COURT:  And that certainly makes sense.
16              The problem would be if we should get ourselves in a
17    problem down the road where something was not turned over, and
18    yet it could be established that the Government had it, would
19    that preclude its use by the Government?
20              Now, of course, it's Brady.  It would be useful to
21    the defense.  That's my concern.  Do we need to establish a
22    date, an end line date, when the Government is turning over
23    and can make a representation that it has turned over all the
24    Brady material of which it is aware?
25              MR. NUCCI:  Oh, well, again, of which it is aware is
```

```
 1    the key, and when we are aware of it, we turn it over or we
 2    come to the Court.
 3            I mean, if you said, well, how about at the end of
 4    December, I'd say, well, that presumes we've gone through all
 5    the other evidence, and as we're looking at it and we find
 6    something.  And, again, I mean, Your Honor is certainly aware
 7    of all the litigation in this area, the publicity, the DOJ
 8    efforts.  I mean, this is something we're acutely aware of.
 9    And so we, you know, err on the side of giving it.
10            So I do not fathom, without coming to the Court --
11    and, please, co-counsel, if you think I'm misspeaking, because
12    I'm only speaking to what is a nonclassified arena here -- if
13    we have Brady we get it to the defense or we go ex parte to
14    the Court maybe for a determination if it is indeed Brady,
15    because that's, you know, generally favorably -- favorable
16    evidence to the defense, or information that's exculpatory as
17    opposed to impeaching, and that they should have as soon as
18    possible, unless there's a reason.
19            THE COURT:  Okay.  Let me come back and ask you,
20    though, if you would to kind of globally respond here.
21            You've seen the defense request.  You, I assume,
22    were consulted, because the motion suggests it was unopposed.
23    Do you agree with the representations or the assessment that
24    the case really needs to be put off until October?
25            MR. NUCCI:  Given the amount of the discovery they
```

```
 1   have and what we still need to get to them, I don't know their

 2   schedule, but I -- yes, I think so.

 3              THE COURT:  All right.

 4              MR. NUCCI:  I mean, I know they've been working

 5   diligently, because I've talked to them.  It's a lot of

 6   material.  And, look, frankly they got a lot on the last day.

 7   I mean, you know, we've gone all through it, giving them --

 8   spacing it out, but they got a lot, and we got the holidays

 9   coming up.

10              I don't -- and I think those dates, it's not that

11   they wouldn't be working as hard as they can.  I would not say

12   that it's anything but a good-faith motion as I can see it.

13              THE COURT:  All right.  Thank you very much.

14              I've wanted to have this meeting with you, because I

15   intend to enter an order, and you'll understand it when you

16   see the order, but it was important for me to take the extra

17   step to talk with you.

18              I appreciated Mr. Natale being so thorough in

19   discussing the problems that he's run into.  I've looked at

20   his anticipated discovery, and I will leave that, because my

21   sense, in having read the two or three pages at the end of his

22   motion, is if it's discoverable under Brady or Giglio or

23   Napue, it would be turned over, and the Court will certainly

24   do it if it has to.  But there's a lot of material there that

25   is sought, and I think that's for another time.  And certainly
```

```
 1    as Ms. Vianale pointed out, the issue of whether the devices

 2    of various codefendants should be effectively turned over is

 3    another matter, too.

 4            I tend to agree with you.  This case is an

 5    enormously serious case just in terms of the charges and so

 6    on.  And more than anything else, I want to make sure that

 7    everybody is ready, that there are no surprises that come out

 8    of left field, and that whatever decisions need to be made,

 9    whatever assessments need to be made for people to make their

10    own individual judgments, that there's plenty of time to do

11    that, and that it's based on a thorough and accurate

12    understanding of what -- what is in the potential evidentiary

13    record.

14            So I think I'll stop at this point.  You've given me

15    the information that I felt I needed, and I'll have an order

16    out relatively quickly on these matters.

17            Is there anything else that someone needs to raise?

18    I'm in the middle of another evidentiary hearing, and I feel

19    that I need to stop, and I don't mean to prolong your time.

20    Does anyone else have any critical issue that you need to

21    raise?

22            MR. NATALE:  No, Your Honor.  I think it's time you

23    go back to work.

24            THE COURT:  I can suggest the same, but I'm

25    hesitant, because I see the motions that result when you all
```

```
 1   do that.  But you're all doing a great job, and thank you for
 2   what you're doing.
 3           Okay.  I'll get an order out to you relatively soon.
 4   Thank you.
 5           VOICES:  Thank you, Your Honor.
 6           THE COURT:  All right.  Thank you, everybody.
 7       (Proceedings concluded.)
 8                         *  *  *  *  *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                      * * * * *

2                    I N D E X

3    Telephonic Status Conference                    3

4                      * * * * *

5                  E X H I B I T S

6    (None.)

7                      * * * * *

8                    CERTIFICATE

9        I, Stephen W. Franklin, Registered Merit Reporter, and

10   Certified Realtime Reporter, certify that the foregoing is a

11   correct transcript from the record of proceedings in the

12   above-entitled matter.

13       Dated this 29th day of DECEMBER, 2016.

14

15       /s/Stephen W. Franklin
         _____
16       Stephen W. Franklin, RMR, CRR

17

18

19

20

21

22

23

24

25
```