# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO.: 16-80107-CR-ROSENBERG

UNITED STATES OF AMERICA,

     v.

DARREN ARNESS JACKSON,

     Defendant.

_____/

## DARREN JACKSON'S PRE-SENTENCE MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

Darren Jackson respectfully submits this memorandum in mitigation of sentence and in support of a motion for a downward variance. Based on the mitigating factors presented here, and other factors we will raise at sentencing, we ask the court to grant the Government's anticipated motion for a downward departure under Sentencing Guidelines § 5K1.1 and Mr. Jackson's motion for a downward variance based on the factors set out in 18 U.S.C. § 3553(a).

Mr. Jackson is 52 years old. He is loved by his children and former wife for his gentle manner and his dedication to his family. He has worked at demanding and difficult jobs his entire life to support his son and three daughters, whom he loves so much. His only prior arrests were for traffic incidents, and he has zero criminal history points. Mr. Jackson has soul-deep remorse that he didn't run for the hills when Greg Hubbard told him about his plans. Hubbard led, browbeating Mr. Jackson all the while, and Darren, during the few weeks he was involved in this offense, to his infinite regret, followed.

1

**List of Exhibits**

The following is a list of the exhibits attached in support of this Memorandum and Motion:

Exhibit A:   Letter in Support from Mr. Jackson's former wife, Nicole Hunt Jackson

Exhibit B:   Letter in Support from Mr. Jackson's 21-year-old daughter, Tajah Nuri Jackson

Exhibit C:   Letter in Support from Mr. Jackson's 20-year-old daughter, Jana Jackson

Exhibit D:   Letter in Support from Mr. Jackson's 20-year-old daughter, Nia Imani Jackson

Exhibit E:   Collected Letters of Support from the following family members:
Mr. Jackson's mother, Willie B. Jackson
Mr. Jackson's nephew, Alan S. James
Mr. Jackson's aunt, Sylvia Vaughn
Mr. Jackson's uncle, Harold Dae Crosby
Mr. Jackson's nephew's wife, JoAnn Leible-Harrison
Mr. Jackson's godmother Mattie Robinson

Exhibit F    Collected court documents showing sentences imposed on defendants who cooperated in other "traveler" cases

Exhibit G    Court documents for cooperating defendant Ahmed Mahamud in similar case, *U.S. v. Mahamud*, Case No. 11-CR-191-MJD (D. Minn.)

Exhibit H    "Who Are Sufi Muslins and Why Do Some Extremists Hate Them?", *New York Times*, Nov. 24, 2017

Exhibit I    Collected court documents showing sentences involving downward variances for defendants who pleaded but did not receive 5K1.1 motions in other material support cases

Exhibit J     Palm Beach County Sheriff's Office, Inmate Classification for Darren Arness Jackson

**Procedural Background**

Mr. Jackson and his two co-defendants were arrested on July 21, 2016 on a complaint which charged them under 18 U.S.C. § 2339B(a)(1) with conspiring to attempt to provide material support to a designated foreign terrorist organization. The complaint described a plan by defendant Gregory Hubbard for him and another individual, who turned out to be a government Confidential Human

2

Source ("CHS"), to travel to Syria to join ISIL, and the co-defendants' role in assisting Mr. Hubbard. After his arrest, Mr. Jackson agreed to assist the government in its investigation. On March 30, 2017, he signed an agreement to plead guilty and cooperate. D.E. 112, paragraph 9. He entered a guilty plea on April 4, 2017.  He has been in custody since his arrest, from July 26, 2016 until May 2, 2017 at Palm Beach County Jail, and since then at St. Lucie County Jail. His nine months of "lock-down" confinement at Palm Beach County Jail are described herein and provide additional grounds for a downward variance.

**IN ARRIVING AT A MINIMAL, REASONABLE SENTENCE,
THE COURT SHOULD GRANT A SUBSTANTIAL DOWNWARD
DEPARTURE UNDER GUIDELINES § 5K1.1 AND
AN ADDITIONAL DOWNWARD VARIANCE**

Sentencing a defendant who has cooperated with the government and on whose behalf the government moves for a departure under § 5K1.1 is a multi-step process.  First, the Court must calculate the advisory Sentencing Guidelines. Next, the Court must apply Sentencing Guidelines § 5K1.1(a) and determine the extent of the substantial assistance downward departure. After it has decided the length of the downward departure warranted by the substantial assistance motion, the district court is then obliged to take into account the sentencing factors set forth in 18 U.S.C. § 3553(a) in arriving at a just and reasonable sentence. *See United States v. McKay*, 447 F.3d 1348, 1356-457 (11th Cir. 2006)(describing this process).

A. **The Advisory Sentencing Guidelines Calculation and the Need for a Front-End Variance to Avoid Sentencing Disparity**

The Pre-Sentence Investigation Report correctly calculates the advisory Sentencing Guidelines for Mr. Jackson.  However, in this case, fairness and the need to avoid disparity require that the sentence imposed on Gregory Hubbard, rather than the advisory Sentencing Guidelines range, be the benchmark from which a departure and variance are calculated for Mr. Jackson.

A similar scenario faced the court in *United States v. Roberts*, 2015 U.S. Dist. LEXIS 129363 (S.D. Fla. 2015)(Judge King). The three co-conspirators in *Roberts* were sentenced by three separate judges. The defendant whom the parties stipulated was least culpable was sentenced last. The most culpable defendant received a 5K1.1 departure, and the next most culpable defendant received a variance to probation with 6 months' house detention. Judge King, sentencing the third, and least culpable, defendant, agreed that he was required to grant a variance to avoid disparity with the previously sentenced, more culpable defendants.

It is our understanding that the government and Mr. Hubbard will be jointly recommending a sentence of 12 years for Mr. Hubbard. In this circumstance, to avoid disparity, the Court should use the 12-year sentence imposed on Mr. Hubbard (or whatever sentence is imposed on him) as the starting point for calculating Mr. Jackson's departure and variance.  Mr. Jackson deserves a 5K1.1 departure from the advisory Sentencing Guidelines based on his cooperation to a level significantly below Hubbard's sentence, and a further downward variance based on the §3553(a) factors.

**B.  Mr. Jackson's Timely and Useful Cooperation Warrants a Substantial Downward Departure.**

Advisory Sentencing Guidelines § 5K1.1 provides guidance for courts evaluating a government motion for a cooperation-based downward departure. This Policy Statement states:

§5K1.1 Substantial Assistance to Authorities (Policy Statement)

Upon a motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has omitted an offense, the court may depart from the guidelines.

(a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5) the timeliness of the defendant's assistance.

Each of these factors supports a substantial sentencing reduction for Darren Jackson.

Mr. Jackson's assistance was timely and useful. This case falls into a category of cases frequently called "traveler" cases – that is, cases in which a defendant is charged with making plans to travel overseas to join ISIL or another banned organization.  These cases invariably involve an undercover officer or a non-law enforcement CHS. There are usually recorded conversations to confirm the defendants' statements, and that was the case here. However, even when there are recordings, the government needs live witnesses to identify voices, clarify garbled language, set the scene and tell the story. The undercover/CHS usually serves that role. In this case, however, the CHS was arrested, indicted, and convicted on new fraud charges while the case was headed for trial.  *See United States v. Mohammed Agbareia*, 17-cr-80089-KAM (S.D. Fla.). The nature of the CHS's new offense – a confidence type fraud -- powerfully undercut his credibility. The CHS's arrest made the availability of Mr. Jackson, as a potential additional witness, particularly useful, and distinguishes this case from the government's usually watertight traveler cases. Moreover, Mr. Jackson was informed of the CHS's impending arrest before his guilty plea.  He did not waver from his decision to plead guilty and cooperate, **even after he learned that the CHS was about to be charged with a new fraud offense**. Mr. Jackson's willingness to go forward with his decision to plead and cooperate, even after he learned the government's case had a wobbly wheel, speaks to the sincerity of his wish to be useful and cooperative.

In addition to submitting to multiple debriefings, Mr. Jackson provided the government with physical evidence from his and Mr. Hubbard's home, including Mr. Hubbard's handwritten draft of his farewell letter to his sister, told the government which of the laptops in his apartment belonged to Mr. Hubbard, and consented to various searches as the government sought additional physical evidence to present at trial. Mr. Jackson was also willing to testify at trial if he was asked to do so about all of these things and about his and Mr. Hubbard's role in the offense.

The risk to Mr. Jackson resulting from his cooperation, another 5K1.1 factor, also strongly favors a downward departure. Should Mr. Jackson face reprisal in jail, or after release, his age and physical condition could make him a particularly vulnerable target.  We expect to present additional evidence and argument on this factor at the sentencing hearing.

Although it is not a factor enumerated in 5K1.1, sentences imposed on other defendants who cooperated in traveler cases also support a substantial departure in this case. The factors that make cooperation in terrorism cases particularly meritorious, valuable, dangerous, and rare have factored into courts' giving very substantial sentencing reductions to the handful of defendants who have cooperated in traveler cases. Undersigned counsel's research discovered the following cases in which courts imposed sentences on defendants who, based on the court record, appear to have cooperated in other traveler cases:

| Case Name and Court | Charge of conviction | Date of sentence | Sentence Imposed |
|---|---|---|---|
| U.S. v. Yusuf, Case No. 15-CR-46-MJD (D. Minn.)(Judgment and Complaint attached) | 18 U.S.C. § 2339B(a)(1) | 11/14/2016 | Time served, 1 year, 8 months, 22 days |
| U.S. v. Warsame, Case No. 16-CR-37-MJD (D. Minn.) (Judgment and Complaint attached) | 18 U.S.C. § 2339B(a)(1) | 11/14/2016 | 30 months |

| U.S. v. Isse, Case No. 9-CR-50-MJD (D. Minn.)(Judgment and Indictment attached) | 18 U.S.C. § 2339A(a) | 5/14/2013 | 36 months |
|---|---|---|---|
| U.S. v. Ahmed, Case No. 9-CR-50-MJD (D. Minn.) (Judgment and Indictment attached) | 18 U.S.C. § 2339A(a) | 5/14/2013 | 36 months |
| U.S. v. Conley, Case No. 14-CR-163-RM (D. Colo.)(Judgment, Complaint and plea agreement attached) | 18 U.S.C. §§371 and 2339B (defendant was allowed to plead to §371 conspiracy, resulting in a five year statutory maximum) | 1/23/2015 | 48 months |

The judgments, and complaints or other documents verifying that these cases involved defendants in traveler cases, are collected at Exhibit F.  The case of *U.S. v. Mahamud*, Case No. 11-CR-191-MJD (D. Minn.), is not a traveler case, but is similar.  It involves a defendant who sought to send money to a terrorist organization. The defendant, who also appears from the court docket to have cooperated, pleaded guilty under 18 U.S.C. § 2339B(a)(1) to providing funds to a terrorist organization and received a 36-month sentence. The Judgment and Indictment in that case are attached as Exhibit G.  The final sentences in these cases may have involved both 5K1.1 departures and additional downward variances. But the bottom line for each of these cooperating defendants was a very substantial sentencing reduction, from a guideline sentence at or near the statutory maximum, to a sentence in the range of one year, eight months to four years.  We advocate for a sentence for Mr. Jackson in the range of these sentences that were given to cooperating defendants in similar cases.

      **C.**     **In Addition to Granting a 5K1.1 Departure, the Court Should Grant a Downward Variance Under 18 U.S.C. § 3553(a) Based on the Totality of Mitigating Circumstances, Including Mr. Jackson's Exemplary Personal History and the Mitigating Circumstances Surrounding his Involvement in this Offense.**

This offense is a shocking aberration to everyone who knows Darren Jackson. Those who know him best, including his former wife and daughters and the many other family members who have provided letters, know him to be kind, gentle, and hardworking.  He lived 50 years as a law abiding citizen, working long hours at difficult jobs.  He endured the grief of losing a beloved brother to murder and a sister to cancer. He loves his children and was always there to guide and help his three daughters. When Darren's father could no longer take care of himself, Darren brought him into his family's home to live.  Darren was, throughout his life, all things for all people.

The strain of having his father in the family home helped precipitate the end of Mr. Jackson's 25-year marriage, at the very end of 2015. (See PSR ¶91, statement by Nicole Hunt Jackson). Mr. Jackson was briefly, and painfully, adrift. It was at this emotionally fraught time that Darren found himself drawn into this offense by his friend Greg Hubbard.

Mr. Jackson is deeply remorseful.  He has done everything in his power to right the wrong he did, including offering to assist in the prosecution of Mr. Hubbard.  We respectfully urge that the 3553(a) factors combine to warrant a downward variance that will return Mr. Jackson to his family as soon as possible and allow him to rebuild his life.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011)(affirming lower court's consideration of post-sentencing rehabilitation in varying downward). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Id.*

8

As set forth in 18 U.S.C. § 3553(a)(2), the primary goal for the sentencing court is to

"impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth

in paragraph 2." 3553(a)(2) states that those purposes are:

> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> **(B)** to afford adequate deterrence to criminal conduct;
> **(C)** to protect the public from further crimes of the defendant; and
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) directs sentencing courts to consider

several factors in addition to the sentence range under the advisory guidelines, among them:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the kinds of sentences available; and
> **(3)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The goals of punishment and the relevant individual factors support a sentence for Mr. Jackson that

requires minimal incarceration beyond the almost two years he has already served.

### A. Mr. Jackson's Unblemished Personal History, Family Ties, and Personal Characteristics Show that this Offense Was an Aberration

Darren Jackson's offense is an aberration after 50 years as a devoted, law abiding father and

son. Like all humans, he has flaws and weaknesses. He strayed from the 50-year path of lawfulness

because he let human weakness get the better of him at a time when his life was in turmoil. In

evaluating this 3553(a) factor, the court should view as a mitigating factor that Mr. Jackson's offense

is an aberration, which occurred under extraordinarily stressful personal circumstances.

1. **Mr. Jackson's Early Life**

The Pre-sentence Investigation Report's section entitled "Personal and Family Data" accurately described Mr. Jackson's middle class upbringing in Hempstead, Long Island.  His mother, Willie Jackson, in her letter (Exhibit E) describes what Darren was like when he was young, stating:

> Darren was always a good man and when he was a young boy, I never had any problems with him or his behavior. He has always been so helpful and loving and he still is.  Even throughout his incarceration, he has been more concerned about its impact on me, than himself.  When Darren was in school he was a good student, obtaining A's and B's in many of his classes.
> ….
> He was never disrespectful to me and has always been there for me to help in any way possible. This incident is very unlike Darren's character.

Darren Jackson did all sorts of odd jobs to give himself pocket money and help the family when he was school age.  He had a particularly close bond with his brother, Rodney, who was 2 years younger than Darren. They did everything together and always watched out for each other. Everyone in the neighborhood called them the "twins."

Darren's parents are both still alive.  His father, Jack Jackson, who is 84, was living with Darren at the time of the arrest in this case. Darren's siblings recently moved him into a retirement community.  Willie Jackson, Darren's mother, is 82 and lives in Texas.

2. **Darren's Marriage to his Former Wife, Nicole**

When he was 22, Darren was working at a Post Office in Long Island when he met his future wife, Nicole. They dated off and on for several years, and were married in 1991. Their marriage lasted 25 years, through which they supported and nurtured each other, and raised three beautiful daughters, Tajah, the oldest (age 21), and 20-year-old twins Nia and Jana. Mr. Jackson took pride in providing well for his family. He learned hotel and restaurant management in the 1980's and held steady full time work at restaurants in New York and Florida through the 1990's.  Nicole had a dream

to become a lawyer. Darren manned the laboring oar at home and at work while Nicole got her education. She did the same for him when he entered the Boilermaker's Apprentice program in 2003.

3. **Darren Reeled from the Death in 1991 of his Brother Rodney**

Nicole Jackson, in her letter to the Court (Exhibit A, p. 2) talks about the shattering impact on Darren of his brother Rodney's murder in 1991. Courts have based variances on a defendant's mental health problems springing from the death of a defendant's sibling. *See, e.g., U.S. v. Wyatt*, 442 F. Supp. 298 (W.D. Va. 2006)(granting a departure where the defendant had been treated for mental health problems attributed to the deaths of her brother and two close friends).

Darren had a close relationship and great fraternal love for his brother Rodney. They shared life's highs and lows, and relied on each other for counsel and support. When Darren left New York for Florida, he tried to get Rodney to move with him. The old neighborhood had become dangerous, and Darren missed his brother. In 1991 Darren thought he had finally persuaded Rodney to move to Florida. Unfortunately the danger Darren hoped to protect his brother from caught Rodney first.

In 1991, Darren's brother was shot dead while walking on the street near his home in Hempstead. Darren was devastated. He began drinking heavily, and went into a deep depression. He never fully recovered from this loss. An older sister of Darren's, the sister to whom he was closest, died of cancer later in the 1990's. Drawing on her 25 years with Darren, his former wife Nicole believes that these losses had a lifelong effect on Darren, and contributed to his involvement in this offense. She states in her letter:

> One of the most significant events that I believe brought Darren here is the loss of his baby brother. Eight months before our marriage in 1991, his only brother was murdered. As a young adult, his brother lived in a tough neighborhood. Despite his mother's best efforts and Darren's suggesting that he should relocate to Florida, he remained in NYC. In 1991, he was struck down by a stray bullet, returning home from a trip to purchase a late night snack. This loss of his only brother crippled Darren for many years and resulted in his longing to replace this stolen brotherhood. He often developed unhealthy alliances, as a result. To add insult to

11

injury, as he began to recover from his brother's murder, he lost his older sister in 1996. She passed away when we were expecting our first child.

4. **Mr. Jackson Found Solace in Study of the Strain of Islam Known as Sufism**

To borrow Nicole's word, Mr. Jackson was "crippled" after the deaths of his brother and sister. It was at this time that he began to study the Islam religion, and specifically the strain of Islam known as Sufism. Mr. Jackson has been part of a weekly prayer group of Sufi Muslims at his local mosque for many years.

The basic tenets of Sufism are explained in the *New York Times* article attached as Exhibit H, "Who Are Sufi Muslims and Why Do Some Extremists Hate Them?" Sufism is a form of Islam that "emphasizes introspection and spiritual closeness with God." Exhibit H, p. 2. Alexander D. Knysh, a professor of Islamic studies at University of Michigan, is quoted in the article, stating that "In modern times, the predominant, leading view of Sufi Islam in one of 'love, peace, tolerance.'" Exhibit H, p. 3. This is the strain of Islam Mr. Jackson has followed for as long as he has been a Muslim.

The *New York Times* article explains that extremists in the Middle East have been targeting Sufi mosques. The article ran days after a November 2017 attack in which militants stormed a Sufi mosque, killing 305 people. The article explains that "some fundamentalists and extremists see Sufism as a threat, and its adherents as heretics or apostates." Exhibit H, p. 3. This is the strain of Islam Mr. Jackson has aligned himself with his whole life – the "tolerant" strain of Islam that many extremists hate.

5. **Darren Worked Tirelessly to Provide for his Family**

Mr. Jackson entered the Boilermakers Union 13 years ago, with a goal of improving his ability to support his family. To lift his earning prospects, he gravitated to a comparatively lucrative specialty, working on the high pressure steam tanks in nuclear power plants. Although

well paid, this work required him to travel nationwide and be away from home for sometimes weeks at a time.  He missed his family when he was away, and the travel made it difficult for him to develop local friendships.  Nicole in her letter put it as follows:

> Darren's children mean the world to him. He always wanted them to have the best and he made sacrifices to provide them with a beautiful home and security.  Darren often traveled far away (he once worked in Alaska) and under dangerous conditions (his position as a boilermaker for the majority of his career placed him in nuclear plants) to provide for our family well.

Unfortunately, Mr. Jackson's conviction in this case will bar him from this work by preventing him from obtaining the security clearance needed to enter and work in nuclear power plants. This disability is an additional penalty Mr. Jackson faces for his involvement in this offense.

### 6.  Darren Jackson 25-year Marriage Fell Apart in the Months before He Was Drawn Into this Offense

Mr. Jackson was drawn into this offense at a time when his life was in turmoil.  This helps understand how he went so wildly off course.

In their letters, Mr. Jackson's family members speak again and again of his family devotion and his being always willing to help. Darren's father had suffered a stroke and was unable to live independently.  Mr. Jackson could not bear the thought of his father being put in a home, and none of his sisters would welcome him.  So Mr. Jackson and his wife brought his father to live with them.

Even a strong marriage can falter when faced with the need to care for an infirm parent, and, sadly, that is what happened to the Jacksons.  Nicole Jackson in her letter explains what happened,

> In 2014, [Darren's father] came to live in our home. Despite our efforts to provide him with occupational therapy, his functioning was very limited.  He needed help with all the necessary tasks involved in self-care. Both of us, along with our children made every effort to care for him.  Darren struggled with providing care for his elderly, infirmed father. His father lived with us for two years before our divorce and had lived with us in the past.

After our separation, Darren and his father moved into their own apartment.  Darren didn't
have sufficient support from most family members to adequately provide for his father's
care.  He made every effort but seemed to buckle under the pressure while striving to do his
best for his Dad, despite the lack of support and his many other responsibilities.

Darren was adrift without his family.  His twin daughters were still in high school. Though they
texted him every day, he missed seeing them. He also missed the love and support he had enjoyed
when living with his wife and daughters.

Darren wasn't able to care for his father alone. He needed to work, and sometimes needed
to travel. In February 2016, when Mr. Jackson was still very much in the turmoil of his recent
separation, he turned to a friend, Greg Hubbard, and asked him if he would move in with him, rent
free, and assist in caring for Darren's father. This placed Mr. Jackson, for the first time, at close
quarters with Mr. Hubbard.

### 7. Darren Jackson Is a Kind, Generous, and Soft-Spoken Man, Who Loves and is Loved by his Family

The letters from family attached as Exhibits A – E tell the story of Darren Jackson's character.
The words ""kind," "helpful," "loving" resonate again and again.  He and his former wife raised
three beautiful daughters, all now in college.  Their letters on behalf of their father say everything
about what kind of man he is. Paragraph two of Nia Jackson's letter (Exhibit D) is heartbreaking, as
it lists all the things she still needs from her father and how much she misses him.

Nia in her letter also strikes on a virtue which, unfortunately, contributed to Mr. Jackson's
involvement in this offense.  She states:

The man I know and love and that I grew up clinging to would not knowingly or intentionally
hurt anyone.  My dad has never had many friends.  His family, my sisters, my brother and I
have always been his world, however, the friends that he had were often lifelong friends that
he cared for deeply and sincerely.

Exhibit D.  Nia also speaks of Darren Jackson's "kind-hearted, push over nature." *Id*.  This quality
is echoed by Jana Jackson.  She states that her father taught her "patience, kindness, and that a quiet

14

presence is the loudest company." *See* Exhibit C.  She goes on, "I have never seen him intrude on

another's space or overstep another's boundaries.  He is a humble man who has the ability to fil a

room with laughter."  Exhibit C, p. 2.  Nicole Jackson also speaks of her husband's "[q]uiet, non-

confrontational nature." Exhibit A, p. 2.

Mr. Jackson is by disposition quiet, kind, and non-confrontational -- a man who would do

anything for a friend and would 'never intrude on another person's space.'  These qualities, virtuous

in most cases, contributed to Mr. Jackson being drawn into this offense.

B. **Mr. Jackson's Involvement in the Offense Was Limited, and Marked by a Bullying, Controlling Relationship between him and Mr. Hubbard**

Section 3553(a) also directs courts to consider the nature and circumstances of the offense.

Mr. Jackson was a follower, not a leader, not even an equal partner, in this offense.  Moreover, he

was, throughout the period of his involvement, bullied by Hubbard.

Based on the tape recorded evidence, Mr. Hubbard's temperament is the polar opposite of

Mr. Jackson's. Darren Jackson is quiet and non-confrontational. Mr. Hubbard is in your face and

unrelenting. The tape recorded conversations show Hubbard stubbornly insisting, time and again,

that his view, whatever the topic, is right.  Even though Mr. Hubbard pushed him around, Mr. Jackson

had known Hubbard a long time, and he valued his friendship. Nicole Jackson opines in her letter

(Exhibit A, p, 2) that this relationship appeared to be an example, like others she had seen in the past,

of Mr. Jackson seeking to replace the close bond he lost when his brother died. You would surely be

hard pressed to find two men more different, or a relationship with a more unequal balance of power.

The CHS, in a conversation recorded on July 16, 2016 commented on the inequality of the

relationship between Hubbard and Jackson, stating that Jackson "cannot say no to [Hubbard].  He's

controlling him." The CHS talked about an argument he observed between Hubbard and Jackson,

and said he saw "tears in his [Jackson's] eyes." In his post-arrest statement, Mr. Jackson told the

investigators about Hubbard's relentless negativity, such as statements bashing Muslims in the United States. Jackson had learned, especially after they began to live together, that saying no to Hubbard was usually hopeless. So, for instance, rather than confront Mr. Hubbard and admit he was never going to join him in Syria, Jackson lied and said he would go after he had learned more about Islam, learned Arabic, and gotten in shape. (*See* PSR para. 52). Mr. Jackson was not studying Arabic and could hardly walk from the pain in his back. Hubbard correctly acknowledged to the CHS in a recorded conversation that Mr. Jackson would never leave the U.S. because he was committed to the "dunya," that is, the material world.  Mr. Jackson told the investigators in his post-arrest statement that when the CHS asked him to drive him and Hubbard to the airport, all he could think was how glad he would be to have Greg Hubbard out of his life.

Mr. Jackson's involvement in the offense also extended over a short period of time. The offense conduct descried in the PSR began on April 11, 2015.  The PSR contains four pages of narrative before Mr. Jackson is first mentioned, in connection with a meeting on May 11, 2016. In the course of the 15-month narrative described in the PSR, Mr. Jackson was involved for only the last 2 months and two weeks.

Mr. Jackson accepts responsibility for the role he took in this scheme. That this mild and non-confrontational man was led into this offense by his over-powering friend is relevant in mitigation of sentence.

### C.  The Period of Supervised Release that Will Follow Mr. Jackson's Incarceration Will Be the Most Important and Beneficial Element of His Sentence.

Looking at the kinds of sentences available, whatever additional prison sentence Mr. Jackson receives will not be the only, or even the most impactful portion of his sentence. We ask the Court to impose a sentence which favors supervised release over protracted additional incarceration.  Mr. Jackson's strong family ties, particularly to his daughters, will give him the support he needs to

succeed when released. Time away from his daughters, along with his missing graduations, birthdays, and other joyful milestones, is heartbreaking to both Mr. Jackson and his daughters. Mr. Jackson is grateful that his family's love for him has been sustained during the last almost two years of confinement. In their letters in Exhibits B-D, each of Mr. Jackson's daughters talks about missing Darren's guidance and his quiet, loving presence. Returning him to his family, by favoring supervision over prison, will assure that these ties remain strong.

In addition, as the PSR states (paragraphs 95-96), Mr. Jackson needs surgery on his back; he was scheduled for surgery the day after he was arrested. If Mr. Jackson will be incarcerated for an additional term of years, this surgery will have to be either deferred, meaning a sentence to a term of painful incarceration, or performed in prison. Again, supervision instead of jail would allow Mr. Jackson to have this surgery performed by his own doctor and at his own expense.

**D. The Need to Avoid Unfair Sentencing Disparity Also Supports a Downward Variance**

The potential for unfair sentencing disparity in this case has two aspects. First, Mr. Jackson is the least culpable and most worthy of leniency of the three defendants. To avoid unfair disparity among the defendants, he should receive the shortest sentence of the three defendants. *See United States v. Roberts*, 2015 U.S. Dist. LEXIS 129363 (S.D. Fla. 2015). In addition, disparity should be avoided in consideration of sentences that have been imposed in similar cases in other districts.

Mr. Jackson should receive a sentence substantially shorter than the sentence imposed on Mr. Hubbard. Hubbard was the driving force who recruited Mr. Jackson. Hubbard browbeat and harangued Mr. Jackson throughout the period of this offense. Mr. Hubbard also held out until the eve of trial to accept responsibility for his offense. Mr. Jackson should also receive a sentence below the sentence of co-defendant Dayne Christian. Mr. Christian was involved in the offense over a longer

and more sustained period of time than Mr. Jackson. Christian also has a prior conviction; Mr. Jackson has none.

In addition, the Court should consider the leniency that has been shown in similar cases. We provided at Exhibit F information regarding sentences in the 1.75 – 4- year range imposed on other cooperators in "traveler" cases. These should be the benchmark for sentencing Mr. Jackson. Recent sentences imposed on non-cooperators in material assistance cases are also worth considering as the court strives to avoid disparity.

The Sentencing Guidelines for terrorism crimes have during all relevant times resulted in defendants in these cases having advisory Sentencing Guidelines ranges at or above the statutory maximum; this was the case when the maximum sentence was 15 years, and it remained the case when the statutory maximum increased to 20 years on June 2, 2015.  Both before and after the statutory maximum was raised, courts have granted non-cooperation based variances in material assistance cases which yielded sentences below, at, or only slightly above eight years (96 months). The following table provides information on traveler cases, and similar "material assistance" cases our research has identified[1]:

| Case Name and Court | Charge of Conviction | Date Offense Ended and Applicable Statutory Maximum | Sentence Imposed |
|---|---|---|---|
| U.S. v. Qamar, Case No. 16-cr-227 (E.D. Va.)(Judgment and Complaint affidavit attached) | 18 U.S.C. § 2339B | 6/10/2016 – 20 year statutory maximum | 102 months |
| U.S. v. Farrokh, Case No. 16-cr-20 (E.D. Va.)(Judgment and Complaint affidavit attached) | 18 U.S.C. § 2339B | 1/15/2016 – 20 year statutory maximum | 102 months |

---

[1] The judgments and the charging documents describing these offenders' offenses are collected in Exhibit G.

18

| U.S. v. Dakhlalla, 15-cr-98 (N.D. Miss.) (Judgment and Complaint affidavit attached) | 18 U.S.C. § 2339B(a)(1) | 8/8/2015 – 20 year statutory maximum | 96 months |
|---|---|---|---|
| U.S. v. Wolfe, Case No. 14-cr-213 (W.D. Tex.)(Judgment and complaint attached) | 18 U.S.C. § 2339B | 6/17/2104 – 15 year statutory maximum | 82 months |
| U.S. v. Avin Brown and Akba Jordan, 14-cr-58 (E.D. N.C.)(Judgments and Complaint affidavit attached) | 18 U.S.C. § 2339A | 3/19/2014 – 15 year statutory maximum | 92 months for Brown; 108 months for Jordan |

This chart does not represent the universe of sentences imposed on non-cooperating "travelers" in cases under 18 U.S.C. § 2339A. However, it shows that courts in multiple districts, before and after the statutory maximum increased, in cases factually similar to this one, have imposed sentences on pleading *non-cooperators* in the eight-year range. To adequately recognize and reward Mr. Jackson's cooperation, and credit the mitigating factors supporting a variance, Mr. Jackson should receive a sentence considerably lower than what non-cooperators have recently received when they pleaded guilty to the same or similar offense.

### E. Mr. Jackson's Prospects are Excellent for Successful Rehabilitation and to Not Re-offend, Based on a Host of Favorable Factors, Including his Clean Prior Record and Exemplary Work History, His Strong Family Support, his Age, and his Complete Renunciation of His Offense.

A defendant's admission of responsibility and expression of contrition "is often a significant first step toward his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence." *Smith v. Wainwright*, 664 F. 2d 1194, 1196 (11th Cir. 1981).  Mr. Jackson has not only accepted responsibility; he agreed to cooperate with the government. These are the actions of a man who has disavowed everything involved in his offense.

Mr. Jackson has no history of criminal violations, which makes full rehabilitation more certain. That this offense occurred at a time of personal upheaval - the end of his marriage, the need to care for his father – gives credence to its being an aberration, and unlikely to be repeated. His

19

age is also a factor favoring a low probability of reoffending. A 2016 report by the United States

Sentencing Commission, entitled *Recidivism Among Federal Offenders: A Comprehensive*

*Overview*, concluded that a defendant's age at the time of his release was closely associated with

differences in recidivism rates. *Recidivism Among Federal Offenders: A Comprehensive*

*Overview*'s, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2016/recidivism_overview.pdf (accessed May 2, 2018), at p. 5. This overview

concludes: "studies have repeatedly shown that older offenders at sentencing are at lower risk for

reoffending, and the Commission's research confirms these findings."  *Id*. p. 23.  Mr. Jackson will

be 53 in September. His age when he will appear for sentencing, 52, and the fact that he got to this

age without incurring anything more serious than a traffic infraction, place him in the class of

offenders with a lower than average risk of reoffending.

The love and support of Mr. Jackson's family will be a very powerful impetus to his

successful rehabilitation. Mr. Jackson's lifetime of steady employment gives every promise that he

will quickly find employment when released.  Indeed, his nephew has offered him a job with his

business, so there is an employment opportunity waiting for Mr. Jackson.

Finally, Mr. Jackson has used his time in custody to study his faith, focusing as he always

has, on "tolerant," God-centered Sufism. In the statement in the PSR in support of acceptance of

responsibility (paragraph 69), he reaffirmed his life-long devotion to Sufism and its anti-violence

message.

Darren Jackson's remorse is boundless.  He is grateful that his family stands by him, and

determined to never disappoint them again. The combination of factors in this case described above

provide a basis for the court to conclude that neither the punishment goal of individual deterrence,

nor any of the other goals of punishment, will be served by protracted additional incarceration for Mr. Jackson.

**AN ADDITIONAL DOWNWARD VARIANCE IS WARRANTED BASED ON THE CONDITIONS MR. JACKSON ENDURED DURING HIS PRETRIAL CONFINEMENT**

Mr. Jackson has been held in pre-trial confinement since his arrest on July 26, 2016. For just over nine months, from July 26, 2016 until May 2, 2017, Mr. Jackson was held at the Palm Beach County Jail. *See* Exhibit J, Palm Beach County Sheriff's Office, Inmate Classification. As the record at Exhibit J indicates, Mr. Jackson was held initially in "administrative segregation with full restrictions," and then in "administrative confinement." Both of these security classifications required him to be housed in a cell alone. His cell had a single window, about 4-inches wide, a bed and a toilet. For those nine months, all movement from his cell, including for attorney visits and medical visits, had to be with a "2 Deputy escort with Supervisor." See Exhibit J, page 3.

Mr. Jackson was held in a solitary cell throughout his nine months at PBCJ. From July to December, he was in the last cell at the end of a corridor, far from the stimulation of the TV that ran in the day room (a room which he was never able to actually visit). Other inmates in the segregation unit several times decided to annoy the staff by causing the toilets to overflow, which poured toilet water across the floor and into the cells. Mr. Jackson's cell at the end of the hall was a particularly bad place to be when this happened. Mr. Jackson's meals were delivered to his cell and eaten alone. His vegetarian tray was labelled by name; other inmates who could talk to him from their cells told him that the prisoners working in food service were tainting his food. Who knows whether this was true, or just said to torment Mr. Jackson. Mr. Jackson was escorted to the shower twice a week (sometimes less), and had recreation rarely, about a dozen times during the entire nine months. His rare recreation opportunities were an hour long, in a caged area outside, alone.

21

When Mr. Jackson was moved from his cell, it was with a three-guard escort, with Mr. Jackson in handcuffs. He was cuffed throughout all our attorney visits, sometimes with his hands cuffed behind his back. On these occasions, when he was cuffed behind his back, he would be in constant pain because of the pressure the unnatural posture put on his back. Being in solitary housing for nine months at PBCJ made his period of pretrial incarceration particularly punitive.

In addition to being housed in solitary confinement, Mr. Jackson endured unremitting back pain throughout his 2 years of pretrial incarceration. As the Pre-Sentence Investigation Report explains (paragraphs 95-96), Mr. Jackson has a back injury resulting from two automobile accidents. He had been scheduled to go in for a laminectomy to repair his back the day after his arrest. Mr. Jackson still needs this surgery, and he has suffered with back pain throughout his incarceration.  He receives Advil daily in the jail, and does the back exercises his doctor recommended. But his not having had the surgery he needed meant that he suffered throughout his pretrial incarceration.

The Eleventh Circuit held in *United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003), that the harsh conditions of pre-trial housing to which a defendant was subjected can provide grounds for a downward variance.  The defendant in *Pressley* had been held for five years of pretrial detention in 23-hour lockdown in USP Atlanta.  The district court had held that Pressley's years of pretrial "lock down" could not support a variance as a matter of law. The Eleventh Circuit reversed, and stated that the district court had the authority to consider both the length and conditions of Pressley's pretrial solitary confinement as a basis for a downward variance.

Mr. Jackson's nine-month subjection to lock-down distinguishes his experience in pretrial confinement from the usual defendant; his experience was far harder. This was made worse since he suffered from a back injury that required surgery which was deferred due to his incarceration.

The circumstances of Mr. Jackson's confinement at PBCJ provide an independent basis for a downward variance.

**Conclusion**

For all of the foregoing reasons, we respectfully ask that the Court impose a sentence similar to those in the 2 year – 4 year range imposed on other cooperating defendants in similar cases. *See supra* p. 6-7 and Exhibits F and G.

Dated:  May 9, 2018                                    Respectfully submitted,

                                                          s/ Julie Prag Vianale
                                                          Julie Prag Vianale (FBN 0184977)
                                                          Attorney for Darren Arness Jackson
                                                          Vianale & Vianale LLP
                                                          5550 Glades Road, Suite 500
                                                          Boca Raton, FL  33431
                                                          Tel: (561) 392-4750
                                                          jvianale@vianalelaw.com

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that she filed the foregoing document on May 9, 2018 using the Court's CM-ECF system, which will cause a true and correct copy to be sent electronically to:

Edward C. Nucci, Esq.
Assistant United States Attorney
Southern District of Florida
500 S. Australian Ave., Suite 400
West Palm Beach FL  33401-6235
Edward.Nucci@usdoj.gov

Karen E. Gilbert, Esq.
Assistant United States Attorney
99 NE 4th Street, Suite 800
Miami, FL 33132
Karen.Gilbert@usdoj.gov

Anthony John Natale
Federal Public Defender's Office
150 W. Flagler Street, Suite 1500
Miami FL  33130-1556
Anthony_Natale@fd.org

Michael Salnick, Esq.
1645 Palm Beach Lakes Blvd., Suite 1000
West Palm Beach FL  33401
msalnick@fblaw.com

s/ Julie Prag Vianale
Julie Prag Vianale (FBN 1084977)
Vianale & Vianale LLP
5550 Glades Road, Suite 500
Boca Raton, FL  33431
Tel: (561) 392-4750

# Exhibit A

February 6, 2018

The Honorable Judge Robin Rosenberg
U.S. District Judge
Southern District of Florida

Nicole Hunt Jackson, Esquire

Please accept this correspondence on behalf of my ex-husband, Darren Jackson.  Thank you, in advance, for taking the time to allow me to share my thoughts about Darren and the impact your sentencing ruling will have on his and our family's future. By way of introduction, I am a local attorney, practicing law for over twenty-two years, admitted in both Florida and New York, and the Southern District, as well.  Darren and I raised three beautiful daughters, who are all attending college and pursuing their life's dreams and goals.  Today, I practice and work closely with one of the oldest and most established law firms in Palm Beach County.  With Darren's support, I was able to complete my education and do what I had dreamed of from the time I was a little girl. While we had our challenges, we worked together on so many issues, as married couples do.

Darren Jackson, my high school sweetheart, is the love of my life.  When we first met, I quickly realized how this young man with a kind, sweet, demeanor, would steal my heart.  I have never stopped loving Darren, even though I decided that I needed to let him go.  For nearly thirty years, I have loved him and I suppose I always will.  At this point, I am sure you may be questioning why I am supporting a man who certainly has disappointed me and who is no longer my husband.  The answer is simply this: Darren is a good man, with a good heart who genuinely cares for others.  Despite his many challenges, he is an awesome father and has always showered our girls with love in the midst of it all. His current situation is more heartbreaking to me than anything he may have done that hurt me. The devastating impact this situation has had on our family and more specifically, our children, is difficult to describe within the four corners of this brief letter.

Darren has suffered with chronic, debilitating neck and back pain for several years.  In July 2016, he was preparing for back and neck surgery, more specifically, an anterior cervical discectomy with fusion at level C/5 through C/7 and a right-sided microdiscectomy with laminotomy at L/4 through S1, hoping that it would provide sufficient relief so that he might be able to continue working, providing for our girls, and assisting our twin daughters, who were beginning their college careers that upcoming August. He was arrested the day before his scheduled surgery. Instead of sharing with their father the excitement of preparing for college, our daughters began their college education struggling with the concept that their Dad, with no criminal history, whom they love dearly, was in a jail cell. Instead of helping them unpack and settle into their dorm rooms, he was sitting in a cell evaluating the consequences of the actions that placed him there.

After much reflection, I believe I understand what led Darren to involve himself in this very serious situation.  My primary wish throughout the course of our twenty-five-year marriage was to help him navigate through his challenges more successfully, attempt to give him wise counsel to assist him with avoiding poor choices, like the ones that brought him here.  Darren has always

been a good man, taking ownership for his mistakes, and has always been a hardworking man. When we met, he was working as a cook and in the evenings for the U.S. Postal service while attending school part-time. Even with physical limitations that often brought him to tears, along with the emotional challenges he struggled with on a daily basis as a result of the tragic loss of his younger brother, Rodney in 1991 and his older sister, Hazel in 1996, he did everything he could possibly do to provide for his family, which included myself and our children, his parents, siblings and our extended family. Darren's children mean the world to him. He always wanted them to have the best and he made sacrifices to provide them with a beautiful home and security. Darren often traveled far away (he once worked in Alaska) and under dangerous conditions (his position as a boilermaker for the majority of his career placed him in nuclear plants), to provide for our family well.

I believe that Darren's struggle to adequately face the emotional challenges he had, as a result of a lifetime of traumatic events very likely played a significant role in how he arrived here today, a place I never imagined he could ever be. Darren grew up with a loving mother and an abusive father. Darren's father suffered several strokes through his lifetime. In 2014, he came to live in our home. Despite our efforts to provide him with occupational therapy, his functioning was very limited. He needed help with all the necessary tasks involved in self-care. Both of us, along with our children, made every effort to care for him. Darren struggled with providing care for his elderly, infirmed father. His father lived with us for two years before our divorce and had lived with us in the past. After our separation, Darren and his father moved into their own apartment. Darren didn't have sufficient support from most family members to adequately provide for his father's care. He made every effort but seemed to buckle under the pressure while striving to do his best for his Dad, despite the lack of support and his many other responsibilities. Mistakenly, he relied on non-family members, when ideally, he never should have had to. Nevertheless, he had a firm ongoing commitment to caring for his elderly father, even if it was at his own expense.

One of the most significant events that I believe brought Darren here is the loss of his baby brother. Eight months before our marriage in 1991, his only brother was murdered. As a young adult, his brother lived in a tough neighborhood. Despite his mother's best efforts and Darren's suggesting that he should relocate to Florida, he remained in NYC. In 1991, he was struck down by a stray bullet, returning home from a trip to purchase a late-night snack. This loss of his only brother crippled Darren for many years and resulted in his longing to replace this stolen brotherhood. He often developed unhealthy alliances, as a result. To add insult to injury, as he began to recover from his brother's murder, he lost his older sister in 1996. She passed away when we were expecting our first child. He also lost a long-time friend. His dear friend Derrick, another good man for whom he served as a groomsman in his wedding, died of a heart attack at a young age a few years ago. These losses were immeasurable for him. It seemed that Islam gave him the peace he needed to cope with these losses and his thirst for brotherhood seemed to be quenched. This need, along with his quiet, non-confrontational nature, I'm certain played a huge role in how he made it to this place in his life. The Darren I know is kind, loves his family, would do anything to protect his family and for the people he cares for, and couldn't hurt a fly. I've never been afraid of him or afraid of being harmed by him. Given his losses, I can't imagine that he would participate in anything that would cause innocent people to be harmed. I'm sure, given the pressures he was experiencing, including the disintegration of our marriage, he failed to recognize the seriousness of what he was involving himself in. It's clear to

me that his judgment had to be comprised, as our family was falling apart, and as he struggled with his need to provide care for his father.

Had we been together, and had he spoken to me about this situation, I would have taken any opportunity to advise him, as a wife and life partner would, to make sure he did not follow the path that led to this. I'm undoubtedly confident that had he taken the time to evaluate the circumstances, he would have determined that different choices would have been more appropriate. Clearly, his conduct has benefitted no one and his decisions do not comport with the man I know or his character in general.

It is very evident to me that Darren is remorseful about his decisions and has learned a valuable lesson as a result. He has a family that loves him and although we are no longer married, my love for him remains. He provided for my family and loves my girls who long for an opportunity to see him whole and hug him again. Please consider this letter a request for this honorable court to have mercy on Darren. I'm so sure that Darren's situation is a result of a misguided attempt to replace the love he shared with his brother, and that this quest for brotherhood led to some unhealthy longtime friendships and to the actions that followed. Darren has been a hardworking family man. So much so, that even throughout most of his incarceration, thus far, his children were still able to have insurance coverage through his employer and be provided for due to his work ethic. In addition, given his many challenges, I'm impressed by the exemplary manner in which he has handled his incarceration, from providing positive encouragement to other inmates, to being a model prisoner. This, in my opinion, only exemplifies the kind of man he is and the grace which I only hope will be extended to him considering his absence of prior criminal behavior and his contributions to the community and society as a whole.

While we may no longer be married, Darren has and always will have a special place in my heart, along with my genuine concern and sincere affection. I have visited him on a regular basis to encourage him and only hope that the struggles he has experienced, some of his own doing, will be behind him soon. Through prayer, reflection and supplication, I know that this experience has helped Darren gain insight into himself. I know that Darren is committed to his own rehabilitation, that he is a danger to no one and poses no threat if he were to be released. The stakes remain high for him, as he misses out on his daughters' milestones, including birthdays (our eldest turned 21 in October of last year) and graduations and he continues to suffer from pain, given his inability to have followed through with his scheduled surgery over a year ago. Please know that I am personally invested in helping him so that he can once again be an integral part of our family's life, help others as he always has and be the outstanding citizen that he once was. Darren has been a good son, good father and person in general. Quite frankly, he once was a good husband. I have personally witnessed him over the years engage in quiet acts of charity and uncommon decency to those less fortunate than him. Darren has been a productive member of society and I would hate to see his incarceration continue to prohibit him from continuing to do so. I truly believe that a harsh sentence would destroy his chance and possibly my daughters' futures as they continue to attempt to reconcile how their loving father could be in jail and not there for them as he consistently has been. His family loves him dearly. Upon his release he will continue to be loved and supported by his entire family. Despite his poor choices, he is a vital asset to our family and the community.

Thank you once again for taking the time to read my letter.  I respectfully request that this Honorable Court have mercy on Darren as it imposes his sentence.


Respectfully Submitted,


Nicole Hunt Jackson, Esquire

# Exhibit B

Tajah Nuri Jackson

The Honorable Judge Robin L. Rosenberg
U.S. District Judge
Southern District of Florida

Re: Darren Jackson

To the Honorable Judge Robin L. Rosenberg:

I am writing this letter on behalf of my father Darren Jackson. Being the eldest daughter of three girls I have had the privilege of having my father in my life just a little longer than my siblings. I consider that alone a blessing. Not a lot of people I know can say their father has been there throughout their 21 years of their life. Even given the circumstance he is currently facing, he refuses to let this stop him from being my father. From lectures, everyday advice and even dating advice. My dad, Darren Jackson, will continue to raise us even though he has been limited to fifteen-minute phone calls in confinement. My father has always had a caring, and giving heart. In my opinion, this genuine heart is unfortunately part of the reason he is in this predicament but also speaks to his lack of a criminal record. He is not built this way. My father is not a criminal. I have learned that most people that experience tough times in life, tend to develop a hardened heart. However, even with some of the traumatizing events that've taken place in my dad's life, he has not allowed it to change who he is. Most would never guess, how many horrible things have happened to him, knowing him. I remember the day my mother called me and told me the devastating news about my father. I just cried in disbelief. It didn't make sense and to this day it still doesn't make sense. This is something so out of my father's character. Helping a friend, I completely understand. Committing a crime, I will never understand. I was more in disbelief and shock than anything. My dad's actions do not add up to the character of the man I know and the noble man that raised me my whole life. I am in no way excusing my dad's actions and his involvement that placed him in this predicament, I only ask that you please consider my father for the man I know he is and not the mistakes he has made. My dad has missed so many milestones in my life since he's been gone and I believe that alone is punishment enough. For such a supportive and naturally involved parent, I'm certain this is hurting him the most. The thought of my dad missing anything else in my life pains me, and brings me to tears. I envision my dad welcoming me at my college graduation in May with roses and a huge proud smile and the thought that this may not be possible is unbearable. My father is a good man, a good father and a good person. My dad has a huge heart, it shows in the way he has cared for me, and our entire family. Your honor I pray that you open your heart towards him during his time of sentencing. I know he regrets the role he played and my only wish is that he can be back home where he belongs. Thank you so much for your time.

Respectfully Submitted,

Tajah Nuri Jackson

Exhibit C

May 1, 2018

Jana Djenne Jackson
The Honorable Judge Robin L. Rosenberg
U.S. District of Florida


Re: Darren Jackson

To the Honorable Judge Robin L. Rosenberg:


This letter is to inform you that my father, Darren Jackson, is an honorable man. He has

supported, stood by, and exalted our family with his presence and hard work for 20 years. Even behind

bars, he continues to lecture and shape his four children into the people he has always hoped and raised

us to be. One trait I know I inherited from my dad is his selflessness and love and care that extends to

his family and even friends.  I know my father has learned many lessons from this that he will take with

him throughout the rest of his life. I'm praying that you have mercy on him in sentencing.

Growing up my father had many painful experiences. The loss of two siblings, having to often

redirect his own dreams to support his family, and the loss of a dear friend. With loss after loss,

including this one, if it can be described as such, I pray that he recovers and that he will gain a chance of

freedom to make his life right again. I have a firm belief that everything happens for a reason.  Some

circumstances and lapses in judgment lead people in the wrong direction. Over the last two years, my

sisters and I could have never foreseen this sequence of events. Speaking to our father for no longer

than fifteen minutes on the phone, his voice often muddled over other prisoners, having to schedule a

visit with no warm embrace but tears through a video screen. It's not the life this second-year college

student would or could have pictured or been prepared for. But I have learned in life, we often must

adapt and move forward which is just what my father is striving to do.

Please don't think I am suggesting that my father is a hero here. He is at fault. He is a grown man who made poor decisions. But any additional incarceration, with its dehumanizing effect, will not serve the community or my father well. My father is a good man, warm and kind. He has always been a hardworking, productive member of society.  For me, he has just been a good daddy. A man who changed diapers, gave us our first baths, combed our hair and created hair treatments to make our hair long and strong. He has taken us to Father-daughter dances, and made every effort to be at every school performance.  He is the kind of man I know would never hurt another person. He mostly kept to himself and focused his attention on his family with a limited number of friends. He has always been present in my life and more than anything wants to remain that way.  With the power that is in your hands, I plead with you to judge my father not based on his mistake, but based on his whole life as a great and loving father.

Even with a crushing back injury, my father worked as a boilermaker and welder, for months at a time with little to no break.  With such an injury, he never should have continued to work like that, but he has always been determined to provide for his family and take care of us, his daughters, as we began our college careers.  As a result of his arrest, he wasn't able to take my sister and me to our first day of college and won't be able to see his eldest graduate this May. Education has always been a paramount concern of my father. Whenever we speak on our timed phone calls the first question he asks is, "How is school going?" He cares so much about my future. And I care about his.

Writing this brings tears to my eyes. The other day my father told me he is sorry for everything he has put me through in the last two years. This broke my heart because I know he has it so much harder than I do. In this situation, he is a victim of his own poor choices and circumstance, however, his focus is still on us. He apologized for the circumstances that he never wanted his children to be exposed to and given the father he has been, one we never expected to be exposed to. He ended the call early out of what seemed to be shame. I started crying, afraid that he was crying. I had my friend nearby to let

me know that everything was going to be alright, and though my father is a grown man, my heart broke knowing that after that call he wouldn't have anyone there to console him. This situation has opened my eyes to the ways we can treat certain experiences. My father has put on a brave front for the past two years, to try to protect us even from behind those bars. On that call, I felt the toll and weight of his guilt for himself and the people he loves the most. I'm not saying you should free my father for my family and me or so he can be surrounded by his loved ones.  I am telling you this story to let you know that my father, Darren Jackson, has deep remorse for his choices.  He has accepted that these are the consequences of his choices and he seems to be most emotional when he evaluates how his actions have affected other people, the people he loves the most.  I believe this supports my assertion that he'd never hurt another person.  He has experienced way too much loss in his life to intentionally hurt innocent people.

Your Honor, I need for you to know how very much I love my father. I've learned many lessons from him.  Such as, patience, kindness, and that a quiet presence is the loudest company. I have never witnessed him intrude on another's space or overstep on another's boundaries. He is a humble man who has the ability to fill a room with laughter. He is the only son of five remaining siblings and grew up learning from so many people. He's always worked hard to be the man and father he has been and wanted to be that person his entire life. This part of his story was never part of his plan. One thing my father could never seem to comprehend is how grateful we are for the life he provided for us. He was always dissatisfied and always striving to give us more.  He never failed to make every effort to go above and beyond for us. I wish he only knew how much going to the basketball court with him, his hugs, and cooking (especially fish and chips, given that his french fries are my favorite), were all we needed from him to make us happy.  His presence, the opportunity to have him continue to impact my life positively and teach me many more lessons I still need to learn, is my only request of the court.  My father is a good man.

It was extremely difficult for me to write this letter and produce a collection of words and reasons why you should see my father the way I do, given the charges he's facing. However, I wholeheartedly believe that my dad does not need to be behind bars any longer. Given the way he has cared for me my whole entire life, and the remorse he has expressed to me, I am certain of it. This letter was challenging for me to prepare, but this is my only means of expressing how much I value my dad and how valuable of an asset he is to this family. Please understand that this letter is respectfully submitted and I am sure my dad made some decisions he shouldn't have made, but I am hard pressed to believe he could have ever had any harmful intent. I needed to do this for my dad and try to make you know my father as I do.

I haven't been able look my father in the eyes in over a year. I haven't been able to hug him in nearly two. I implore you, to consider my words and give me a chance to hug my father once again.

Respectfully submitted,

Jana Jackson

# Exhibit D

Nia Jackson

The Honorable Judge Robin L Rosenberg
U.S District Judge
Southern District of Florida

Re: Darren Jackson

To the Honorable Judge Robin Rosenberg:

This letter is being written on behalf of my father Darren Jackson.  As a young child, my mother always told me that I clung to my father most. I am a daddy's girl without question. He has always been the quiet, soft-spoken, understanding parent that I needed, while my mom was a bit more unyielding and tough.  My dad, while stern, was always prepared to make my sisters and I laugh and offer us comfort. I've never given much thought to the idea that I favored my father, or we related more, until his incarceration. My life without him has been unbearable and replete with struggle.  The charges against my father have left me bewildered, and the difficulty I have reconciling between the father I know and the charges, have shaken the world that I have known my entire life, and I have never been the same. His arrest left me in utter disbelief.  The man that I know, and love and that I  grew up clinging to would not knowingly or intentionally hurt anyone. My dad has never had many friends. His family, my sisters, my brother and I have always been his world, however, the friends that he had, were often lifelong friends that he cared for deeply and sincerely. I'm not making excuses, but one might not recognize the affect their actions might bring into the outside world, when helping a longtime friend. The day I found out about my dad's arrest, still resonates in my head, and thinking of him in prison and surrounded by dangerous criminals, leaves me heartbroken daily.

Your Honor, please know that I am not being dismissive about my father's wrongdoing, he somehow got involved in this, or I wouldn't be writing this correspondence.  All I can do is ask that you review his longstanding record of good deeds and recognize the good in my father's heart.  I know he has made some mistakes, and some wrong choices, but I empathize with him and I pray that you can do the same. As a young adult of 20 years old, I desperately still need my father's guidance. To advise me and help give me direction to avoid making mistakes.  I can't talk to my dad about personal things that only he understands while a third party is listening in. I would give anything to be able to laugh with him again.  I need him to help me when I'm upset about a relationship that may not work out. I need my dad to teach me things about the world that he couldn't teach me two years ago, because I was too young. Most of all, I need able to hug him. Not being to hug and be hugged by my daddy for two years is unfathomable. I need him to be my father.

We have had to come to terms with the thought that my daddy, who did his best to never miss a performance, show or event at school, will miss a major milestone in my sister's life.  Her college graduation is in May, four days before this court's hearing that will decide his fate going forward.  We prayed and hoped that the court would see fit that he has been punished enough, when the hearing was set it April, but it became apparent that he was not going to be there.  Not being able to attend my sister's graduation, I'm sure is going to be one of the most difficult days for my dad, not to mention the hurt my sister feels. It hurts me to see my sister in pain and hear

the pain in my father's voice, as he apologizes through a three way phone call and expresses regret about missing this important milestone in my sister's life. I watched my sister cry profusely, as she watched her good friend, dance with her father, wondering if that might be another missed opportunity for her and our dad. Your honor, my dad is a good person and sometimes good people make terrible mistakes. I ask that you please be understanding, and consider the limited nature of my dad's conduct and how his kind hearted, push over nature, may have gotten him here. When the time approaches for my graduation, I need my father home, I need him there, embracing me with open arms, expressing his delight in my achievements. I could not have done it without his support and it breaks my heart that he can't provide the support that he always has, as he and my mom have always worked hard to try to give us the very best. I often worry about the toll this is taking on my mom, as she never thought this could be the reality of our lives.

In the next few months, my father will have spent nearly two years in jail. He is in his fifties and his mom and dad are up in age. He has expressed regret and paid dearly for his mistakes already. I'm sure that he only wishes for a chance to take care of us and make his mother happy and proud again. Please give him a second chance, I am sure that he recognizes the grave errors he made and just wants to be able to be my daddy again. Thank you for your time.

Respectfully,

Nia Imani Jackson

# Exhibit E

February 16, 2018

The Honorable Judge Robin Rosenberg
U.S. District Judge
Southern District of Florida

Dear Judge Rosenberg:

I am writing this letter on behalf of my son who is before the court on a criminal charge.

My son, Darren has worked hard his entire life and I am praying the court will see fit to afford him the opportunity to continue to do so. He is a hard-working man who always put his family first. He would travel long distances from his family for many months at a time working on his job to help provide for his family.  Darren and I have and have always had a great mother and son bond. I raised him to be a sweet and kind man.  And today, he is still that sweet and kind man. I believe being home with his family would be the best thing for all involved and certainly it is more beneficial for him to remain the responsible, productive citizen he has been than any incarceration.

Darren was always a good man and when he was a young boy, I never had any problems with him or his behavior. He has always been so helpful and loving and he still is. Even throughout his incarceration, he has been more concerned about its impact on me, than himself.   When Darren was in school he was a good student, obtaining A's and B's in many of his classes. His teachers always had good things to say about him and would be very surprised to hear of his current situation.  I'm sure, if given the chance, they would tell you it's not like him at all to commit such a crime.

I also was extremely shocked and dismayed over the allegations regarding his behavior as he has always been a good child. He was never disrespectful to me and has always been there for me to help in any way possible. This incident is very unlike Darren's character.  He has always been willing to help and has always made friends easily.

Your Honor, I am seeking the mercy of the Court when you decide what punishment would be appropriate for my son given his behavior. I hope that you will reach deep within in making that decision

and that you will see that this behavior is unusual for my son and  be lenient, allowing him to move forward with his goals, affording him the opportunity to continue to provide for his family as he has for most of his adult life.

Being without his children and without him being able to support and help them, his family has suffered and will continue to suffer both financially and emotionally. As a father, he has always been heavily involved in his children's lives and not having Darren there with them and his support in their daily activities, will only cause them further emotional stress.

I beg your Honor to please consider my letter, when you hand down your sentence. Only you have the ability to give Darren a second opportunity.

Thank you for your time and consideration.

Sincerely,

Willie B. Jackson

# ALAN S. JAMES

December 4, 2017

Your Honor,

I am writing this letter on behalf of my uncle Darren Jackson. I have been blessed to be a part of Darren's life for my whole life. My heart is devastated at the thought of my dear uncle being sent to prison. Darren has such a sweet demeanor and a giving heart. He is a nourishing father to his 4 beautiful children, a great uncle who has been there for me since day one, and has always been a calm, reliable and wise family member.

Your Honor, I am in no way trying to ignore his present circumstances, I am only imploring for leniency in sentencing. Upon hearing about the serious charges against him I was absolutely dumbfounded. These acts were out of character for Darren and do not sound like the Uncle I know and love. His lack of any criminal history supports that.

I sat and pondered as to what could lead Uncle Darren down a road so off path for him. Please understand that I am not blaming anyone else for Darren's acts. He is an adult and he does know right from wrong. However, I honestly believe that he was so wrapped up in trying to be a devout Muslim that without even realizing it, devotion had become detrimental and instead of trying to find the inner strength to walk away, he allowed manipulation to take over and he became blind to the fact that he had become lost, trying to please someone else, which is his character.

He has always put others before himself, first as a Christian and then during his conversion to Islam in the 1980's before we had ever heard of negative behavior associated with Islam.  But it has destroyed not only his future, but the lives of the 4 children that need their father, and the sisters, cousins, nieces, nephews and extended family for which Darren has always been a reliable source of support.

Tel
Fax

# ALAN S. JAMES

Darren has a remarkable support system behind him and I feel that despite his poor choice in judgement, he is a vital asset to our family and community. Darren's involvement in this offense was utterly out of character. Darren's acts of selflessness and kindness are his normal way of life.  His taking his father in when he became infirm is an excellent example. He's been a good son, a good father, and a good uncle.  His detention caused him to miss milestone family events, and that is a severe punishment. He overcame personal struggles such as the death of 2 siblings to become a good and productive person.

Uncle Darren is getting older. His hard work as a plumber has taken a toll on his body, but not on his mind. He suffers physically in jail due to his physical ailments. And, of course, he is loved and that upon release he will be loved and supported by his family.

I thank you for taking the time to read my letter and I pray, by the grace of God, that your heart be shifted towards mercy during the time of his sentencing.

Sincerely,

Alan S. James

Tel
Fax

February 25, 2018

Your Honor,

I am writing this letter on behalf of my nephew Darren Jackson. It is a pleasure and privilege to   have Darren in my life. I can honestly say that he is one of my favorite nephews.  When I received the news regarding the charges against him; I was absolutely shocked and devastated that my loving and caring nephew could be facing prison time.

Your Honor, I have known Darren since childhood; he has always been a person of good character and demeanor. I am not trying to ignore the seriousness of Darren's present circumstance; however, these acts are out of character for Darren and his lack of any criminal history supports that.

Darren is a very considerate person and one who I would consider a public servant to others.  Darren's present and extended family will be supporting him whole heartily, even in his present circumstance; he is a valuable asset to not only his family, but also to all who cross his path. He is a loving father, son and nephew.  Darren took in his father after he became ill and he is also known to assist others who are in need.

I would like to thank you for taking the time to read this letter.  I pray that your decision during sentencing will be favored by God's grace and mercy.

Sincerely,

*Sylvia Vaughan*

Sylvia Vaughan

Harold Crosby

█████████████

March 7, 2018

Your Honor:

I am writing this letter on behalf of my nephew Darren Jackson. Darren has a kind and

giving heart. He is a nourishing father to his four beautiful children. In Darren defense,

your Honor I am in no way trying to ignore his present circumstances, I am only

imploring for leniency in sentencing upon hearing about the serious charges against him.

I absolutely was shocked to hear of these acts. This was out of character for Darren and

did not sound like the nephew I knew and loved. Darren lack of any criminal history

supports that.

I often wondered what could had lead my nephew to be in this situation. Please

understand that I am not accusing anyone else for Darren's acts. Darren is an adult and he

does know right from wrong. The choices he made destroyed not only his future, but his

family. I thank you for taking the time to read this letter. I pray your Honor by the grace

of God that you will have mercy during the time of his sentencing.

Sincerely,
*Harold Dae Crosby*

Harold Dae Crosby

May 5, 2018

Re: Darren Jackson

The Honorable Judge Robin Rosenberg:

Having known Darren Jackson for over seven years now, I was very shocked when I heard of the charges filed against him. There are a few things I really would like to share with you about my relationship that I have had with him. First, I would like to introduce myself. My name is Joann Leible-Harrison and I am the wife of Darren's nephew. I was introduced to Darren back in 2010 and was very excited to meet him. My husband had always spoken very highly of him and his family, but unfortunately, we lived in different states so the only contact at first was limited to phone conversations. However, one day Darren surprised us and invited myself and my husband to lunch when he arrived from Florida to New York for his next job assignment. Throughout our conversation over lunch I felt so comfortable that it felt like I had known him way longer than I had.

Darren is very genuine, caring and most of all, the man I know has been a loving husband, father and friend. During our first meeting, he spoke of his wife with the highest regard and very fondly of his three beautiful, intelligent daughters, as well as his son, whom he also was very proud of. I am having a very hard time reconciling this entire incident with the man I know that seems extremely out of character for Darren. Darren was introduced to my family and they all felt the same way as I did. This is someone who, to my knowledge, has never been in any kind of trouble throughout his entire life. This is someone who has guided MY husband from his own life experiences and someone that I have become close with.

I have seen him, over the years, help several people including his own dad. Not only did Darren take care of him, he moved him to his own family's home and was taking care of him. He has always been a family man and is someone who loves his family very much. Every family function, BBQ, Darren was the first to jump in and make sure everyone was okay. I always found him to be a giving person. I believe Darren is truly despondent regarding what he has put his family through. He has truly been a good family man. Darren's mother, father, entire family and children are certainly not deserving of what they have been through. Darren is missed and his family needs him.

As the wife of his nephew, I have truly watched how his family means the world to him. I am aware that Darren has done something, but I still can't imagine the Darren that I have come to know over the last seven years doing anything to intentionally hurt anyone.

I am thankful for your having taken the time to read my letter, and I humbly ask you to please give him an opportunity to set his life back on track and not let a bad decision or error in judgment alter his life's direction.

Respectfully submitted,

JoAnn Leible-Harrison
Pharmacy Manager

April 25, 2018

Mattie V. Robinson


The Honorable Judge Robin L. Rosenberg
U.S. District Judge
Southern District of Florida

Re: Darren A. Jackson

Your Honor:

This letter speaks to the character of Darren Jackson.  Darren was raised by parents who

instilled in him good morals and values.  I know this to be factual because I have known Darren

since the day he was born, as he is my godson.  I cannot imagine what happened that caused

Darren to be incarcerated, since he has always been a hardworking, God-fearing, law abiding

citizen.  I ask that you carefully consider Darren's case and give him another chance at life.  I am

certain you will not regret it.   May God Bless this Court.


Respectfully Submitted,

Mattie V. Robinson

# Exhibit F

U.S. v. Yusuf, Case No. 15-CR-46-MJD (D. Minn.)(Judgment and Complaint attached)

AO 245B (Rev. 11/16)  Sheet 1 - Judgment in a Criminal Case

# United States District Court
### District of Minnesota

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | Case Number: **15-cr-46 (1) (MJD)** |
| **Abdullahi Mohamud Yusuf** | USM Number: **18318-041** |

**Manvir Atwal and Jean Brandl**
Defendant's Attorney

## THE DEFENDANT:

[X]    pleaded guilty to count 1 of the Information.
[]    pleaded nolo contendere to counts(s) which was accepted by the court .
[]    was found guilty on count(s)  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:2339B(a)(1) | CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION | 6/1/14 | 1 |

The defendant is sentenced as provided in pages 2 through 5 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[]    The defendant has been found not guilty on counts(s) .
[]    Count(s)  (is)(are) dismissed on the motion of the United States.

A $100.00 special assessment for the Crime Victims Fund is required by statue to be paid immediately.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of any material change in economic circumstances.

November 14, 2016
Date of Imposition of Judgment

s/Michael J. Davis
Signature of Judge

**MICHAEL J. DAVIS**, Senior United States District Judge
Name & Title of Judge

November 30, 2016
Date

AO 245B (Rev. 11/16)  Sheet 2 - Imprisonment

| | |
|---|---|
| DEFENDANT: | ABDULLAHI MOHAMUD YUSUF |
| CASE NUMBER: | 15-CR-46 (1) (MJD) |

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of time served.

[]      The court makes the following recommendations to the Bureau of Prisons:

[X]    The defendant is remanded to the custody of the United States Marshal until his halfway house designation has been completed.

[]      The defendant shall surrender to the United States Marshal for this district.
           [] at  on .
           [] as notified by the United States Marshal.

[]      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
           [] before  on .
           [] as notified by the United States Marshal.
           [] as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
United States Marshal

By _____
Deputy United States Marshal

AO 245B (Rev. 11/16)  Sheet 3 - Supervised Release

| DEFENDANT: | ABDULLAHI MOHAMUD YUSUF |
|---|---|
| CASE NUMBER: | 15-CR-46 (1) (MJD) |

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of 20 years **.**

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from  imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    []     The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. (check if applicable)

4. [X] You must cooperate in the collection of DNA as directed by the probation officer. (*check if applicable)*

5. [] You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as  directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. (*check if applicable)*

6. [] You must participate in an approved program for domestic violence. (*check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 11/16)  Sheet 3A - Supervised Release

| | |
|---|---|
| DEFENDANT: | ABDULLAHI MOHAMUD YUSUF |
| CASE NUMBER: | 15-CR-46 (1) (MJD) |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

# U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at www.uscourts.gov.

Defendant's Signature _____ Date _____

Probation Officer's Signature _____ Date _____

AO 245B (Rev. 11/16)  Sheet 3D - Supervised Release

| | |
|---|---|
| DEFENDANT: | ABDULLAHI MOHAMUD YUSUF |
| CASE NUMBER: | 15-CR-46 (1) (MJD) |

## SPECIAL CONDITIONS OF SUPERVISION

a    The defendant shall participate in educational programming as approved by the probation officer to obtain a high school diploma or General Equivalency Diploma.

b    The defendant shall submit his person, residence, office, vehicle, or an area under the defendant's control to a search conducted by a United States Probation Officer or supervised designee, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a supervision violation. The defendant shall warn any other residents or third parties that the premises and areas under the defendant's control may be subject to searches pursuant to this condition.

c    The defendant shall not possess or use a computer or have access to any on-line service without the prior approval of the U.S. Probation and Pretrial Services Office.  The defendant's cooperation shall include but not be limited to allowing installation of a computer and Internet monitoring program and/or identifying computer systems, Internet-capable devices, and similar memory and electronic devices to which the defendant has access.  Monitoring may include random examinations of computer systems along with Internet, electronic, and media storage devices under the defendant's control. The computer system or devices may be removed for a more thorough examination, if necessary. The defendant shall contribute to the cost of such monitoring services, based on the defendant's ability to pay, as deemed appropriate by the U.S. Probation Office and Pretrial Services Office.

d    If not employed at a regular lawful occupation, as deemed appropriate by the probation officer, the defendant may be required to perform up to 20 hours of community service per week until employed. The defendant may also participate in training, counseling, daily job search, or other employment-related activities, as directed by the probation officer.

e    The defendant shall provide the probation officer access to any requested financial information, including credit reports, credit card bills, bank statements, and telephone bills.

f    The defendant shall not possess, view, access or otherwise use material that reflects extremist or terroristic views or as deemed to be inappropriate by the U.S. Probation Office.

g    The defendant shall participate in a mental health counseling program as approved by the probation officer. This program may include psychological/psychiatric counseling or treatment, family counseling, and mentor support.

h    The defendant shall submit to periodic polygraph testing at the direction of the probation officer as a means to ensure compliance with the requirements of supervision.

i    The defendant shall surrender his passport and any travel documents and must not apply for a new passport or travel documents.

j    The defendant shall reside for a period of up to 365 days in a residential reentry center as approved by the probation officer and shall observe the rules of that facility, which may include location monitoring with Global Positioning System (GPS) technology. The defendant may be restricted to their residence at all times except for employment; education; religious services; medical; substance abuse; or mental health treatment; court obligations; or discretionary leave activities as approved by the probation officer. The defendant shall not be required to pay the costs of location monitoring.

# UNITED STATES DISTRICT COURT

for the

District of Minnesota

UNITED STATES OF AMERICA

v.

ABDULLAHI YUSUF
ABDI NUR

Case No. 14-MJ- 1024  (JSM)

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my

knowledge and belief. Beginning on or before April 1, 2014, and continuing until the present in the State and

District of Minnesota and elsewhere, defendant(s)

Conspired to provide material support to a designated foreign terrorist organization and provided material
support to a designated foreign terrorist organization.

in violation of Title 18, United States Code, Section(s) 2339B.

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒Yes  ☐ No

_____
Complainant's signature

John Thomas, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 11/24/14

_____
Judge's signature

City and state:  Minneapolis, MN

The Honorable Janie S. Mayeron, U.S. Magistrate
Judge
Printed name and title

SCANNED
NOV 2 5 2014
U.S. DISTRICT COURT MPLS

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
District Court File No. 14-MJ-_10 24_ (JSK)

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )        **AFFIDAVIT IN SUPPORT OF A**
                                   )        **CRIMINAL COMPLAINT AND**
          vs.                      )        **ARREST WARRANT**
                                   )
(1) ABDULLAHI YUSUF, and           )
(2) ABDI NUR,                      )
                                   )
                    Defendants.    )

I, John P. Thomas, being first duly sworn, hereby depose and state as follows:

STATE OF MINNESOTA          )
                            )        SS:
COUNTY OF HENNEPIN          )

## I.    INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed by the FBI since 2007. I am currently assigned to the Joint Terrorism Task Force ("JTTF") of the FBI's Minneapolis Division. That has been my assignment since March of 2008. As part of my duties as a Special Agent, I investigate, among other things, criminal violations relating to terrorism, such as material support to designated foreign terrorist organizations. The statements contained in this affidavit are based on information I have learned through my own investigation; my background, training, and experience as a Special Agent assigned to the JTTF; the investigation of other FBI special agents and law enforcement officers; records and other evidence

obtained during the course of this investigation; and discussions with individuals as set forth in this affidavit.

2.    This affidavit is intended to show merely that there is probable cause to believe that the defendants, ABDULLAHI YUSUF and ABDI NUR have committed various federal crimes. It does not set forth all of my knowledge about this matter.

## II.    PURPOSE OF THE AFFIDAVIT

3.    I make this affidavit in support of an application for a criminal complaint charging the defendants, ABDULLAHI YUSUF and ABDI NUR with:

Count One, Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization (the Islamic State of Iraq and the Levant), in violation of Title 18, United States Code, Section 2339B (Both Defendants);

Count Two, Providing Material Support to a Designated Foreign Terrorist Organization (the Islamic State of Iraq and the Levant), in violation of Title 18, United States Code, Section 2339B (NUR);

This affidavit is also made in support of an application for a warrant to arrest defendants ABDULLAHI YUSUF and ABDI NUR.

## III.    FACTS CONSTITUTING PROBABLE CAUSE

### INTRODUCTION

4.    FBI Minneapolis is investigating numerous individuals who have traveled, attempted to travel, or otherwise seek to travel to Syria in order to involve themselves in the fighting that has consumed Syria for more than three years. Open source materials

indicate that in March, 2011, political opponents of the Assad regime attempted to protest in Damascus and in the southern Syrian city of Deraa. The government security forces in Deraa opened fire, killing many protestors. The level of violence in Syria increased rapidly following the incidents of March, 2011. In an August 2014 report to the United Nations Security Council, the UN's Human Rights Data Analysis Group conservatively estimated the death toll from the violence in Syria at 191,000. Terrorist groups are involved in the fighting in Syria, among which is the Islamic State of Iraq and the Levant ("ISIL") (also known as the Islamic State of Iraq and Syria ("ISIS"), the Islamic State of Iraq and al-Sham (also "ISIS") or as the Islamic State (IS)). This organization will be referred to as "ISIL" for the balance of this affidavit.

5.      On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has never called itself "al-Qa'ida in Iraq," this name has frequently been used to describe it through its history. In an audio recording publicly released on June 29, 2014, ISIL announced a formal change of ISIL's name to Islamic State.

3

## THE GOVERNMENT'S INVESTIGATION

*BACKGROUND ON DEFENDANT ABDULLAHI YUSUF*

6.      Abdullahi YUSUF (hereinafter "YUSUF") is a United States citizen who was born on April 12, 1996 and currently lives with his parents in Inver Grove Heights, Minnesota. At the outset of this investigation, YUSUF was a student at the Heritage Academy Charter School, located at 1042 18th Avenue SE, Minneapolis, Minnesota. Based on the reports of FBI surveillance agents, your affiant believes that YUSUF presently attends Inver Hills Community College, located at 2500 80th St. East, in Inver Grove Heights, Minnesota. According to one of YUSUF's family members, the father is the only person in the household (consisting of father, mother, YUSUF, and YUSUF's younger brother) who holds a paying job. According to the family member, the father did not purchase any tickets for international air travel for YUSUF, and YUSUF had no independent income and could not afford such a purchase himself.

7.      Through this investigation, I learned the following:

a.      On April 28, 2014, YUSUF went to the Minneapolis Passport Office and applied for an expedited passport, identifying his travel destination as Turkey.

b.      The passport specialist assisting YUSUF said YUSUF arrived alone. YUSUF presented a junior high school identification card, high school identification card, and a Certificate of Citizenship, which satisfied the identification requirement to apply for a passport. Based on YUSUF's

4

presentment of the high school identification card and his age (18), the passport specialist asked YUSUF if he was traveling after graduation. YUSUF replied that he was not graduating and was traveling to Istanbul for a vacation. When asked who he was traveling with, YUSUF replied that he was traveling by himself. When the passport specialist sought more details about his travel plans, YUSUF responded that "his mom couldn't afford to go and no one else wanted to go with him." YUSUF claimed he was meeting a friend he "met on Facebook not too long ago." Asked if it was a girl he was meeting, YUSUF said, "no it's a guy, just friend."

     c.     YUSUF did not provide any more details about his friend and, according to the passport specialist, became visibly nervous, more soft-spoken, and began to avoid eye contact. As the conversation continued, the passport specialist learned YUSUF did not know where his "friend" lived in Istanbul. Although YUSUF stated his intention was to go "sightseeing" in Turkey, when asked by the passport officer for details about his sightseeing plans, YUSUF replied that he was going to see "The Blue Mosque" and "some other mosques" and "stuff like that." YUSUF also indicated he would be staying in a hotel, but was unable to provide the name of the hotel or any other details.

     d.     When the passport specialist asked YUSUF about the cost of the trip, YUSUF responded that the trip would cost "about $1500." When the passport specialist remarked that $1500 was costly and inquired how YUSUF

could afford to pay for the trip, YUSUF said he was "tutoring" and had "saved up."[1]  YUSUF advised that he had not received money from his mother, had never been to Turkey, and had no family connections to Turkey.

       e.     When asked if he was traveling anywhere else, YUSUF responded, "I don't know yet. I don't think so."

       f.     The passport specialist also observed that YUSUF did not appear excited or happy to be traveling to Turkey for vacation.

       g.     The passport specialist found his interaction with YUSUF so unusual that he contacted his supervisor who, in turn, alerted the FBI to YUSUF's intended travel.

8.     Approximately one week later, on the morning of May 5, 2014, FBI surveillance observed YUSUF's father dropping YUSUF off at Heritage Academy. After his father left, YUSUF did not enter the school, but instead walked to a known mosque located approximately two blocks away from Heritage Academy. Later that morning, at approximately 10:30 a.m., FBI surveillance agents watched YUSUF walk from the mosque to a bus station where he boarded a Metro Transit bus. YUSUF took the bus to the Cedar Riverside apartment complex near downtown Minneapolis and then walked towards a light rail station. Within 14 minutes, a separate surveillance team observed

---

[1] Agents have confirmed that YUSUF has no reported earnings documented with the Minnesota Department of Employment and Economic Development.

YUSUF enter the Minneapolis Passport Office located in downtown Minneapolis where YUSUF picked up his new passport.

9.     Later on May 5, 2014, YUSUF used his new passport as a form of identification to open a checking account, with an associated debit card, at Wells Fargo Bank.

10.     On May 23, 2014, YUSUF deposited $1,500 in cash into his newly-opened Wells Fargo Bank account. The $1,500 was broken down into four separate deposits spaced throughout the day. The first two deposits were one hundred dollars each, followed by a three hundred dollar deposit, followed by a final deposit of one thousand dollars. All were made at an ATM near the intersection of Lake Street and Nicollet Avenue in Minneapolis. I have reviewed still photographs of the deposits taken automatically by the ATM's camera. The person in each of the surveillance photographs is YUSUF.

11.     On May 24, 2014, YUSUF used his Wells Fargo debit card to purchase a $1,427.05 airline ticket on the website of the priceline.com partner, "Kayak." YUSUF's itinerary was to take him via Aeroflot from Minneapolis/Saint Paul to New York's John F. Kennedy International Airport, where, after an approximately 23 hour layover, he would fly on to Moscow, Russia, where he would catch a connecting Aeroflot flight to Istanbul. YUSUF was scheduled to depart Minneapolis/Saint Paul on May 28, 2014.

12.     On May 28, 2014 (the day of YUSUF's intended departure), FBI surveillance agents observed YUSUF's father drop YUSUF off at Heritage Academy.

7

Approximately one hour after being dropped off, YUSUF left Heritage Academy and walked to the nearby known mosque. YUSUF entered the mosque and just over one hour later, a blue Volkswagen Jetta with a known Minnesota license plate[2] parked near the exit of the mosque. Within a minute of the Jetta's arrival, YUSUF walked out of the mosque and entered the Jetta, departing as a passenger.[3] Surveillance of the Jetta continued as it drove for approximately 15 minutes towards the light rail system and parked near the intersection of E. 45th St. and Hiawatha Avenue. This location is approximately 5 blocks from a light rail stop. At this location, both YUSUF and the driver got out of the vehicle and opened the trunk. YUSUF removed a sweatshirt he was wearing and replaced it with a pink button-down dress shirt. While YUSUF was changing clothes, the driver moved objects from a red duffel bag to a black duffel bag. The driver then put both duffel bags and a backpack into the trunk of the Jetta. The driver and YUSUF got back into the Jetta and drove approximately 5 blocks to the light rail station and parked. Inside the vehicle, YUSUF hugged the driver and got out of the Jetta. After retrieving the black duffel bag and black backpack from the trunk of the Jetta, he walked to the light rail and boarded a

---

[2] Agents know that the registered owner of the Jetta is the boyfriend of co-defendant ABDI NUR's sister. According to a witness familiar with the vehicle, NUR was given permission to use the blue Jetta in the days prior to YUSUF's attempted departure.

[3] A review of telephone toll records obtained by subpoena reveals that YUSUF called NUR after he arrived at the mosque and that NUR called YUSUF approximately 4 minutes before YUSUF was picked up at the mosque by the Jetta.

8

train which took him to the Minneapolis/St. Paul International Airport (Lindbergh Terminal).

13.     My review of reports of interviews of YUSUF's parents revealed that, according to both parents, YUSUF planned his travel, obtained his passport, purchased his airline ticket to Turkey, and packed his bag all without their knowledge.

### YUSUF MAKES FALSE STATEMENTS WHEN HE IS INTERVIEWED AT THE AIRPORT BY FBI AGENTS

14.     On May 28, 2014, I conducted an interview of YUSUF at the airport after advising YUSUF that he would not be permitted to travel to Turkey as he had planned. During this interview, I learned the following:

      a.     YUSUF stated he was traveling to Turkey for a two-week vacation.

      b.     YUSUF indicated he had no plans to travel beyond Turkey.

      c.     When asked if his parents knew where he was, YUSUF stated, "yes." As noted above, this statement was contradicted by YUSUF's parents.

      d.     YUSUF stated that he paid for his own ticket by saving up money. As noted above, YUSUF did not have the means to save up money nor has any income for YUSUF been reported to the State of Minnesota.

      e.     When asked who he would see in Turkey, YUSUF stated "I wasn't gonna meet anybody." When advised that he previously told the Passport Office that he was going to visit someone he met on Facebook, YUSUF said, "I said I have a couple friends on Facebook from Turkey." I have reviewed YUSUF's

9

Facebook page. He has no Facebook friends who identify themselves as Turkish, as being in Turkey, as being from Turkey, or as being associated with Turkey in any other way.

f.　　When asked about his plans in Turkey, YUSUF stated that he planned to "Go to the Blue Mosque, the Grand Bazaar, a lot of places. Go sightseeing."

g.　　YUSUF maintained he was traveling to Turkey on vacation. When told agents did not believe him, but instead believed he was ultimately traveling to Syria to join a terrorist organization, YUSUF responded, "I've never committed a crime. I never committed no terrorist crimes that you're accusing me of." He stated his belief that the FBI learns information primarily through informants and said it was his "word against theirs." YUSUF asked the agents how the FBI would prove in a court of law what an informant said about him was true.

h.　　When asked if his parents knew where he was, YUSUF responded, "yes" and said he told them he "was gonna be gone for awhile." When asked if his father knew he was flying overseas, YUSUF said, "I don't think he cares."

i.　　YUSUF was not able to identify who he was meeting, other than a "couple friends on Facebook from Turkey." When asked where he was staying, YUSUF initially provided the name of a hotel, but later said he would just take a cab from the airport in Istanbul to a hotel. YUSUF did not have a travel itinerary

and said he was going to visit "the Blue Mosque, the Grand Bazaar, a lot of places. Go sightseeing."

*NUR DEPARTS MINNESOTA FOR TURKEY*

15.     The description and license plate number of the Volkswagen Jetta described in paragraph 13 above was circulated to law enforcement agencies.  The Minneapolis Police Department located a police report documenting the Jetta's involvement in a minor accident one week before YUSUF's attempted travel.  The Minneapolis Police report identified the driver of the Jetta at the time of the accident as ABDI NUR ("NUR"), a 20 year-old United States citizen of Somali descent, born on April 1, 1994.  The reports generated by the responding officer noted that the VW Jetta had a broken driver's side rearview mirror.

16.     The FBI then attempted to ascertain NUR's whereabouts and involvement, if any, in facilitating travel to Syria.  On May 29, 2014, the FBI learned that, earlier that day, NUR had departed on a flight from Minneapolis/Saint Paul International Airport, and was scheduled to arrive in Istanbul, Turkey on May 30, 2014, following layovers in Newark, New Jersey, and Munich, Germany.

17.     NUR's banking records were obtained and reviewed.  That review showed that on May 27, 2014, a $1,540 cash deposit was posted to NUR's account at Wells Fargo Bank.  ATM surveillance video shows that at approximately 11:00 AM on May 24, 2014 NUR deposited the $1,540.    On May 27, 2014, NUR paid Lufthansa $1,619.30, using his Wells Fargo debit card, for the travel described above in this affidavit.    The

11

investigation has shown that, like YUSUF, NUR was unemployed at the time he bought this ticket and did not have the financial means to purchase an international airline ticket. Also of note, agents know that NUR deposited $160 at the same ATM near Lake Street and Nicollet Avenue on the same day that YUSUF deposited his funds as described in paragraph 11 of this affidavit. The $160 deposit by NUR was made within 19 minutes of the third of YUSUF's first three deposits on May 27th. Further, when YUSUF made the $1,000 deposit later in the evening at the same location, he did so at a drive-up teller which captured an image of YUSUF in a vehicle making the deposit. Your affiant has reviewed this image and notes that the vehicle used by YUSUF has a broken driver's side rearview mirror and is blue in color. Also, a second individual can be seen in the vehicle's front passenger seat with YUSUF but this individual cannot be identified from this image.

18. From my review of NUR's travel itinerary, I learned that NUR's return flight was scheduled for June 16, 2014. Agents have confirmed that NUR was not aboard his scheduled return flight and there is no record that NUR has since lawfully re-entered the United States.

### NUR'S PRE-DEPARTURE ACTIVITIES

19. According to interviews with NUR's family, NUR was unemployed at the time of his departure from Minnesota. NUR's family stated that his only recent receipt of money had been the disbursement of a $2,000 student loan; however, they reported NUR spent almost the entire $2,000 on a new computer and an iPhone.

20.     Further queries revealed that NUR obtained his U.S. Passport on April 24, 2014, four days before YUSUF applied for his passport.  Both NUR and YUSUF's passport applications were submitted with their request to have processing of the application expedited.  On NUR's passport application, NUR stated he planned to travel to Australia in early June of 2014.

21.     On May 30, 2014, Witness 1, a close relative of NUR, walked into the Minneapolis Police Department's 5th Precinct stationhouse to report NUR missing.

*NUR's ELECTRONIC COMMUNICATIONS SUGGEST HE HAS TRAVELED TO SYRIA TO JOIN A TERRORIST ORGANIZATION*

22.     On May 30, 2014 and again on May 31, 2014, an FBI Agent interviewed Witness 1.  During these interviews, Witness 1 showed the Agent communications Witness 1 had exchanged with NUR since his departure from the United States.  From my conversations with the Agent, I learned Witness 1 exchanged messages with NUR by both Kik[4] and Facebook.

   a. From my subsequent review of the Kik communications between NUR and Witness 1, I learned the following:

      i. NUR stated that he had gone "to the brothers".

---

[4] Based on my training and experience, and conversations with other agents, I know Kik is a Canadian-based company that does not maintain records of user conversations.  The Kik application is accessed via internet and unlike other messaging applications, Kik is accessed by username and password instead of the user's phone number.

     ii.     NUR also stated we "will see each other in afterlife inshallah" (sic) and advised Witness 1 "You cant come looking for me its to late for that" (sic); and "im not coming back" (sic).

     iii.     When Witness 1 replied "going to kill poor people is not the answer also poor Muslims I know u r playing to go to sirya but please change mind" (sic), NUR did not refute his/her accusation, but instead replied, "And everybody dies but I want the best death [name of Witness 1] and take care of hooyo[5] for me inshallah".

    b.     From my review of the contemporaneous Facebook communications between NUR and Witness 1, I learned the following:

     i.     When Witness 1 implored NUR to "respond to me I love u and can't live knowing this" NUR stated "I told you I cant be talking to you [name of Witness 1], what are the questions you have so I can answer them [name of Witness 1] you have to stop talking to me till I talk to you okay" (sic).

     ii.     NUR also stated that "im not scared subhanallahallah put ease in my heart but im very busy nooh but tell hooyo I said salams and ill call you guys in 3 days inshallah [Witness 1]."[6]

---

[5] I know "hooyo" to be the Somali language term for "mother."

[6] Subhanallah means "Glorious is God" in the Arabic language; "salams" means "peace" in the Arabic language and is a commonly used greeting.

14

iii.    When Witness 1 advised NUR that "I don't want to loose you" (sic), and further stated that NUR's father "went into shock and is not talking." NUR replied "If I didnt care I wouldnt have left but I want jannah[7] for all of us."

iv.    NUR also told Witness 1 "You have to be strong [Witness 1] im gonna go now and you wont hear from me for a while [Witness 1] love you and may allah make it easy for you".

23.    I also viewed the publicly available content on NUR's Facebook account and observed several pictures of lions[8], one picture of a person holding a t-shirt that says "Syria" on the front, and another image that states "The Caliphate is Coming."[9] I also am aware that NUR is Facebook "friends" with Mohamed Abdullahi Hassan, a/k/a "Miski" ("MISKI") who in 2009 was indicted by a grand jury of this district with Conspiracy to

---

[7] Jannah refers to Heaven. Based on your Affiant's experience investigating Islamist extremism, your Affiant knows that it is common for recruits to be told that if they die while fighting jihad that not only will they be granted entry to Jannah, but they will be able to guarantee entry for a number of other individuals even if the other individuals were not devout Muslims.

[8] Your Affiant knows that militant Islamic extremists like to refer to themselves as lions, as in "Lions of Allah" or "Lions of Somalia". This is a reference to being a strong warrior for the cause of *jihad*. For example, on or about May 11, 2012, Ayman al-Zawahiri, the leader of al Qaeda, issued a statement "O Lions of Somalia, Do Jihad Against the Descendants of Abu Raghal" that was addressed to members of al Shabaab.

[9] Your Affiant knows the "caliphate" is a reference to land that is controlled by an Islamic supreme religious and political ruler. Based on training and experience, your Affiant is aware that references to "expanding", "returning" and "regaining" the caliphate are common themes among Islamic extremists.

Provide and Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A; Conspiracy to Provide and Providing Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B; and Conspiracy to Kill Abroad, in violation of 18 U.S.C. § 956. From my review of this indictment (09-cr-50-MJD/FLN), I know MISKI left the United States on August 2, 2008, to join al Shabaab in Somalia. As of this writing MISKI remains a fugitive from justice.

24.    I have also reviewed the contents of a series of private conversations on Facebook occurring between August 9th and August 14th of 2014 between NUR and MISKI which were obtained by executing a search warrant on Facebook.

    a.    Among other topics, NUR (then believed to be in Syria) asks MISKI (then believed to be in Somalia) to pass a message to a mutual friend: "...send him my salams ahki and when your in jihad you forget a lot of ppl [people] back in the past so remind him that the salams came from abdiyare [NUR] that you went to southwest [high school] with." When NUR asked if he could speak with this person, MISKI replied "...Insha Allah he's went to the frontlines..."

    b.    MISKI asked NUR: "...us brothers from mpls [Minneapolis] wanted to know how many you guys are back there in sham [Syria/Iraq]?" NUR replied, "...only three of us the others there still workin making hijirah[10]..."

---

[10] The term "hijra" is a migration or journey.

c. After asking NUR if he knew "Duale" (a U.S. citizen known to have traveled to Syria), MISKI advised NUR "...try to all connect and make one of you guys mas'uul to know your affairs...Being connected in Jihad make you stronger and you can all help each other by fulfilling the duties that Allah swt put over you...Like us in Somalia the brothers from mpls are well connected so try to do the same....It is something we have learned after 6 years in Jihad."

d. To this, NUR replied: "...inshallah and its hard to stay together in dawla[11] ahki they move you around from place to place if theres a mahrakah so even worse if you come to sham different times..."

e. MISKI later tells NUR: "Jihad teaches you to have as much connection as you can from other Jihadi fronts. That's some lessons we got the past 6 years."

f. On August 13, 2014, MISKI asks NUR how things are. NUR replies, "...good bro, just getting ready for a mahrakah soon IA against pkk[12] inshallah where done with frontline rabat now were planning on attacking

---

[11] A cycle, period, or a time of success.

[12] "PKK" is an acronym for the Kurdistan Workers' Party.

17

them soon...but IA today or tomorrow the brothers will take over the airport in dabkah[13]"

### THE RECENT RADICALIZATION OF NUR

25.     During the interviews described above, Witness 1 also told the FBI that NUR had become "much more religious" over the course of the previous two months.[14] According to family, NUR had begun talking about how his family needed to change, to pray more, and to dress in more traditional clothing. Witness 1 stated that NUR also began talking about jihad. Witness 1 stated that this change in NUR coincided with his beginning to attend a known mosque in Bloomington, Minnesota.

26.     After learning that NUR had left Minneapolis, Witness 1 went to the known mosque in Bloomington and confronted several individuals with whom NUR had been associating since attending the mosque. One of the individuals stated that NUR's ticket had been paid for and that NUR was likely already leaving.

### DOCUMENTS IN THE VOLKSWAGEN JETTA PROVIDE FURTHER EVIDENCE OF TRAVEL TO SYRIA TO JOIN A TERRORIST ORGANIZATION

---

[13] Your affiant knows that on or about August 24 ISIL fighters attacked the Syrian air base called "Tabqa". Your affiant believes the word "dabkah" is a phonetic reference to this air base. According to news reports, over 500 persons were killed in the fighting, and a number of Syrian prisoners of war were beheaded by ISIL.

[14] Your affiant notes that NUR and MISKI became Facebook Friends almost exactly two months before the May 30, 2014, interview with Witness 1.

18

27.     In social media messages NUR also told his relative that he had abandoned the Jetta and told his relative the location near a light rail station where it could be found. The owner of the vehicle gave the FBI consent to search the Jetta. In that search several items of interest were found. Among those items was a receipt for the purchase of Nike-brand athletic wear made at a Macy's store at the Southdale Mall in Edina, Minnesota. A review of Macy's video surveillance footage and transactional information revealed YUSUF and NUR were together at the Macy's store on the evening prior to YUSUF's attempted departure. Both YUSUF and NUR purchased Nike clothing at Macy's on May 27, 2014. Based upon the transactional information available, the Macy's receipt found in the Jetta matches the purchase by YUSUF and NUR depicted in the video surveillance footage. Finally, a piece of paper was found in the Jetta on which was written the handwritten words "Chicago, IL O'Hare intl Airport" with a hand-drawn arrow to the handwritten words "Gaziantep, turkey – Sazgin Airport." Gaziantep is a city in southern Turkey, near the Syrian border. Gaziantep is approximately fifty miles from Aleppo, Syria, where heavy fighting between Syrian government forces and various opposition groups, including ISIL, has been ongoing for approximately two years.

*YUSUF's FURTHER CONNECTIONS TO INDIVIDUALS WHO HAVE TRAVELED FROM THE UNITED STATES TO COMMIT UNLAWFUL VIOLENCE OVERSEAS*

28.     I am aware that YUSUF is an associate of H.M., a former Minnesota resident now believed to be fighting in Syria. The investigation into H.M.'s conduct has revealed that H.M. traveled from Minnesota to Turkey on March 9, 2014. Agents have learned that the debit card used to purchase airline tickets for H.M.'s travel from

Minnesota to Turkey was also used to purchase airline tickets for a third traveler who flew to Turkey on the same day that H.M. traveled from Minnesota to Turkey. Further, subsequent investigation has shown that H.M. has not lawfully re-entered the United States. YUSUF queried H.M.'s Facebook account seven days after H.M. departed the United States for Syria.

29.     Consistent with the payment pattern described in this affidavit for YUSUF and NUR, cash deposits were made into the account used to purchase H.M's and the above-referenced third traveler's tickets in the days immediately preceding the purchase of their tickets for their travel to Turkey.

30.     Information provided to the FBI from H.M.'s family includes the fact that H.M.'s departure was unexpected and unknown to immediate family, and that three of H.M.'s cousins are known to have traveled to Syria. H.M. had visited with these cousins prior to all three of their departures. Further, during phone conversations with a family member that took place in March of 2014, H.M. confirmed that he was, in fact, in Syria serving as a "border guard" and that he believed he would go to jail if he returned to the United States.

31.     YUSUF is Facebook "Friends" with H.M., and a review of telephone records shows several phone calls and text messages between YUSUF and H.M., including a two minute call between the telephone of YUSUF's father (believed, however, to have been used by YUSUF) and H.M., two days before H.M.'s departure for

20

Syria. One week after H.M.'s departure from Minneapolis, YUSUF conducted a query on Facebook for H.M..

32.    A review of YUSUF's Facebook account reveals that his profile picture depicted a man with the head of a lion. Further, in February of 2014, he posted the following: "Bashaar asad don't deserve to live."

---

## CONCLUSION

33.    Based on the foregoing, I respectfully submit to this Court that there is evidence amounting at least to probable cause to believe that YUSUF and NUR have committed the federal crimes specified above in this affidavit, and that the nature of these crimes, and YUSUF's attempted international travel, further supports the issuance of warrants by this court for the arrest of Abdullahi YUSUF and Abdi NUR.

Respectfully submitted,

JOHN P. THOMAS
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before
me on this 24th day of November, 2014.

JANIE S. MAYERON
United States Magistrate Judge

22

U.S. v. Warsame, Case No. 16-CR-37-MJD (D. Minn.) (Judgment and Complaint attached)

AO 245B (Rev. 11/16)  Sheet 1 - Judgment in a Criminal Case

# United States District Court
### District of Minnesota

UNITED STATES OF AMERICA

v.

**Abdirizak Mohamed Warsame**

**JUDGMENT IN A CRIMINAL CASE**

Case Number: **16-cr-37 (1) (MJD)**

USM Number: **19700-041**

**Robert Sicoli**

Defendant's Attorney

## THE DEFENDANT:

[X]  pleaded guilty to count 1 of the Information.

[]  pleaded nolo contendere to counts(s) which was accepted by the court.

[]  was found guilty on count(s)  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:2339B(a)(1) | CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION | 4/3/15 | 1 |

The defendant is sentenced as provided in pages 2 through 5 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[]  The defendant has been found not guilty on counts(s) **.**

[]  Count(s)  (is)(are) dismissed on the motion of the United States.

A $100.00 special assessment for the Crime Victims Fund is required by statue to be paid immediately.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of any material change in economic circumstances.

November 14, 2016

Date of Imposition of Judgment

s/Michael J. Davis

Signature of Judge

**MICHAEL J. DAVIS**, Senior United States District Judge

Name & Title of Judge

November 30, 2016

Date

AO 245B (Rev. 11/16)  Sheet 2 - Imprisonment

DEFENDANT: ABDIRIZAK MOHAMED WARSAME
CASE NUMBER: 16-CR-37 (1) (MJD)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of 30 months.

[X]     The court makes the following recommendations to the Bureau of Prisons: The Defendant be placed in the state of Minnesota so he may be close to his family.

[X]     The defendant is remanded to the custody of the United States Marshal.

[]      The defendant shall surrender to the United States Marshal for this district.
        [] at   on .
        [] as notified by the United States Marshal.

[]      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
        [] before  on .
        [] as notified by the United States Marshal.
        [] as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on_____ to _____

a _____ , with a certified copy of this judgment.

_____
United States Marshal

By _____
Deputy United States Marshal

AO 245B (Rev. 11/16)  Sheet 3 - Supervised Release

| | |
|---|---|
| DEFENDANT: | ABDIRIZAK MOHAMED WARSAME |
| CASE NUMBER: | 16-CR-37 (1) (MJD) |

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of 20 years **.**

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from  imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        []    The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. (check if applicable)

4. [X] You must cooperate in the collection of DNA as directed by the probation officer. (*check if applicable)*

5. [] You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as  directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. (*check if applicable*)

6. [] You must participate in an approved program for domestic violence. (*check if applicable*)

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 11/16)  Sheet 3A - Supervised Release

| | |
|---|---|
| DEFENDANT: | ABDIRIZAK MOHAMED WARSAME |
| CASE NUMBER: | 16-CR-37 (1) (MJD) |

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

# U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at www.uscourts.gov.

Defendant's Signature  _____  Date _____

Probation Officer's Signature  _____  Date _____

AO 245B (Rev. 11/16)  Sheet 3D - Supervised Release

| | |
|---|---|
| DEFENDANT: | ABDIRIZAK MOHAMED WARSAME |
| CASE NUMBER: | 16-CR-37 (1) (MJD) |

# SPECIAL CONDITIONS OF SUPERVISION

a    The defendant shall submit his person, residence, office, vehicle, or an area under the defendant's control to a search conducted by a United States Probation Officer or supervised designee, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a supervision violation. The defendant shall warn any other residents or third parties that the premises and areas under the defendant's control may be subject to searches pursuant to this condition.

b    The defendant shall not possess or use a computer or have access to any on-line service without the prior approval of the U.S. Probation and Pretrial Services Office.  The defendant's cooperation shall include but not be limited to allowing installation of a computer and Internet monitoring program and/or identifying computer systems, Internet-capable devices, and similar memory and electronic devices to which the defendant has access.  Monitoring may include random examinations of computer systems along with Internet, electronic, and media storage devices under the defendant's control. The computer system or devices may be removed for a more thorough examination, if necessary. The defendant shall contribute to the cost of such monitoring services, based on the defendant's ability to pay, as deemed appropriate by the U.S. Probation Office and Pretrial Services Office.

c    If not employed at a regular lawful occupation, as deemed appropriate by the probation officer, the defendant may be required to perform up to 20 hours of community service per week until employed. The defendant may also participate in training, counseling, daily job search, or other employment-related activities, as directed by the probation officer.

d    The defendant shall provide the probation officer access to any requested financial information, including credit reports, credit card bills, bank statements, and telephone bills.

e    The defendant shall not possess, view, access or otherwise use material that reflects extremist or terrorist views or as deemed to be inappropriate by the U.S. Probation Office.

f    The defendant shall participate in a mental health counseling program as approved by the probation officer. This program may include psychological/psychiatric counseling or treatment, family counseling, and mentor support.

g    The defendant shall submit to periodic polygraph testing at the direction of the probation officer as a means to ensure compliance with the requirements of supervision.

h    The defendant shall surrender his passport and any travel documents and must not apply for a new passport or travel documents.

i    The defendant shall reside for a period of up to 365 days in a residential reentry center as approved by the probation officer and shall observe the rules of that facility, which may include location monitoring with Global Positioning System (GPS) technology. The defendant may be restricted to their residence at all times except for employment; education; religious services; medical; substance abuse; or mental health treatment; court obligations; or discretionary leave activities as approved by the probation officer. The defendant shall not be required to pay the costs of location monitoring.

j    The defendant shall submit to substance abuse testing as approved and directed by the probation officer.

k    The defendant shall not give interviews or speeches unless approved by the Court and U.S. Attorneys Office.

ARW:tac

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

District of Minnesota

UNITED STATES OF AMERICA

v.

Case No. 15-mj-978 HB

ABDIRIZAK MOHAMED WARSAME

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning on or before March 1, 2014, and continuing until the present in the State and District of Minnesota, defendant(s)

Conspired to provide material support to a designated foreign terrorist organization and provided material support to a designated foreign terrorist organization.

in violation of Title 18, United States Code, Section(s) 2339B.

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

_____
*Complainant's signature*

**Vadym Vinetsky, Special Agent**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/9/15

City and State:  St. Paul, MN

_____
*Judge's Signature*

Hildy Bowbeer, U.S. Magistrate Judge
*Printed Name and Title*

SCANNED
DEC. 09 2015
U.S. DISTRICT COURT ST. PAUL

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
District Court File No. 15 –mj - *978  HB*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **AFFIDAVIT OF SPECIAL** |
| | ) | **AGENT VADYM VINETSKY** |
| Plaintiff, | ) | **IN SUPPORT OF AN** |
| | ) | **APPLICATION FOR A** |
| v. | ) | **CRIMINAL COMPLAINT** |
| | ) | **AND AN ARREST WARRANT** |
| ABDIRIZAK MOHAMED WARSAME,) | | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| STATE OF MINNESOTA | ) | |
| | ) | **SS:** |
| COUNTY OF RAMSEY | ) | |

I, Vadym Vinetsky, being duly sworn upon my oath, depose and state as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation (hereinafter the "FBI"), and have been employed by the FBI since approximately February of 2010. Since November of 2014, I have been assigned to the Joint Terrorism Task Force (hereinafter the "JTTF") of the FBI's Minneapolis Division.  My duties as a Special Agent include, among other things, investigating criminal violations relating to terrorism, such as material support to designated foreign terrorist organizations.  The statements contained in this affidavit are based on information I have learned through my own investigation; my background, training, and experience as an FBI Special Agent assigned to the JTTF; the investigation of other FBI Special Agents and law enforcement officers;

1

records and other evidence obtained during the course of this investigation; and discussions with individuals as set forth in this affidavit.

2.       The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement personnel, and witnesses. This affidavit is intended to show merely that there is probable cause for this Court to issue the requested criminal complaint and arrest warrant.  This affidavit does not set forth all of my knowledge about this matter.

3.       Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the defendant herein, **ABDIRIZAK MOHAMED WARSAME ("WARSAME")**, has committed violations of 18 U.S.C. § 2339B(a)(1) (providing, and conspiring to provide, material support, specifically personnel, to a designated foreign terrorist organization), as described in more detail below.

## FACTS CONSTITUTING PROBABLE CAUSE

*The Islamic State in Iraq and the Levant is a Designated Foreign Terrorist Organization*

4.       The Islamic State in Iraq and the Levant ("ISIL") is a designated Foreign Terrorist Organization.  On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

2

5.     On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa ash-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  Although the group has never called itself "al-Qa'ida in Iraq," this name has frequently been used to describe it throughout its history. In an audio recording publicly released on June 29, 2014, ISIL announced a formal change of ISIL's name to Islamic State.  This terrorist organization will be referred to as "ISIL" for the balance of this affidavit.

*Charges Related To The Conspiracy To Provide Material Support To ISIL.*

6.     Beginning no later than approximately April of 2014, several young men from Minnesota's Somali-American community began conspiring to travel to Syria to join, and fight with, ISIL.  Nine of these men, not including **ABDIRIZAK WARSAME**, have so far been charged, either by complaint or indictment, as a result of the FBI's investigation into this conspiracy.  Three of the nine have pleaded guilty, five are scheduled to start trial on a second superseding indictment on May 9, 2016, and one is in Syria.

3

*Defendant ABDIRIZAK WARSAME Is a Member of the Conspiracy to Provide Material Support to ISIL*

7.    Your affiant knows that in the summer of 2013, H.A.M., a 19 year-old Somali-American male from Minneapolis, Minnesota, traveled to Canada to visit several of his cousins.[1]    When H.A.M. returned to Minnesota in the fall of 2013, his friend ABDULLAHI YUSUF ("YUSUF")[2], noted that H.A.M. had become far more conservative.

8.    YUSUF has informed investigators that in the early spring of 2014, H.A.M. disappeared.  YUSUF looked for H.A.M., but was eventually told that H.A.M.'s passport was missing and that his mother had flown to Turkey to try and find her son and persuade him to return home to Minnesota.  That same day defendant GULED ALI OMAR ("OMAR")[3] picked up YUSUF and co-defendant ADNAN ABDIHAMID FARAH ("A. FARAH")[4] and took them to a restaurant.  OMAR and A. FARAH talked to YUSUF about fighting jihad overseas and afterwards, the three men went to a local mosque, where they played basketball and watched propaganda videos that glorified religious

---

[1] Investigators learned that three of those cousins later left Canada for Syria where they joined ISIL, and are believed to have been killed while fighting for the terrorist organization.

[2] On February 26, 2015, YUSUF appeared with counsel before Senior District Judge Michael J. Davis and pleaded guilty to one count of conspiring to provide material support and resources to a designated foreign terrorist organization (ISIL) in violation of 18 U.S.C. § 2339B(a)(1).

[3] OMAR is charged in a second superseding indictment in Criminal File No. 15-49 (MJD/FLN) with various crimes related to the conspiracy to travel to Syria to join, and fight with, ISIL.  He is scheduled to be tried together with his four co-defendants beginning on May 9, 2016.

[4] A. FARAH is charged in a second superseding indictment in Criminal File No. 15-49 (MJD/FLN) with various crimes related to the conspiracy to travel to Syria to join, and fight with, ISIL.  He is scheduled to be tried together with his four co-defendants beginning on May 9, 2016.

4

violence. A number of other men, including **WARSAME**, ZACHARIA ABDURAHMAN ("ABDURAHMAN")[5], ABDI NUR[6], A. FARAH, MOHAMED ABDIHAMID FARAH ("M. FARAH")[7] and ABDIRAHMAN YASIN DAUD ("DAUD")[8] were present at the mosque that night, watching videos and playing basketball. YUSUF has told investigators that after this evening, and throughout the spring of 2014, he attended a number of meetings with these men – all of whom aspired to travel to Syria to join and fight with ISIL. At one such meeting during the spring of 2014, members of the group discussed ways to leave the United States and travel to Syria despite the fact that law enforcement's scrutiny of them was intense. **WARSAME**, OMAR and others settled on a plan of going to Syria via Mexico. At another meeting of the group, OMAR was elected leader, or "emir" of the group. According to YUSUF, **WARSAME** participated in the meeting at which OMAR was elected emir.

9.     Also during the spring of 2014, **WARSAME** and OMAR introduced YUSUF to co-conspirator Y.J., a 21 year-old Minneapolis resident aspiring to travel to

---

[5] On September 17, 2015, ABDURAHMAN appeared with counsel before Senior District Judge Michael J. Davis and pleaded guilty to one count of conspiring to provide material support and resources to a designated foreign terrorist organization (ISIL) in violation of 18 U.S.C. § 2339B(a)(1).

[6] NUR departed from Minnesota on May 29, 2014, and traveled to Syria, where he joined ISIL. He has been charged by complaint with conspiring to provide material support and resources to a designated foreign terrorist organization (ISIL) in violation of 18 U.S.C. § 2339B.

[7] M. FARAH is the brother of A. FARAH. He is charged in a second superseding indictment in Criminal File No. 15-49 (MJD/FLN) with various crimes related to the conspiracy to travel to Syria to join, and fight with, ISIL. He is scheduled to be tried together with his four co-defendants beginning on May 9, 2016.

[8] DAUD is charged in a second superseding indictment in Criminal File No. 15-49 (MJD/FLN) with various crimes related to the conspiracy to travel to Syria to join, and fight with, ISIL. He is scheduled to be tried together with his four co-defendants beginning on May 9, 2016.

Syria to join ISIL. YUSUF learned that Y.J. had obtained a U.S. passport and had saved approximately $5,000 for this purpose. OMAR, then planning his own imminent departure for Syria, appointed **WARSAME** to replace him as the emir for the remaining co-conspirators in Minnesota. As the new emir, **WARSAME** immediately encouraged those with passports and money to travel to Syria by the end of the upcoming summer. On May 24, 2015, OMAR, Y.J., and a third individual,[9] attempted to drive to southern California, planning to cross into Mexico and then from Mexico travel onwards to Syria. This plan was thwarted by OMAR's family.[10]

10. YUSUF, A. FARAH, and ABDI NUR ("NUR"), in a conversation with OMAR, decided to obtain passports and fly out of a U.S. airport as these three co-conspirators were believed to not be under law enforcement scrutiny. In YUSUF's presence, **WARSAME** provided A. FARAH $200 for A. FARAH's expedited passport application. After YUSUF obtained his own passport, he showed the document to others involved in the conspiracy, including **WARSAME**. The group, including **WARSAME**, then discussed YUSUF's ability to travel to Syria.

11. Records of the U.S. Department of State's Passport Office show that on April 16, 2014, **WARSAME** applied for a U.S. passport on an expedited basis. The passport officer was concerned because **WARSAME**'s written application stated that he

---

[9] The third individual who attempted to leave for Syria on May 24, 2014, was a 19 year-old Somali male who would, as described later in this affidavit, begin to cooperate with the FBI in 2015.

[10] After this attempt failed, Y.J. bought a Greyhound bus ticket to New York City and a plane ticket from New York to Istanbul. Y.J. left Minneapolis for New York by bus on June 8, 2014 and flew out of New York, bound for Istanbul, on June 9, 2014. Y.J. eventually reached Syria and joined ISIL and is believed to have been killed in August of 2014 while fighting for the terrorist organization.

needed a passport for a family trip to Britain that was planned for July; however, in the Passport Office, **WARSAME** stated that the family was going to Australia, not Britain, and **WARSAME** said he needed the passport soon – the same day if possible. **WARSAME**'s passport application was denied on the grounds of insufficient supporting documentation.   While your affiant has learned that **WARSAME** later succeeded in obtaining a U.S. passport in August of 2014, your affiant assesses that the denial of his application in the spring of 2014 kept **WARSAME** from attempting to leave the U.S. for Syria in April or May of 2014.

12.    YUSUF made reservations for a May 28, 2014 flight from Minneapolis – Saint Paul ("MSP") to Istanbul, Turkey.  In the days prior to his planned departure, YUSUF made several deposits of cash into a newly-opened checking account. According to YUSUF, **WARSAME** accompanied him to deposit a portion of these funds.  Also, the day before YUSUF's attempted departure, **WARSAME** accompanied YUSUF, NUR, and M. FARAH to a public library where YUSUF printed out his itinerary from one of the library's publicly-available computer terminals.  The four men then went to a nearby mall, where they shopped for items needed for travel to Syria. Video obtained from a department store at the mall near the library depicts **WARSAME**, YUSUF, NUR, and M. FARAH shopping together during the early evening hours of May 27, 2014.  FBI surveillance personnel noted YUSUF, M. FARAH, and NUR together outside Minneapolis Community and Technical College earlier, on the afternoon of May 27, 2014.

7

13.     On or about May 28, 2014, YUSUF attempted to travel to Istanbul, Turkey. YUSUF had planned to make contact with ISIL members in Istanbul and, with their help, cross the Turkish/Syrian border in order to join the terrorist organization.  YUSUF was stopped at MSP, however, by FBI Agents who prevented YUSUF from boarding his flight.

14.     On May 29, 2014, NUR left from MSP and flew to Istanbul, Turkey.   One week later, on June 6, 2014, NUR phoned home to Minnesota and spoke to a family member.  The caller ID feature captured the number from which NUR was calling.  The number contained a prefix "90", indicating that this is a Turkish telephone number.  On June 25, 2014, Y.J., whose own travel to Syria to join and fight with ISIL is described above in paragraph nine and footnote 10 of this affidavit, also phoned home to Minnesota from the same Turkish number.

15.     YUSUF has informed investigators that following his failed attempt to leave and NUR's successful departure for Syria, the group of aspiring travelers met at a park in Minneapolis to discuss the status of the conspiracy.   At this meeting, **WARSAME** and YUSUF both assured the group of co-conspirators that they had not provided any information to authorities investigating the matter.

16.     A man who later became a cooperating human source ("CHS") for the FBI traveled to San Diego, California at the end of May, 2014.  There, he awaited contact from Douglas McAuthur McCain, a former Minnesota and San Diego resident who had

successfully traveled to Syria and joined ISIL in 2014.[11]    In June of 2014, while still

waiting to hear from McCain, the future CHS was contacted by **WARSAME**, who asked

him for contact information for ISIL member H.K., a cousin of the future CHS's.  H.K.

was a Canadian citizen who had succeeded in reaching Syria and joining ISIL.  ISIL

member H.K. is one of the Canadian cousins of H.A.M. mentioned in paragraph seven of

this affidavit, above.  The future CHS provided the requested contact information to

**WARSAME**.  Later, in an April 6, 2015, recorded conversation, co-conspirators MUSSE

and ABDURAHMAN told the CHS that **WARSAME** had sought this contact

information in order to pass it to Y.J. (who is discussed in paragraph nine and footnote

10, above).  When Y.J. went to Turkey, according to ABDURAHMAN, "he didn't have

the numbers;" "he didn't have nothing;" and so "[h]e called Abdirizak, bro."  MUSSE

then stated "Abdirizak gave him the numbers."  The CHS then stated that **WARSAME**

got the numbers [12] from him, the CHS, while the CHS was in San Diego.   Although Y.J.

reached Istanbul on or about June 9, 2014, he did not phone home from the same Turkish

telephone number that NUR had earlier used until June 25, 2014.  The fact that NUR and

Y.J. both used this number, and that they phoned Minnesota to say good-bye to their

families after being in Turkey for a while, can be explained by this Turkish number being

an ISIL-controlled number.  The 16-day gap between Y.J.'s June 9 arrival in Turkey and

---

[11] McCain was later killed fighting for ISIL.  On or about August 24, 2014, the U.S. State Department's Bureau of Consular Affairs, Office of Overseas Citizen Services, informed McCain's next-of-kin of his likely death in Syria.

[12] The numbers the CHS gave to WARSAME were the numbers for the CHS's cousin, and were not the same as the Turkish phone number from which both NUR and Y.J. phoned home to Minnesota.

his June 25 phone call leads your affiant to infer that Y.J. experienced difficulty in contacting ISIL facilitators upon arrival in Turkey and that H.K.'s contact information would therefore have been helpful to Y.J.

17.     In an April 9, 2015 recorded conversation, the subject of **WARSAME** seeking a telephone number for an ISIL contact came up again.  In a tape-recorded conversation between A. FARAH and the CHS, A. FARAH, referring to **WARSAME**, stated **WARSAME** had been trying to obtain from OMAR "a number from one of the brothers."  The CHS asked "oh, he's trying to go to Sham, right," to which A. FARAH replied "yeah."[13]

18.     On November 6, 2014, OMAR attempted to fly from MSP to San Diego, California.  OMAR came to the airport with only a single piece of carry-on, and carrying his passport.  OMAR was not permitted to board his flight.  In subsequent recorded conversations reviewed by your affiant, OMAR would tell others that this effort on November 6th was one of several by OMAR to leave the United States for Syria.  At this same time, co-conspirators MUSSE, ABDURAHMAN, M. FARAH, and AHMED traveled by bus from Minneapolis to New York and, on November 8, 2014, attempted to board flights from John F. Kennedy International Airport (hereinafter "JFK") to various cities in southeastern Europe (Sofia, Bulgaria; Athens, Greece; and Istanbul, Turkey). Federal law enforcement officers at JFK denied boarding to the men.  Three of the men returned to Minnesota by bus; ABDURAHMAN also left New York City on a bus, but

---

[13] "Sham" is a word that is used to denote greater Syria, and is a word used by *ISIL*.  One of the names under which ISIL was designated as a terrorist organization by the Secretary of State (see paragraphs four and five above) was the Islamic State of Iraq and al-Sham.

stopped in Chicago on November 9 and 10 before returning to Minneapolis on November 11, 2014. At the time, **WARSAME** was temporarily residing in Chicago with his father. Your affiant has reviewed phone records showing that **WARSAME** and ABDURAHMAN's phones connected with each other on November 9, 10, 11, and 12, 2014.

19. In early 2015, OMAR, DAUD, ABDURAHMAN, MUSSE, M. FARAH and A. FARAH revived the idea of leaving the United States for Mexico, and then traveling onward to Syria from Mexico. Another participant in these conversations was the individual described in paragraph 16 above, who had agreed to cooperate with the FBI's investigation. Now a Confidential Human Source ("CHS"), he recorded numerous conversations he had with members of the conspiracy. **WARSAME,** while visiting from Chicago in early April of 2015, participated in several of these conversations and, as outlined below, actively encouraged OMAR to travel to Syria to join ISIL. **WARSAME** did not plan to join the Mexico group, because he was planning to travel with his family to East Africa, then either break free of his family and travel onwards to Syria, or, as indicated in paragraph 23 of this affidavit, below, wait in Somalia for a time when, he believed, ISIL would expand to Somalia.

20. As noted above, the CHS made tape-recordings of numerous conversations he had with members of the conspiracy between February and April of 2015. Transcripts of those conversations have been prepared and reviewed. Several transcript portions bear on **WARSAME**'s membership in this conspiracy, and the specific things he did and said

11

in furtherance of the conspiracy's criminal objectives. Those transcript portions are described in the following paragraphs.

21. In a recorded conversation with OMAR on March 3, 2015, OMAR described **WARSAME** as part of the group of men aspiring to travel to Syria to join ISIL:

> *"And even the first time remember they had Abdi Yare (NUR) and all of us and they made me emir. Even before that, me and Daud, we had a really bad encounter because he was always like trying to rush everybody, everything, you know. We had a bad experience with each other. So whenever me and Abdi Yare (NUR), and…Hanad (MUSSE), Abdullahi (YUSUF), and Yusuf (JAMA) and Zach (ABDURAHMAN) and A-Zak (WARSAME) and, uh, who else, A-Zak and (name of unindicted co-conspirator)… (unindicted co-conspirator) was trying to leave with us too. (unindicted co-conspirator), Mohamed Farah, Adnan, and then there was ten of us and they appointed me as emir, you know? Daud was, Abdi Yare (NUR) was always trying to bring Daud, ya know?"*

22. In a tape-recorded conversation on April 2, 2015, **WARSAME** described to OMAR an earlier conversation he had with A. FARAH. It was that conversation with A. FARAH, according to **WARSAME**, that was critical to his decision to travel overseas to join ISIL. In the following excerpt "AW" is **WARSAME** and "GO" is OMAR:

> *AW:* *You know what Adnan (FARAH) said to me? He was like … wallahi,[14] if you leave [Somali language spoken here]. He said [Somali] …and the good people will stay [UI] be tested and the people were fake [Somali]. He said if anything, it's good for them. Wallah, I never will forget that what he said, it was good for them. But that's when [UI] got my picture. Bro, my mom and family and stuff were out of the picture a long time ago. Wallah, I made that decision a long time ago.*
>
> *GO:* *I did too, bro.*

---

[14] "Wallahi" means "I swear to Allah".

12

23.     During this same recording, **WARSAME** can be heard telling OMAR and the CHS about the method by which "the mujahadeen"[15] pray during *jihad*. He stated, "*I love how the praying is*."

24.     On April 2, 2015, **WARSAME** recounted a conversation he had with NUR, before NUR left the United States for Syria. In this exchange, **WARSAME** told OMAR and the CHS that he proposed to NUR that they rob people in order to finance their travel overseas to Syria. **WARSAME** explained that NUR rejected this idea, and suggested they rob the government instead. **WARSAME** then referred to NUR as "a genius."

25.     In this same conversation, **WARSAME,** aware of OMAR's prior failed attempts to join ISIL, encouraged him to continue his efforts to travel overseas to join the terrorist organization. In the following excerpt, "AW" is **WARSAME**, "GO" is OMAR, and "CHS" is the FBI's Cooperating Human Source, while "[UI]" means "unintelligible":

AW:     *Could it be maybe this time if you still go, maybe Allah will see you as somebody who is—keeps trying and will probably allow you to go? Did you ever think of that?*

GO:     *I did wallah. That's the plus. That's was make...that was telling me this is the right thing to do. Because you're trying to [UI].*

AW:     *Wallahi, I guarantee you, wallah. [UI]. If you, if you go and it does not work out, wallahi I guarantee you soon you will try again. You will keep trying [Somali]. Why beca-it's going to—you know-have you—you know people that play poker?*

———————

AW:     *So I mean-I think, wallah, you should try it, just be smart about it. Don't be dumb. You know? And know that every move you make, every thought, every single step you take...cuz it's like playing a game of chess, bro, one wo-thing you move you can be in danger, or you could win. And that everything—comes with its consequences. You're not good at chess, [UI].*

———————

[15] One who is engaged in *jihad*, a holy war.

13

GO: *I am good at chess, bro.*
AW: *[Somali for "Look"], that's not the point, though.*
CHS: *No, you're not.*
AW: *If you know chess, every move you make you can-you can lose or-or win or whatever.*
GO: *I know. That's why I'm [UI]. I'm not good at chess. [UI].*
CHS: *So why don't you just [UI].*
GO: *[UI]*
CHS: *So, where are we at?*
AW: *—all about putting your trust in Allah —*
CHS: *But that's what we have. Yeah [UI]?*
AW: *Wallahi, Guled, if you make it – wallahi you will give a hundred and—a thousand people [UI] not only that but you will give them conviction that anybody can do it.*
GO: *Wallah, I don't know. [UI].*
AW: *You will be an inspiration.*

26.　　In a tape-recorded conversation on April 3, 2015, an exchange took place involving **WARSAME**, the CHS, M. FARAH, and DAUD. In this discussion, **WARSAME** discussed his plan to travel to Syria from Somalia, and noted that if, as anticipated, the terrorist organization *al Shabaab* pledged allegiance to *ISIL*, then he, **WARSAME**, might not need to travel to Syria, because *ISIL* would then be in Somalia. In the following excerpt, "MF" is M. FARAH, "AW' is **WARSAME**, and "AD" is DAUD. "[OV]" means "overlapping voices," and "[UI]" means "unintelligible":

MF: *I want to ask Miski,[16] yo, when they gonna give bayah[17], fear God ["fear God," was said in Somali]. I'm going to ask him soon.*
AW: *[OV] Yo, yo, yo, that's—that's why I'm trying to stay there, bro.*
MF: *Over there, ah?*

---

[16] "Miski" is a nickname for Mohamed Abdullahi Hassan, who departed Minnesota on or about August 2, 2008 for Somalia, where he joined the foreign terrorist organization *al Shabaab*. He was indicted as defendant number six in District Court Criminal File Number 09-50 (JMR/SRN) and as of this writing remains a fugitive from justice.

[17] "Bayah" means allegiance.

AW:     [OV] Yeah, if I can't get to the dawla [a shortened name for ISIS], the dawla's probably gonna come to me.
MF:     I mean—
MF:     [OV] [UI]
MF:     The time, the time [said in Somali]. If you have an opportunity while you're over there ["while you're over there," said in Somali].
AW:     Ah, wallahi
AD:     [OV] Go to Sham[18], better get to Sham, bro.

## CONCLUSION

27.     Your affiant respectfully submits that the foregoing establishes evidence amounting at least to probable cause to believe that **ABDIRIZAK MOHAMED WARSAME** has committed the crime of conspiring to provide material support to a designated foreign terrorist organization, namely *ISIL*. Your affiant therefore respectfully asks that the requested criminal complaint and arrest warrant issue from this Court.

Dated:  12/09/15

_____
Vadym Vinetsky, Special Agent
Federal Bureau of Investigation



Subscribed and sworn to before me this 4th day of December, 2015.

_____
THE HONORABLE HILDY BOWBEER
United States Magistrate Judge



---

[18] "Sham" is the historic name for greater Syria.

U.S. v. Isse, Case No. 9-CR-50-MJD (D. Minn.)(Judgment and Indictment attached)

AO 245B (Rev. 11/11)  Sheet 1 - Judgment in a Criminal Case

# United States District Court

### District of Minnesota

UNITED STATES OF AMERICA

v.

**Abdifatah Yusuf Isse**
*aka Omar*

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)
Case Number: 09-cr-50 (01)(MJD/FLN)
USM Number: 39155-086
Social Security Number: 6764
Date of Birth: 1983

Paul Engh
Defendant's Attorney

## THE DEFENDANT:

[X]     pleaded guilty to Count 1 of the Indictment.
[]      pleaded nolo contendere to counts(s)  which was accepted by the court.
[]      was found guilty on count(s)  after a plea of not guilty.
The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:2339A(a) | PROVIDING MATERIAL SUPPORT TO TERRORISTS | December 2008 | 1 |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[]      The defendant has been found not guilty on counts(s) **.**
[X]     Count 2 is dismissed on the motion of the United States.

A $100.00 special assessment for the Crime Victims Fund is required by statue to be paid immediately.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of any material change in the economic circumstances.

May 14, 2013
Date of Imposition of Judgment

s/Michael J. Davis
Signature of Judge

**MICHAEL J. DAVIS**, Chief United States District Judge
Name & Title of Judge

May 29, 2013
Date

O 245B (Rev. 11/11)  Sheet 2 - Imprisonment

DEFENDANT:           ABDIFATAH YUSUF ISSE
CASE NUMBER:         09-CR-50 (01) (MJD/FLN)

# IMPRISONMENT

       The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 36 months.

[X]      The court makes the following recommendations to the Bureau of Prisons: The defendant shall be placed in a facility in Seattle, Washington or in the pacific northwest if Washington is not available.

[]       The defendant is remanded to the custody of the United States Marshal.

[]       The defendant shall surrender to the United States Marshal for this district.
         [] at   on .
         [] as notified by the United States Marshal.

[X]      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
         [X] on June 14, 2013 by noon. If the placement has not yet been made for the defendant, he shall report to the U.S. Marshal in Seattle, WA on June 14, 2013 by noon.
         [] as notified by the United States Marshal.
         [] as notified by the Probation or Pretrial Services Office

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on_____ to _____

a _____ , with a certified copy of this Judgment.

_____
                 United States Marshal

By  _____
                 Deputy United States Marshal

AO 245B (Rev. 11/11)  Sheet 3 - Supervised Release

| | |
|---|---|
| DEFENDANT: | ABDIFATAH YUSUF ISSE |
| CASE NUMBER: | 09-CR-50 (01) (MJD/FLN) |

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 20 years.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

[X]     The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

[X]     The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

[X]     The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

[]     The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

[]     The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this Judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without permission of the court or probation officer;
2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependants and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 11/11)  Sheet 3A - Supervised Release

| | |
|---|---|
| DEFENDANT: | ABDIFATAH YUSUF ISSE |
| CASE NUMBER: | 09-CR-50 (01) (MJD/FLN) |

# SPECIAL CONDITIONS OF SUPERVISION

a.  The defendant shall comply with all Immigration rules and regulations and, if deported from this country, either voluntarily or involuntarily, not reenter the United States illegally.  Upon any reentry to the United States during the period of court-ordered supervision, the defendant shall report to the nearest U.S. Probation and Pretrial Services Office within 72 hours.

b.  If not employed at a regular lawful occupation, as deemed appropriate by the probation officer, the defendant may be required to perform up to 20 hours of community service per week until employed. The defendant may also participate in training, counseling, daily job search, or other employment-related activities, as directed by the probation officer.

c.  The defendant shall submit his person, residence, office, vehicle, or an area under the defendant's control to a search conducted by a United States Probation Officer or supervised designee, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a supervision violation. The defendant shall warn any other residents or third parties that the premises and areas under the defendant's control may be subject to searches pursuant to this condition.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>1.    ABDIFATAH YUSUF ISSE,<br>       a/k/a Omar, and<br>2.    SALAH OSMAN AHMED,<br>       a/k/a Salman,<br><br>        Defendants. | **INDICTMENT**<br>CR09-050 ~~PAM~~/SRN<br>JMR<br><br>(18 U.S.C. § 956(a)(1))<br>(18 U.S.C. § 1001)<br>(18 U.S.C. § 2339A(a)) |

THE UNITED STATES GRAND JURY CHARGES THAT:

## COUNT 1
### (Providing Material Support to Terrorists)

1.    From in or about September 2007 through in or about December 2008, in the State and District of Minnesota and elsewhere, the defendants,

**ABDIFATAH YUSUF ISSE,**
a/k/a Omar, and
**SALAH OSMAN AHMED,**
a/k/a Salman,

did provide material support and resources, namely personnel including themselves, knowing and intending that the material support and resources were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill, kidnap, maim or injure persons in a foreign country); all in violation of Title 18, United States Code, Section 2339A(a).

**SCANNED**

JUL 13 2009

U.S. DISTRICT COURT ST. PAUL



FILED   **FEB 1 9 2009**
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS



### COUNT 2
(Conspiracy to Kill, Kidnap, Maim, and Injure)

2. From in or about September 2007 through in or about December 2008, in the State and District of Minnesota and elsewhere, the defendants,

**ABDIFATAH YUSUF ISSE,**
a/k/a Omar, and
**SALAH OSMAN AHMED,**
a/k/a Salman,

knowingly and intentionally conspired with each other and others, known and unknown to the grand jury, to kill, kidnap, and maim and injure persons outside of the United States, in violation of Title 18, United States Code, Section 956.

3. In furtherance of the conspiracy, and to effect the objects thereof, one of the co-conspirators knowingly performed the following overt act: on or about December 6, 2007, in the State and District of Minnesota, Salah Osman Ahmed boarded Northwest Airlines flight 56 from Minneapolis, Minnesota, to Amsterdam, Netherlands, with a final destination of Somalia.

### COUNT 3
(False Statements)

4. On or about July 30, 2008, in the State and District of Minnesota, in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency of the United States, and in an offense involving international terrorism,

**SALAH OSMAN AHMED,**
a/k/a Salman,

2

United States v. Abdifatah Yusuf Isse et al.

did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation to agents of the FBI, in violation of Title 18, United States Code, Section 1001(a)(2); that is, he stated that he did not know anyone on his flight to Somalia in December 2007, when, in fact, he traveled to Somalia together with an individual he knew, so that they could fight *jihad* in Somalia.

## COUNT 4
(False Statements)

5. On or about December 8, 2008, in the State and District of Minnesota, in a matter within the jurisdiction of the FBI, an agency of the United States, and in an offense involving international terrorism,

**SALAH OSMAN AHMED,**
a/k/a Salman,

did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation to agents of the FBI, in violation of Title 18, United States Code, Section 1001(a)(2); that is, he stated that he traveled alone and did not know anyone on his flights to Somalia in December 2007, when, in fact, he traveled to Somalia together with an individual he knew, so that they could fight *jihad* in Somalia.

A TRUE BILL

_____          _____
UNITED STATES ATTORNEY                    FOREPERSON

3

U.S. v. Ahmed, Case No. 9-CR-50-MJD (D. Minn.) (Judgment and Indictment attached)

AO 245B (Rev. 11/11)  Sheet 1 - Judgment in a Criminal Case

# United States District Court
### District of Minnesota

UNITED STATES OF AMERICA
v.
**Salah Osman Ahmed**
*aka Salman*

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)
Case Number: 09-cr-50 (02) (MJD/FLN)
USM Number: 14546-041
Social Security Number: 8340
Date of Birth: 1982

James Ostgard II
Defendant's Attorney

## THE DEFENDANT:

[X]     pleaded guilty to Count 1 of the Indictment.
[]      pleaded nolo contendere to counts(s)  which was accepted by the court.
[]      was found guilty on count(s)  after a plea of not guilty.
The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:2339A(a) | PROVIDING MATERIAL SUPPORT TO TERRORISTS | December 2008 | 1 |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[]      The defendant has been found not guilty on counts(s) **.**
[X]     Counts 2-4 are dismissed on the motion of the United States.

A $100.00 special assessment for the Crime Victims Fund is required by statue to be paid immediately.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of any material change in the economic circumstances.

May 14, 2013
Date of Imposition of Judgment

s/Michael J. Davis
Signature of Judge

**MICHAEL J. DAVIS**, Chief United States District Judge
Name & Title of Judge

May 29, 2013
Date

O 245B (Rev. 11/11)  Sheet 2 - Imprisonment

DEFENDANT:           SALAH OSMAN AHMED
CASE NUMBER:      09-CR-50 (02) (MJD/FLN)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 36 months.

[X]      The court makes the following recommendations to the Bureau of Prisons: The defendant shall be placed in a facility in the state of Minnesota

[]      The defendant is remanded to the custody of the United States Marshal.

[]      The defendant shall surrender to the United States Marshal for this district.
         [] at  on .
         [] as notified by the United States Marshal.

[X]      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
         [X] on June 14, 2013 by noon. If the placement has not yet been made for the defendant, he shall report to the U.S. Marshal in Minneapolis, MN on June 14, 2013 by noon.
         [] as notified by the United States Marshal.
         [] as notified by the Probation or Pretrial Services Office

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on_____ to _____

a _____ , with a certified copy of this Judgment.

_____
United States Marshal

By   _____
Deputy United States Marshal

Page 2

AO 245B (Rev. 11/11)  Sheet 3 - Supervised Release

| | |
|---|---|
| DEFENDANT: | SALAH OSMAN AHMED |
| CASE NUMBER: | 09-CR-50 (02) (MJD/FLN) |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 20 years.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

[X]     The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

[X]     The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

[X]     The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

[]     The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

[]     The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this Judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without permission of the court or probation officer;
2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4)   the defendant shall support his or her dependants and meet other family responsibilities;
5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 11/11)  Sheet 3A - Supervised Release

| | |
|---|---|
| DEFENDANT: | SALAH OSMAN AHMED |
| CASE NUMBER: | 09-CR-50 (02) (MJD/FLN) |

# SPECIAL CONDITIONS OF SUPERVISION

a.  If not employed at a regular lawful occupation, as deemed appropriate by the probation officer, the defendant may be required to perform up to 20 hours of community service per week until employed. The defendant may also participate in training, counseling, daily job search, or other employment-related activities, as directed by the probation officer.

b.  The defendant shall submit his person, residence, office, vehicle, or an area under the defendant's control to a search conducted by a United States Probation Officer or supervised designee, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a supervision violation. The defendant shall warn any other residents or third parties that the premises and areas under the defendant's control may be subject to searches pursuant to this condition.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| UNITED STATES OF AMERICA, | ) | **INDICTMENT** |
|---|---|---|
| | ) | CRO9-050 PPP/SRN |
| Plaintiff, | ) | (18 U.S.C. § 956(a)(1)) JMR |
| | ) | (18 U.S.C. § 1001) |
| v. | ) | (18 U.S.C. § 2339A(a)) |
| | ) | |
| 1. ABDIFATAH YUSUF ISSE, | ) | |
| a/k/a Omar, and | ) | |
| 2. SALAH OSMAN AHMED, | ) | |
| a/k/a Salman, | ) | |
| | ) | |
| Defendants. | ) | |

THE UNITED STATES GRAND JURY CHARGES THAT:

### COUNT 1
(Providing Material Support to Terrorists)

1. From in or about September 2007 through in or about December 2008, in the State and District of Minnesota and elsewhere, the defendants,

**ABDIFATAH YUSUF ISSE,**
a/k/a Omar, and
**SALAH OSMAN AHMED,**
a/k/a Salman,

did provide material support and resources, namely personnel including themselves, knowing and intending that the material support and resources were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill, kidnap, maim or injure persons in a foreign country); all in violation of Title 18, United States Code, Section 2339A(a).

**SCANNED**

JUL 13 2009

U.S. DISTRICT COURT ST. PAUL





FILED **FEB 1 9 2009**
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

### COUNT 2
(Conspiracy to Kill, Kidnap, Maim, and Injure)

2.   From in or about September 2007 through in or about December 2008, in the State and District of Minnesota and elsewhere, the defendants,

**ABDIFATAH YUSUF ISSE,**
a/k/a Omar, and
**SALAH OSMAN AHMED,**
a/k/a Salman,

knowingly and intentionally conspired with each other and others, known and unknown to the grand jury, to kill, kidnap, and maim and injure persons outside of the United States, in violation of Title 18, United States Code, Section 956.

3.   In furtherance of the conspiracy, and to effect the objects thereof, one of the co-conspirators knowingly performed the following overt act: on or about December 6, 2007, in the State and District of Minnesota, Salah Osman Ahmed boarded Northwest Airlines flight 56 from Minneapolis, Minnesota, to Amsterdam, Netherlands, with a final destination of Somalia.

### COUNT 3
(False Statements)

4.   On or about July 30, 2008, in the State and District of Minnesota, in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency of the United States, and in an offense involving international terrorism,

**SALAH OSMAN AHMED,**
a/k/a Salman,

2

United States v. Abdifatah Yusuf Isse et al.

did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation to agents of the FBI, in violation of Title 18, United States Code, Section 1001(a)(2); that is, he stated that he did not know anyone on his flight to Somalia in December 2007, when, in fact, he traveled to Somalia together with an individual he knew, so that they could fight *jihad* in Somalia.

### COUNT 4
(False Statements)

5. On or about December 8, 2008, in the State and District of Minnesota, in a matter within the jurisdiction of the FBI, an agency of the United States, and in an offense involving international terrorism,

**SALAH OSMAN AHMED,**
a/k/a Salman,

did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation to agents of the FBI, in violation of Title 18, United States Code, Section 1001(a)(2); that is, he stated that he traveled alone and did not know anyone on his flights to Somalia in December 2007, when, in fact, he traveled to Somalia together with an individual he knew, so that they could fight *jihad* in Somalia.

A TRUE BILL

_____        _____
UNITED STATES ATTORNEY                  FOREPERSON

3

U.S. v. Conley, Case No. 14-CR-163-RM (D. Colo.)(Judgment, Complaint and plea agreement attached)

✎AO 245B   (Rev. 11/14) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of _____ COLORADO _____

| UNITED STATES OF AMERICA | |
|---|---|
| V. | **JUDGMENT IN A CRIMINAL CASE** |
| SHANNON MAUREEN CONLEY | |

Case Number:     14-cr-00163-RM-01

USM Number:     40384-013

Robert W. Pepin, AFPD
Defendant's Attorney

## THE DEFENDANT:

[X] pleaded guilty to Count    1 of the Information

[ ] pleaded nolo contendere to Count(s) _____
which was accepted by the Court.

[ ] was found guilty on Count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 371 and 2339B | Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization | 4/8/2014 | 1 |

The defendant is sentenced as provided in pages 2 through ___ 10 ___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on Count(s) _____

[ ] Count(s) _____ [ ] is [ ] are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

January 23, 2015
Date of Imposition of Judgment

Signature of Judge

Raymond P. Moore, U.S. District Judge
Name and Title of Judge

January 26, 2015
Date

AO 245B     (Rev. 09/08) Judgment in Criminal Case
            Sheet 2 — Imprisonment

Judgment — Page __2__ of ___10___

DEFENDANT:         SHANNON MAUREEN CONLEY
CASE NUMBER:       14-cr-00163-RM-01

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
    forty-eight (48) months.

[X]    The court makes the following recommendations to the Bureau of Prisons:

       that the defendant be placed in a facility nearest to the District of Colorado consistent with her security requirements.

[X]    The defendant is remanded to the custody of the United States Marshal.

[ ]    The defendant shall surrender to the United States Marshal for this district:

       [ ]   at _____ [ ] a.m. [ ] p.m.   on   _____ .
       [ ]   as notified by the United States Marshal.

[ ]    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

       [ ]   before 12 p.m. on   _____ .
       [ ]   as notified by the United States Marshal.
       [ ]   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

Case 1:14-cr-00163-RM   Document 79   Filed 01/26/15   USDC Colorado   Page 3 of 10
AO 245B   (Rev. 09/08 Judgment in a Criminal Case
Sheet 3 — Supervised Release

|  |  | Judgment—Page | 3 | of | 10 |
|---|---|---|---|---|---|

DEFENDANT:        SHANNON MAUREEN CONLEY
CASE NUMBER:   14-cr-00163-RM-01

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:        three (3) years.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☒   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

5) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

6) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician. Except as authorized by court order, the defendant shall not possess, use or sell marijuana or any marijuana derivative (including THC) in any form (including edibles) or for any purpose (including medical purposes). Without the prior permission of the probation officer, the defendant shall not enter any marijuana dispensary or grow facility;

7) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

8) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

9) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

10) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

11) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

12) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement; and

13) the defendant shall provide access to any requested financial information.

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
          Sheet 3C — Supervised Release

| | Judgment—Page | 4 | of | 10 |
|---|---|---|---|---|

DEFENDANT:       SHANNON MAUREEN CONLEY
CASE NUMBER:    14-cr-00163-RM-01

## SPECIAL CONDITIONS OF SUPERVISION

1.    The defendant shall participate in and successfully complete a program of mental health treatment, as approved by the probation officer, until such time as the defendant is released from the program by the probation officer. The defendant shall pay the cost of treatment as directed by the probation officer.

2.    The defendant shall remain medication compliant and shall take all medications that are prescribed by her treating psychiatrist or mental health professional. The defendant shall cooperate with random blood tests as requested by his treating psychiatrist and/or supervising probation officer to ensure that a therapeutic level of her prescribed medications is maintained.

3.    The defendant is prohibited from any communication with any individual who is known to be associated with ISIS, Al-Qaeda, or any other terrorist organizations. Additionally, the defendant shall not access or review magazines, publications, or websites, which are primarily associated with terrorist organizations, specifically and including Inspire magazine and the preaching of Anwar Al-Awlaki.

4.    The defendant shall not possess any quantity of black powder or any explosive material.

5.    The defendant shall not obtain or possess any passport or international travel documents. Any existing passport or international travel document the defendant has shall be surrendered to the supervising probation officer within 72 hours upon her release from custody.

6.    The defendant shall perform 100 hours of community service as directed by the probation officer. Both the type of work and the agency where the defendant performs her community service shall be approved by the probation officer. The community service organization shall not be associated in any way with the homeless population.

7.    The defendant shall submit her person, property, house, residence, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of her supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
           Sheet 5 — Criminal Monetary Penalties

|  |  |  |
|---|---|---|
|  | Judgment — Page __5__ of __10__ |  |

DEFENDANT:        SHANNON MAUREEN CONLEY
CASE NUMBER:      14-cr-00163-RM-01

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $  100.00 | $ 0.00 | $ 0.00 |

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $           0.00 | $          0.00 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The Court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the  ☐ fine  ☐ restitution.

☐  the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 09/08) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __6__ of __10__

DEFENDANT:        SHANNON MAUREEN CONLEY
CASE NUMBER:      14-cr-00163-RM-01

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A  ☐  Lump sum payment of $ _____ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance   ☐ C,   ☐ D,   ☐  E, or   ☐ F below; or

B  ☒  Payment to begin immediately (may be combined with   ☐ C,   ☐D, or   ☐F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
    imprisonment.  The Court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the Court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following Court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and Court costs.

AO 245B  (Rev. 09/08) Criminal Judgment
Attachment (Page 1) — Statement of Reasons

DEFENDANT:          SHANNON MAUREEN CONLEY
CASE NUMBER:        14-cr-00163-RM-01

# STATEMENT OF REASONS

**I**  **COURT FINDINGS ON PRESENTENCE INVESTIGATION REPORT**

A  ☒  The Court adopts the presentence investigation report without change.

B  ☐  The Court adopts the presentence investigation report with the following changes.

(Check all that apply and specify Court determination, findings, or comments, referencing paragraph numbers in the presentence report, if applicable.) (Use page 4 if necessary.)

1  ☐  Chapter Two of the U.S.S.G. Manual determinations by Court (including changes to base offense level, or specific offense characteristics):

2  ☐  Chapter Three of the U.S.S.G. Manual determinations by Court (including changes to victim-related adjustments,  role in the offense, obstruction of justice, multiple Counts, or acceptance of responsibility):

3  ☐  Chapter Four of the U.S.S.G. Manual determinations by Court (including changes to criminal history category or scores, career offender, or criminal livelihood determinations):

4  ☐  Additional Comments or Findings (including comments or factual findings concerning certain information in the presentence report that the Federal Bureau of Prisons may rely on when it makes inmate classification, designation, or programming decisions):

C  ☐  The record establishes no need for a presentence investigation report pursuant to Fed.R.Crim.P. 32.

**II**  **COURT FINDING ON MANDATORY MINIMUM SENTENCE** (Check all that apply.)

A  ☒  No Count of conviction carries a mandatory minimum sentence.

B  ☐  Mandatory minimum sentence imposed.

C  ☐  One or more Counts of conviction alleged in the indictment carry a mandatory minimum term of imprisonment, but the sentence imposed is below a mandatory minimum term because the Court has determined that the mandatory minimum does not apply based on

☐  findings of fact in this case

☐  substantial assistance (18 U.S.C. § 3553(e))

☐  the statutory safety valve (18 U.S.C. § 3553(f))

**III**  **COURT DETERMINATION OF ADVISORY GUIDELINE RANGE (BEFORE DEPARTURES):**

Total Offense Level:  37
Criminal History Category:  VI
Imprisonment Range:       60         months
Supervised Release Range:   1   to   3   years
Fine Range: $  20,000.00   to  $  200,000.00
☒  Fine waived or below the guideline range because of inability to pay.

AO 245B   (Rev. 09/08) Criminal Judgment
Attachment (Page 2) — Statement of Reasons

| | Judgment—Page 8 of 10 |
|---|---|

DEFENDANT:   SHANNON MAUREEN CONLEY
CASE NUMBER:   14-cr-00163-RM-01

# STATEMENT OF REASONS

**IV   ADVISORY GUIDELINE SENTENCING DETERMINATION** (Check only one.)

A ☐   The sentence is within an advisory guideline range that is not greater than 24 months, and the Court finds no reason to depart.

B ☐   The sentence is within an advisory guideline range that is greater than 24 months, and the specific sentence is imposed for these reasons.
(Use page 4 if necessary.)

C ☒   The Court departs from the advisory guideline range for reasons authorized by the sentencing guidelines manual.
(Also complete Section V.)

D ☐   The Court imposed a sentence outside the advisory sentencing guideline system.  (Also complete Section VI.)

**V   DEPARTURES AUTHORIZED BY THE ADVISORY SENTENCING GUIDELINES** (If applicable.)

A   **The sentence imposed departs** (Check only one.):
☒ below the advisory guideline range
☐ above the advisory guideline range

B   **Departure based on** (Check all that apply.):

1   **Plea Agreement** (Check all that apply and check reason(s) below.):
☒ 5K1.1 plea agreement based on the defendant's substantial assistance
☐ 5K3.1 plea agreement based on Early Disposition or "Fast-track" Program
☐ binding plea agreement for departure accepted by the Court
☐ plea agreement for departure, which the Court finds to be reasonable
☐ plea agreement that states that the government will not oppose a defense departure motion.

2   **Motion Not Addressed in a Plea Agreement** (Check all that apply and check reason(s) below.):
☐ 5K1.1 government motion based on the defendant's substantial assistance
☐ 5K3.1 government motion based on Early Disposition or "Fast-track" program
☐ government motion for departure
☐ defense motion for departure to which the government did not object
☐ defense motion for departure to which the government objected

3   **Other**
☐ Other than a plea agreement or motion by the parties for departure (Check reason(s) below.):

C   **Reason(s) for Departure** (Check all that apply other than 5K1.1 or 5K3.1.)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ 4A1.3 | Criminal History Inadequacy | ☐ 5K2.1 | Death | ☐ 5K2.11 | Lesser Harm |
| ☐ 5H1.1 | Age | ☐ 5K2.2 | Physical Injury | ☐ 5K2.12 | Coercion and Duress |
| ☐ 5H1.2 | Education and Vocational Skills | ☐ 5K2.3 | Extreme Psychological Injury | ☐ 5K2.13 | Diminished Capacity |
| ☐ 5H1.3 | Mental and Emotional Condition | ☐ 5K2.4 | Abduction or Unlawful Restraint | ☐ 5K2.14 | Public Welfare |
| ☐ 5H1.4 | Physical Condition | ☐ 5K2.5 | Property Damage or Loss | ☐ 5K2.16 | Voluntary Disclosure of Offense |
| ☐ 5H1.5 | Employment Record | ☐ 5K2.6 | Weapon or Dangerous Weapon | ☐ 5K2.17 | High-Capacity, Semiautomatic Weapon |
| ☐ 5H1.6 | Family Ties and Responsibilities | ☐ 5K2.7 | Disruption of Government Function | ☐ 5K2.18 | Violent Street Gang |
| ☐ 5H1.11 | Military Record, Charitable Service, Good Works | ☐ 5K2.8 | Extreme Conduct | ☐ 5K2.20 | Aberrant Behavior |
| | | ☐ 5K2.9 | Criminal Purpose | ☐ 5K2.21 | Dismissed and Uncharged Conduct |
| ☐ 5K2.0 | Aggravating or Mitigating Circumstances | ☐ 5K2.10 | Victim's Conduct | ☐ 5K2.22 | Age or Health of Sex Offenders |
| | | | | ☐ 5K2.23 | Discharged Terms of Imprisonment |
| | | | | ☐ | Other guideline basis (e.g., 2B1.1 commentary) |

D   **Explain the facts justifying the departure.** (Use page 4 if necessary.)

AO 245B     (Rev. 09/08) Criminal Judgment
            Attachment (Page 3) — Statement of Reasons

| | Judgment—Page | 9 | of | 10 |
|---|---|---|---|---|

DEFENDANT:        SHANNON MAUREEN CONLEY
CASE NUMBER:      14-cr-00163-RM-01

# STATEMENT OF REASONS

VI   **COURT DETERMINATION FOR SENTENCE OUTSIDE THE ADVISORY GUIDELINE SYSTEM**
     (Check all that apply.)

A    **The sentence imposed is** (Check only one.):
     ☐ below the advisory guideline range

     ☐ above the advisory guideline range

B    **Sentence imposed pursuant to** (Check all that apply.):

1    **Plea Agreement** (Check all that apply and check reason(s) below.):
     ☐ binding plea agreement for a sentence outside the advisory guideline system accepted by the Court
     ☐ plea agreement for a sentence outside the advisory guideline system, which the Court finds to be reasonable
     ☐ plea agreement that states that the government will not oppose a defense motion to the Court to sentence outside the advisory guideline
        system

2    **Motion Not Addressed in a Plea Agreement** (Check all that apply and check reason(s) below.):
     ☐ government motion for a sentence outside of the advisory guideline system
     ☐ defense motion for a sentence outside of the advisory guideline system to which the government did not object
     ☐ defense motion for a sentence outside of the advisory guideline system to which the government objected

3    **Other**
     ☐ Other than a plea agreement or motion by the parties for a sentence outside of the advisory guideline system (

C    **Reason(s) for Sentence Outside the Advisory Guideline System** (Check all that apply.)

     ☐ the nature and circumstances of the offense and the history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1)

     ☐ to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A))

     ☐ to afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B))

     ☐ to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C))

     ☐ to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner
        (18 U.S.C. § 3553(a)(2)(D))

     ☐ to avoid unwarranted sentencing disparities among defendants (18 U.S.C. § 3553(a)(6))

     ☐ to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7))

D    **Explain the facts justifying a sentence outside the advisory guideline system.** (Use page 4 if necessary.)

AO 245B      (Rev. 09/08) Criminal Judgment
             Attachment (Page 4) — Statement of Reasons

|  | Judgment—Page | 10 | of | 10 |

DEFENDANT:        SHANNON MAUREEN CONLEY
CASE NUMBER:      14-cr-00163-RM-01

# STATEMENT OF REASONS

## VII   COURT DETERMINATIONS OF RESTITUTION

A ☒ Restitution Not Applicable.

B  Total Amount of Restitution: _____

C  Restitution not ordered (Check only one.):

   1  ☐  For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because the number of
          identifiable victims is so large as to make restitution impracticable under 18 U.S.C. § 3663A(c)(3)(A).

   2  ☐  For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because determining complex
          issues of fact and relating them to the cause or amount of the victims' losses would complicate or prolong the sentencing process to a degree
          that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process under 18 U.S.C. § 3663A(c)(3)(B).

   3  ☐  For other offenses for which restitution is authorized under 18 U.S.C. § 3663 and/or required by the sentencing guidelines, restitution is not
          ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweigh
          the need to provide restitution to any victims under 18 U.S.C. § 3663(a)(1)(B)(ii).

   4  ☐  Restitution is not ordered for other reasons.  (Explain.)

D ☐ Partial restitution is ordered for these reasons (18 U.S.C. § 3553(c)):

## VIII  ADDITIONAL FACTS JUSTIFYING THE SENTENCE IN THIS CASE (If applicable.)

Sections I, II, III, IV, and VII of the Statement of Reasons form must be completed in all felony cases.

Case 1:14-cr-00163-ARMS-E Document 28 Filed 06/26/14 USDC Colorado Page 1 Page 1 of
Case 9:16-cr-80107-RLR Document 298 Entered on FLSD Docket 05/09/2018 Page 128 of
281

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | |
| | ) | Case No.   14-mj-01045-KLM |
| | ) | |
| SHANNON MAUREEN CONLEY | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

Between and on or about September 7, 2013 through April 8, 2014, inclusive, in the State and District of Colorado and elsewhere, the defendant, Shannon Maureen CONLEY, together with others, did knowingly attempt to provide material support and resources, to wit: personnel (1 or more individuals who may be or include oneself) and expert advice or assistance, to a foreign terrorist organization, specifically the Islamic State of Iraq and Syria ("ISIS"), also known as the Islamic State of Iraq ("ISI") or Al-Qaeda in Iraq ("AQI"), continuously designated since December 17, 2004, knowing that the organization was a designated terrorist organization, that the organization had engaged in and was engaging in terrorist activity and terrorism, and the offense occurred in whole or in part within the United States.

All in violation of Title 18, United States Code, Section 2339B.

This criminal complaint is based on these facts:

See Affidavit attached hereto and herein incorporated by reference.

**X** Continued on attached sheet.

_s/Christian K. R. Byrne_
*Complainant's signature*

Christian K. R. Byrne, Task Force Officer, FBI-JTTF
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☑ submitted, attested to, and acknowledged by reliable electronic means.

Date: **09 Apr 2014**

_Judge's signature_

City and state:   Denver, Colorado

Kristen L. Mix
United States Magistrate Judge
*Printed name and title*

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

The undersigned, being duly sworn, deposes and says:

1.  Your affiant, Christian K. R. Byrne, is a sworn peace officer in the State of Colorado, and a
    Special Deputy US Marshal in the United States of America.  Your affiant has been a peace
    officer in Colorado since 1996, a Special Deputy US Marshal since 2012, and is currently
    assigned to the Federal Bureau of Investigation (FBI), Denver Field Office, Joint Terrorism
    Task Force (JTTF).  Your affiant's primary responsibilities include the investigation of
    crimes as defined by United States Code and Colorado Revised Statutes within the state of
    Colorado. Your affiant states that the following facts are true and based upon the affiant's
    personal knowledge, as a result of the affiant's conversations with the persons named herein
    and reviewing their written reports.

2.  In the course of his official duties, your affiant is charged with the investigation of crimes
    within the federal district of Colorado.  In this regard, the following information was
    developed by your affiant, Special Agent (SA) Matthew J. Dahl and SA Kharim Khomssi in
    connection with the FBI investigation of Shannon Maureen Conley (hereinafter: Conley)
    within the District of Colorado.  This document contains a summary of the facts of the
    investigation and not the complete details therein.

3.  This affidavit is made in support of an application for a criminal complaint and arrest warrant
    for Shannon Maureen Conley for a violation of Title 18 United States Code Section 2339B --
    Providing and Attempting to Provide Material Support or Resources to a Designated Foreign
    Terrorist Organization.

## THE INVESTIGATION

4.  On 11/5/2013, your affiant was advised that Faith Bible Chapel (FBC) pastor and security

    director reported to Arvada police and Colorado Bureau of Investigation suspicious activity

    involving Shannon Maureen Conley at FBC on numerous Sundays in October of 2013, which

    took place at FBC's main campus located at 6210 Ward Road, Arvada, Colorado.  FBC was

    the site of a fatal active shooter incident in 2007.  Conley was observed by staff on the FBC

    campus wandering around and taking notes in a notebook that appeared to FBC staff to be

    consistent with taking notes of various locations and the layout of the campus.  Church staff

    confronted Conley and asked to see her notes, to which Conley refused.  Conley then became

    confrontational with FBC staff, citing her own Islamic religious views.  Conley made

    spontaneous statements to church staff to the effect of: "Why is the church worried about a

    terrorist attack?"; and, that terrorists are: "…not allowed to kill aging adults and little

    children." On Sunday, 11/3/2013, Conley was asked by church officials not to return to FBC.

5.  On 11/7/2013, Conley was interviewed by an Arvada Police Detective and your affiant.  Both

    were in plain clothes with weapons concealed at meetings in public locations to which

    Conley agreed.  Conley was told she was not under arrest, free to leave at any time, did not

    have to speak to interviewers, or answer any questions that she did not wish to answer;

    Conley agreed to this. When asked why she went to FBC for the last two months, Conley

    initially responded that, "I hate those people."  According to Conley, she initially started

visiting the FBC because she wanted to meet people of other faiths and learn about them. She started going to Sunday services and classes, but did not discuss her views and dressed in her hijab.[1]  Conley stated that does not like Israel or FBC's active and vocal support for Israel. After a while, Conley noticed she was being followed and felt they treated her like a terrorist.  Conley stated that she reasoned that, "If they think I'm a terrorist, I'll give them something to think I am."  She started keeping a notebook and acted like she was diagramming the church to alarm them.  After that, Conley got into an argument with the pastor and was asked to leave.  Conley stated that Jihad to her is war against "kafir" (derogatory Arabic term for non-Muslims) to protect Muslim lands, although she acknowledged that Jihad can also mean internal religious struggle.  When asked her opinion about harming innocent people while waging Jihad, Conley stated that it depended on the circumstance.  To Conley, it is okay to harm innocents if they are part of a target.  She felt that if wives, children, and chaplains visiting a military base are killed during an attack, it is acceptable because they should not have been at a legitimate target.  She repeatedly referred to US military bases as "targets."

6. On 12/6/2013, Conley was again interviewed by FBI Special Agent (SA) Karim Khomssi and your affiant.  Conley stated she joined the US Army Explorers[2] (USAE) to be trained in US military tactics and in firearms.  She said she intended to use that training to go overseas to wage Jihad.  She also intended to train Islamic Jihadi fighters in US military tactics.  She previously wanted to serve in the US military but no longer wanted to because she felt the

---

[1] A hijab is a head covering worn in public by Muslim women.
[2] US Army Explorers is a national non-profit youth career exploration program for persons ages 13-20.  The program exposes participants to career opportunities in the military and provides knowledge and experience in military occupational skills.

military would not accept her due to her religious beliefs and her wearing of a hijab and niqab.[3]  She said she wanted military training, so the Explorers were the best option because she will never be deployed and they will let her wear a hijab.  Conley stated she wanted to wage Jihad and would like to go overseas to fight.  She further stated that if she is not allowed to fight because she is a woman, she will use her medical training to aid Jihadi fighters. Conley is licensed as a Certified Nurse's Aide in the State of Colorado.  If she cannot fight or be a nurse for Jihad, Conley stated she will assist Jihadi fighters in whatever manner is needed. According to Conley, it is acceptable to attack westerners when engaged in "defensive Jihad."  Conley stated that legitimate targets of attack include military facilities and personnel, government facilities and personnel, and public officials.  When asked if this includes law enforcement, Conley replied that it does.  According to Conley, law enforcement is included because police enforce man-made laws that are not grounded in God's law.  Conley stated targets to be avoided include women, children, and the elderly.  Investigation shows that Conley joined the USAE on September 7, 2013.

7.   On 12/19/2013, SA Khomssi and your affiant again interviewed Conley.  Conley stated that Jihad must be waged to protect Muslim nations.  Conley said she needed to go overseas to be trained in Jihad, but did not need to be overseas to wage Jihad. Conley was asked if she would be willing to support Muslim lands by getting involved in humanitarian efforts, such as the Red Crescent.  She had never heard of the Red Crescent and questioned whether it is a "real" Muslim organization.  Conley responded that humanitarian work is not an option because it does nothing to solve the problem. Conley showed interviewers a book called "Al-

---

[3] A niqab is a veil or cloth that covers the face as part of a hijab.

Qaida's Doctrine for Insurgency: Abd Al-Aziz Al-Muqrin's A Practical Course for Guerilla War" by Norman Cigar.  Conley saw herself as being a part of tactics taught in the book.  The book had several passages underlined by Conley, including motorcade attacks and waging guerilla warfare.  Conley stated that attacking a motorcade in the US was not viable because security in the US is too good.  Conley thought she could plan such an attack, but not carry it out.  Conley liked the idea of guerilla warfare because she could do it alone.  Conley stated she needed three elements in order to wage Jihad:  intent, means, and opportunity.  She had the intent, but lacked the means and opportunity.  Conley stated that if everything falls into place, she may be ready to wage Jihad in a year. Conley was reminded, and acknowledged, that she had made statements to overt law enforcement about waging Jihad against the US.  Conley was further advised, and acknowledged, that what she wanted to do is illegal.  When asked if she still wanted to carry out the plans, knowing they are illegal, Conley said that she does.

8.  On 1/15/2014, Conley was again interviewed by SA Khomssi and your affiant.  Conley advised she would attend USAE training in the Dallas/Fort Worth, TX area between 2/7-9/2014. Conley planned to go to Morocco with friends from the Denver area in late May, 2014. Conley said she planned to tell her family about her Jihad plans once she was out of the US as there was nothing they would be able to do about it then.   From Morocco, Conley planned to go to Iraq.  Conley went on to say that the purpose of going to Iraq was to make contact with a friend of a friend of one of her travel companions.  The contact in Iraq was to help her find a Jihadist training camp. Conley did not know who the person was in Iraq, where in Iraq he lived, or what exactly he would do for her.  Conley was asked again if she

considered doing humanitarian work with a group like the Red Crescent, instead of waging Jihad.  Conley stated she has no interest in doing humanitarian work.  Conley felt that Jihad is the only answer to correct the wrongs against the Muslim world.  Conley said she preferred to wage Jihad overseas so she could be with Jihadist fighters.

9.  On 2/4/2014, Conley was again interviewed by SA Khomssi and your affiant.  Conley intended to go through with the USAE training on the upcoming weekend.  It sounded like fun to her and it would provide training she wanted to further her Jihadist goals. Conley was asked whether, and she confirmed that, she was being truthful in this conversation and in prior conversations regarding her intentions.  On 2/11/2014, Conley was again interviewed by SA Khomssi and your affiant. Conley stated that she had attended USAE training and that she enjoyed it and benefitted from it.

10.  On 3/18/2014, SA Khomssi and your affiant again interviewed Conley.  When asked if she wanted to visit Syria, she was evasive in her answer, but did admit that she knew an "ISIS" fighter in Syria, as well as "a sister" married to an ISIS fighter in Syria.  She did not divulge more information about ISIS or the fighter.  Conley advised that if she had enough money to do anything she wanted, she would travel for Jihad or fund whatever was needed for the cause.

11.  On 3/27/2014, Conley met with SA Khomssi and SA Gamal Abdel-Hafiz.  This meeting was an overt attempt to dissuade Conley from violent criminal activity and give her the opportunity to turn away from her intention to participate in supporting terrorist activities.  At the end of the conversation, Conley said she had not changed her mind but would research what was discussed.  SA Khomssi admonished Conley twice in the conversation that travel

with intent to wage Jihad may be illegal and result in her arrest.  Conley told SA Khomssi

said she would rather be in prison than do nothing.

12. On 4/4/2014, SA Khomssi and your affiant again interviewed Conley.  Conley stated that the

"ISIS" fighter that knew in Syria was her suitor.  Conley said she is aware that her suitor is a

fighter for ISIS and that ISIS is, "The Islamic State of Iraq and Al Sham." Conley was aware

ISIS is synonymous with the Islamic State of Iraq and the Levant (ISIL) and was and may

still be associated with Al-Qaeda.  Conley said that she researched ISIS and stated, "In the

research I made [um] there were two opinions. One said that they began as part of Al-Qaeda

and then they split off.  But another one says that they are still."   Conley stated she did not

care if ISIS was associated with Al-Qaeda or not.  Conley said ISIS was "going to try to

make Syria and Iraq the beginnings of a calipha (ph)."  Conley further admitted she is aware

that Al-Qaeda and ISIS are US government Designated Foreign Terrorist Organizations.

Conley defended her actions by having stated that she would be, "Defending Muslims on the

Muslim homeland against people who are trying to kill them." Conley said she planned to

travel next week to meet her suitor in Syria and that they intended to reside near the Turkish

border.  Conley stated the airline ticket was purchased for her.  Conley said that if she was

prohibited from leaving the country she, "…would find another way." Conley has not sent

any material or money to her suitor, but had been asked by him to transfer money for him.

Conley did not transfer the money because she thought it may get her in trouble.  Conley told

investigators she planned to be the suitor's housewife and the camp nurse.  When Conley told

the suitor she wants to provide his camp with medical services and training, he told her that

was good because they needed more nurses.  Conley quoted her suitor as having said, "We

need some nurses over here." Conley stated that she was aware that her plans were potentially illegal and she could possibly get arrested, and therefore she has no intention to return to the US. Conley mentioned an incident where an individual was arrested for attempting to go fight in Syria. She told SA Khomssi and your affiant there was nothing they could do to change her mind and that she was still going, although she admitted, "I know things can go terribly wrong." When asked if she would engage in actual combat on the battlefield, Conley said, "If it was absolutely necessary, then yes. I wouldn't like it…but I would do it." Conley also said, "He's the man, he should be doing the fighting."

13. Your affiant is aware the United States State Department designated Al-Qaeda in Iraq (AQI) as a designated foreign terrorist organization under Section 219 of the Immigration and Nationality Act on 12/17/2004 and that it remains designated as of the date of this complaint. According to the National Counterterrorism Center (NCTC) and the State Department's designation, AQI is also known as the "Islamic State of Iraq" (ISI). According to NCTC, AQI declared in 2013 that it operates in Syria under the name the "Islamic State of Iraq and the Levant" (ISIL). Your affiant is further aware that ISIS is another name for the "Islamic State of Iraq and Syria," "Islamic State of Iraq and the Levant," or "Islamic State of Iraq and Al-Sham."

14. A records check confirmed that Conley is scheduled to fly out of Denver International Airport on 4/8/2014. She is listed as booked on United Airlines Flight #8879 departing Denver for Frankfurt, Germany at 5:25 p.m. Records then show Conley is scheduled to depart Frankfurt, Germany for Istanbul, Turkey on Lufthansa Flight #1300 at 1:00 p.m. on 4/9/2014. Lastly, records indicate a final flight booked for Conley on 4/10/2014 on Turkish

Airlines Flight #2476 from Istanbul, Turkey to Adana, Turkey.  Your affiant learned that Adana, Turkey is approximately a three hour drive from the Syrian / Turkish border.

15. During the course of this investigation, FBI personnel also contacted Conley's parents. Conley lives with her parents at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ On 2/19/2014, Ana Conley (hereinafter: Ana) was interviewed at her place of employment by SA Matthew Dahl and your affiant.  Ana is the mother of Conley.  Ana is married to the father of Conley, John Conley (hereinafter: John).  Conley lives at the home of her parents. Ana advised there were several firearms within their home and Conley is familiar with their use.  Conley and a friend, Amber, had taken one of the rifles and had recently practiced shooting at a local shooting range.  On 2/25/2014, John was interviewed by SA Dahl and your affiant (Ana was present but did not participate).  John was aware that Conley had converted to Islam, but was not aware she had any interest in extremist Islam or violent Jihad.  Conley had described Jihad to her father as struggles to help the oppressed or the poor. John and Ana were advised their daughter had expressed, to overt FBI agents, her intention to travel overseas and commit violent Jihad.  John and Ana were asked to attempt to engage Conley in candid conversation and to get her to expose her true views on Islam.  John and Ana were further requested to meet with, and ask Conley to speak with, elders at her mosque to discuss more moderate views.

16. On 3/10/2014, John called SA Dahl and reported that he and his wife spoke with their daughter, Conley, regarding her religious views on the previous evening.  John stated that Conley's views on Islam were far more extreme than he had previously thought.  Conley explained to her father she felt conflicted with what she thought Islam required of

her.  Conley believed she, as a Muslim, needed to marry young and be confrontational in her support of Islam.  She conceded her knowledge of Islam was based solely on her own research that she conducted on the Internet.  According to John, Conley had her own laptop computer and she accessed the wireless internet within their home on it.  John advised Conley made efforts to prohibit him and Ana from seeing what she had on the screen of the computer.

17. On 3/14/2014, your affiant talked to John by telephone.  According to John, Conley recently met a new suitor online.  He is a 32 year old Tunisian male named ▆▆▆▆  Conley told John that ▆▆▆▆ claimed to be in Syria fighting on behalf of "ISIS."  John met ▆▆▆▆ when he found Conley on her computer talking to ▆▆▆▆ via Skype.  At that time, Conley and ▆▆▆▆ asked for John's blessing for Conley and ▆▆▆▆ to marry and for John to send Conley to Syria to marry ▆▆▆▆ as soon as possible.  John declined both requests, which appeared to surprise both Conley and ▆▆▆▆  Conley and ▆▆▆▆ were trying to figure out how to get Conley to Syria so they could marry and settle in Syria.

18. On 4/1/2014, John was interviewed by SA Dahl and your affiant.  Conley told John and Ana of her plan to go overseas to marry.  Conley told John that ▆▆▆▆ is her current suitor.  Conley stated that ▆▆▆▆ claimed to be a stateless person; meaning he is Tunisian, but broke Tunisian law by going to Syria to fight.  According to ▆▆▆▆ if he returned to Tunisia, he would face charges for joining a group fighting in Syria.  Conley told John she wants to go marry a soldier.  Conley stated that if she cannot fight, she will still be supporting his cause. John called your affiant later that day to report that he found a one-way ticket for Conley to travel from Denver to Adana, Turkey on 4/8/2014 on his desk.  On 4/2/2014, John

called SA Dahl and reported he and Ana had again confronted Conley and stated conclusively they did not provide their blessing, nor their support for her travel and marriage. Conley was aware that Islam required the blessing of her family for her marriage, but told John she had thought about it and disagreed with Islam on the issue and was going to travel and marry anyway without their blessing. John and Ana could not dissuade Conley from her plans to travel to Turkey on 4/8/2014 to marry ████. John told agents that he witnessed this exchange on Conley's laptop computer at their residence located at ████████ in Arvada, Colorado.

19. On 4/8/2014, Conley went to DIA, checked baggage and proceeded to check in for her flight departing Denver for Frankfurt, Germany. Agents arrested Conley on probable cause as she walked down the jet way to board the flight.

20. After the Conley's arrest, agents read Conley her Miranda rights. She indicated she understood her rights and waived them, giving a statement to agents. Conley told agents that she planned to fly to Turkey and wait there until associates of her suitor contacted her. These associates would then take Conley into Syria to meet up with her suitor.

21. On 4/8/2014, agents executed search warrants for Conley's residence located at ████████ ████ in Arvada, Colorado and for the luggage she checked at DIA. At the residence, agents found materials about jihad and Al-Qaeda. Agents recovered a number of CD/DVDs labeled "Anwar al-Awlaki." In Conley's luggage, agents found a folder with materials about first aid in the field. From Conley's person, agents recovered a contact list which included numbers for ████████

## CONCLUSION

22. Based on the information set forth in this application, your affiant submits that there is

probable cause to issue a criminal complaint and arrest warrant for Shannon Maureen Conley

for a violation of Title 18 United States Code Section 2339B – Provision and Attempted

Provision of Material Support or Resources to a Designated Foreign Terrorist Organization.

Respectfully submitted,

*s/Christian K. R. Byrne*
Christian K. R. Byrne
Task Force Officer
FBI-JTTF

Sworn to before me this ___9th___ day of ___April___, 2014.

United States Magistrate Judge

**Criminal Complaint and Applications for Search Warrant were reviewed and are
submitted by Gregory Holloway, Assistant United States Attorney.**

DEFENDANT:        SHANNON MAUREEN CONLEY

YOB:        1996

ADDRESS (CITY/STATE):        Arvada, Colorado

OFFENSE(S):        18 U.S.C. § 2339B, Provision and Attempted Provision of Material Support or Resources to a Designated Foreign Terrorist Organization

LOCATION OF OFFENSE (COUNTY/STATE): Jefferson County, Colorado

PENALTY:        NMT 15 years imprisonment, $250,000 fine, or both; NMT 5 years supervised release; $100 special assessment

AGENT:        Christian K. R. Byrne
Task Force Officer, FBI-JTTF

AUTHORIZED BY:  Gregory Holloway
Assistant U.S. Attorney

ESTIMATED TIME OF TRIAL:

____X____ five days or less        _____ over five days        _____ other

THE GOVERNMENT

____X____ will seek detention in this case        _____ will **not** seek detention in this case

The statutory presumption of detention **is** applicable to this defendant.

OCDETF CASE:        _____ Yes        ___X___        No

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No.:   14-cr-00163-RM

UNITED STATES OF AMERICA,

  Plaintiff,

v.

1.  SHANNON CONLEY,

  Defendant.

---

## PLEA AGREEMENT AND STATEMENT OF FACTS
## RELEVANT TO SENTENCING

---

The United States of America (the government), by and through Gregory Holloway,

Assistant United States Attorney for the District of Colorado, and the defendant,

SHANNON CONLEY personally and by counsel, Robert Pepin, submit the following Plea

Agreement and Statement of Facts Relevant to Sentencing, pursuant to D.C.Colo.LCrR

11.1.

### I. PLEA AGREEMENT

The defendant agrees to plead guilty to a one-count Information which charges her

with Conspiracy to Provide Material Support to a Designated Foreign Terrorist

Organization, a violation of 18 U.S.C. § 371, referencing 18 U.S.C. § 2339B.

The government agrees that a three-point reduction in the offense level for

Court's Exhibit

1

acceptance of responsibility is appropriate pursuant to United States Sentencing

Commission, Guidelines Manual, § 3E1.1(a)(Nov. 2013).

The government further agrees not to charge the defendant in United States District

Court for the District of Colorado with any additional criminal activity currently known to

the government provided the defendant fulfills the terms of the plea agreement and

cooperates completely and truthfully as described below.

As part of this disposition, the defendant agrees to cooperate and debrief completely

and truthfully with Federal Bureau of Investigation ("FBI") agents and other law

enforcement officials concerning her knowledge of other individuals involved in providing

or attempting to provide material support in any form to any terrorist organization; and any

other criminal activity in the District of Colorado and/or elsewhere.   The United States

agrees to fully and fairly consider the information provided pursuant to § 5K of the

Sentencing Guidelines and Policy Statements.   The United States, in its sole discretion,

will determine whether the defendant has provided substantial assistance.   The defendant

also agrees to testify truthfully before a grand jury or petit jury in this case and any future

prosecution arising out of her cooperation.

If the defendant provides substantial assistance in the debriefing described above,

by fully and truthfully disclosing all information known to her concerning the matters

referenced above, the government will file a motion for downward departure pursuant to §

5K1.1 of the Sentencing Guidelines.   The United States, in its sole discretion, will

determine the amount of any downward departure request pursuant to § 5K1.1.

## II.  ELEMENTS OF THE OFFENSE

In order to establish a violation of 18 U.S.C. § 371, the government would need to prove that:

1) The defendant agreed with at least one other person to violate the law;

2) one of the conspirators engaged in at least one overt act furthering the conspiracy's objective;

3) the defendant knew the essential objective of the conspiracy;

4) the defendant knowingly and voluntarily participated; and,

5) there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

Tenth Circuit Pattern Criminal Jury Instruction 2.19 (2011).

For a violation of 18 U.S.C. § 2339B, Providing and Attempting to Provide Material Support to a Designated Foreign Terrorist Organization, the government must prove:

1.    The defendant did knowingly provide and attempt to provide material support and resources to a foreign terrorist organization;

2.    That the defendant knew that the foreign terrorist organization was a designated terrorist organization, that had engaged in and was engaging in terrorist activity and terrorism; and,

3

3.      That the offense occurred in whole or in part within the United States.

18 U.S.C. § 2339B.

Material support and resources means any property, tangible or intangible, or

service, including training, expert advice or assistance, false documentation or

identification, communications equipment, facilities, weapons, lethal substances,

explosives, personnel (1 or more individuals who may be or include oneself), and

transportation.

Training means instruction or teaching designed to impart a specific skill, as

opposed to general knowledge.

Expert advice or assistance means advice or assistance derived from scientific,

technical or other specialized knowledge.

18 U.S.C. § 2339A(b)(1)(2) and (3), *modified*.

### III.   STATUTORY PENALTIES

The maximum statutory penalty for a violation of 18 U.S.C. § 371 is not more than 5

years imprisonment; not more than a $250,000   fine, or both; not more than 3 years

supervised release; $100.00 special assessment fee.

The conviction may cause the loss of civil rights, including but not limited to the

rights to possess firearms, vote, hold elected office, and sit on a jury.

A violation of the conditions of probation or supervised release may result in a

separate prison sentence.

The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed.   Understanding this and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria:   (1) the sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the Court, after determining the otherwise applicable sentencing guideline range, either departs or varies upwardly, or (3) the Court determines that the offense level is greater than 35 and imposes a sentence based upon that offense level determination.   Except as provided above, the defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742.   The defendant also knowingly and voluntarily waives her right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255.   This waiver provision, however, will not prevent the defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial misconduct.   Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from this waiver provision.

## IV.   STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree that there is no dispute as to the material elements which establish a factual basis of the offense of conviction.

Pertinent facts are set out below in order to provide a factual basis for the plea and to provide facts which the parties believe are relevant, pursuant to § 1B1.3, for computing the appropriate guideline range.   To the extent the parties disagree about the facts relevant to sentencing, the statement of facts identifies which facts are known to be in dispute at the time of the plea.   (§ 6B1.4(b))

The statement of facts herein does not preclude either party from presenting and arguing, for sentencing purposes, additional facts or factors not included herein which are relevant to the advisory guideline computation (§ 1B1.3) or to sentencing in general (§ 1B1.4).   Nor is the Court or Probation precluded from the consideration of such facts. In "determining the factual basis for the sentence, the Court will consider the stipulation [of the parties], together with the results of the pre-sentence investigation, and any other relevant information."   (§ 6B1.4 Comm.)

The parties agree that the government's evidence would show that the date on which the conduct relevant to the offense (§ 1B1.3) began is approximately September of 2013.

The parties agree that the government's evidence would be:

6

### A. The Conspiracy

1. From on or about sometime in February 2014, and continuing through on or about April 8, 2014, the exact dates being unknown, in the State and District of Colorado and elsewhere, Defendant Shannon Maureen Conley and co-conspirator Yousr Mouelhi did unlawfully, voluntarily, intentionally, knowingly and willfully conspire, combine, confederate, and agree together with each other and other individuals both known and unknown to commit an offense against the United States, specifically to provide and attempt to provide material support and resources to a designated foreign terrorist organization, specifically Al-Qaeda (AQ) and its affiliates, including Al-Qaeda in Iraq (AQI), a/k/a the Islamic State of Iraq (ISI), a/k/a the Islamic State of Iraq and Al Sham (ISIS), a/k/a the Islamic State of Iraq and the Levant (ISIL), continuously designated since December 17, 2004, all in violation of Title 18, United States Code, Section 2339B.

### B. Manner and Means of the Conspiracy

2. The conspiracy was accomplished, in part, through the following manner and means:

3. Sometime in 2014, Defendant Shannon Maureen Conley met Yousr Mouelhi on the internet.   During their communications, Conley and Mouelhi shared their view of Islam as requiring participation in violent jihad.

Mouelhi communicated to Conley that he was an active member of an Al-Qaeda (AQ) affiliate fighting in Syria known as the Islamic State of Iraq and Al Sham (ISIS),   a/k/a Al-Qaeda in Iraq (AQI), a/k/a the Islamic State of Iraq (ISI), a/k/a a/k/a the Islamic State of Iraq and the Levant (ISIL).   Conley and Mouelhi decided to become engaged; and, together with each other and others both known and unknown, arranged to have Conley travel to Syria and be with Mouelhi.

4. Before traveling to Syria, Conley was to refine and obtain additional training and skills in order to provide support and assistance to any AQ and/or ISIS fighter. Conley and Mouelhi planned for Conley to provide support and assistance and to fight should it be deemed necessary.

### C. Overt Acts of the Conspiracy

5. In furtherance of the conspiracy, Defendant Conley and co-conspirator Mouelhi acted interdependently and committed one or more overt acts, including but not limited to the following:

6. On or about September 7, 2013, Defendant Conley joined the US Army Explorers (USAE) to be trained in US military tactics and in firearms.

7. Between and on or about February 7, 2014 through February 9, 2014, Defendant Conley traveled to Texas and attended the USAE training.

8. On or about March 29, 2014, Mouelhi, together with others, arranged for an airline ticket to be purchased for Defendant Conley to travel to Turkey, departing from Denver on April 8, 2014.

9. On or about April 8, 2014, Defendant Conley went to Denver International Airport (DIA) to fly to Turkey.

### D. Additional Facts

10. The defendant knew that ISIS is a designated foreign terrorist organization, specifically an Al-Qaeda (AQ) affiliate, which includes Al-Qaeda in Iraq (AQI), a/k/a the Islamic State of Iraq (ISI), a/k/a the Islamic State of Iraq and Al Sham (ISIS), a/k/a the Islamic State of Iraq and the Levant (ISIL).

11. At the time of her arrest, the defendant had in her possession a list of contacts including phone numbers.   Yousr Mouelhi was listed.   The defendant also had a number of items demonstrating proficiency and certifications for a variety of specialized skills, including first aid/nursing certification, US Army Explorers certification, National Rifle Association certification, and a field first aid manual.

12. During a search of Conley's residence, agents recovered DVDs of Anwar Al-Awlaki lectures and a number of books and articles about Al-Qaeda, its affiliate groups, and jihad.   Agents also recovered shooting targets labeled with the number of rounds fired and distances.

## V.  <u>SENTENCING COMPUTATION</u>

The parties understand that the court may impose any sentence, up to the statutory maximum, regardless of any guideline range computed, and that the court is not bound by any position of the parties.   (§ 6B1.4(d))   The court is free, pursuant to §§ 6A1.3 and 6B1.4, to reach its own findings of facts and sentencing factors considering the parties' stipulations, the pre-sentence investigation, and any other relevant information.   (§ 6B1.4 Comm.; § 1B1.4)

To the extent the parties disagree about the sentencing factors, the computations below identify the factors which are in dispute.   (§ 6B1.4(b)).

The 2013 Edition of the Sentencing Guidelines is applicable to this case.

A.      The base guideline is § 2X1.1(a), referencing § 2M5.3(a), with a base offense level of 26.

B.      There are no specific offense characteristics.

C.      The victim related adjustment for a crime of terrorism applies pursuant to § 3A1.4(a), adding 12 levels.

D.      The adjusted offense level would therefore be 38.

E.      The defendant should receive a 3-level adjustment for acceptance of responsibility.   The resulting offense level would therefore be 35.

F.      The parties understand that the defendant's criminal history computation is tentative.   The criminal history category is determined by the Court.   Known facts

10

regarding the applicable criminal history are as follows:

The defendant has no known criminal history.   However, by operation of the victim related adjustment above, the criminal history category is VI.   § 3A1.4(b).

Based on that information, if no other information were discovered, the defendant's criminal history category would be VI.

G.      Assuming the (tentative) criminal history facts of (F) above, the career offender/criminal livelihood/armed career criminal adjustments would not apply.

H.      The guideline range resulting from the estimated offense level of 35 above, and the (tentative) criminal history category of VI above, is 292 to 365 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the estimated offense level 35 above could conceivably result in a range from 168 months (bottom of Category I), to 365 months (top of Category VI).   The sentence would be limited, in any case, by the statutory maximum which is 60 months.

I.      Pursuant to guideline § 5E1.2, assuming the estimated offense level of 35 above, the fine range for this offense would be $20,000 to $200,000, plus applicable interest and penalties.

J.      Pursuant to guideline § 5D1.2, if the Court imposes the term of supervised release, that term shall be not less than two years and not more than 3 years.

VI.   **WHY THE PROPOSED PLEA DISPOSITION IS APPROPRIATE**

The parties believe the proposed plea agreement is appropriate because all relevant

conduct is disclosed, the sentencing guidelines take into account all pertinent sentencing factors with respect to this defendant, and the charges to which the defendant has agreed to plead guilty adequately reflect the seriousness of the actual offense behavior.

This document states the parties' entire agreement.   There are no other promises, agreements (or "side agreements"), terms, conditions, understandings or assurances, express or implied.   In entering this agreement, neither the government nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date: _09/09/2014_

Shannon Conley
Defendant

Date: _09/09/2014_

Robert Pepin
Attorney for Defendant

Date: _09 - 10 - 2014_

Gregory A. Holloway, WSBA #28743
Assistant U.S. Attorney

12

Exhibit G

AO 245B (Rev. 11/11)  Sheet 1 - Judgment in a Criminal Case

# United States District Court

### District of Minnesota

UNITED STATES OF AMERICA

v.

**Ahmed Hussein Mahamud**

**JUDGMENT IN A CRIMINAL CASE**

(For Offenses Committed On or After November 1, 1987)

Case Number: 11-cr-191 (01)(MJD/FLN)

USM Number: 69534-061

Social Security Number: 0575

Date of Birth: 1985

Rick Mattox
_____
Defendant's Attorney

## THE DEFENDANT:

[X]     pleaded guilty to Count 3 of the Indictment.

[]      pleaded nolo contendere to counts(s)  which was accepted by the court.

[]      was found guilty on count(s)  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:2339B (a)(1) | CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION | February 2012 | 3 |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[]      The defendant has been found not guilty on counts(s) **.**

[X]     Counts 1, 2, and 4 are dismissed on the motion of the United States.

A $100.00 special assessment for the Crime Victims Fund is required by statue to be paid immediately.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of any material change in the economic circumstances.

May 14, 2013
_____
Date of Imposition of Judgment

s/Michael J. Davis
_____
Signature of Judge

**MICHAEL J. DAVIS**, Chief United States District Judge
_____
Name & Title of Judge

May 29, 2013
_____
Date

O 245B (Rev. 11/11)  Sheet 2 - Imprisonment

DEFENDANT:          AHMED HUSSEIN MAHAMUD
CASE NUMBER:        11-CR-191 (01) (MJD/FLN)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 36 months.

[X]     The court makes the following recommendations to the Bureau of Prisons: The defendant shall be placed in a facility in the state of Ohio.

[]      The defendant is remanded to the custody of the United States Marshal.

[]      The defendant shall surrender to the United States Marshal for this district.
        [] at  on .
        [] as notified by the United States Marshal.

[X]     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
        [X] on June 14, 2013 by noon. If the placement has not yet been made for the defendant, he shall report to the U.S. Marshal in Columbus, Ohio on June 14, 2013 by noon. (Courthouse Address: 85 Marconi Boulevard, Columbus, OH 43215. (614) 469-5540
        [] as notified by the United States Marshal.
        [] as notified by the Probation or Pretrial Services Office

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on_____ to _____

a _____ , with a certified copy of this Judgment.


                                                        _____
                                                                United States Marshal


                                                By      _____
                                                                Deputy United States Marshal


Page 2

AO 245B (Rev. 11/11)  Sheet 3 - Supervised Release

| | |
|---|---|
| DEFENDANT: | AHMED HUSSEIN MAHAMUD |
| CASE NUMBER: | 09-CR-191 (01) (MJD/FLN) |

# SUPERVISED RELEASE

      Upon release from imprisonment, the defendant shall be on supervised release for a term of 20 years.
The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

[X]      The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

[X]      The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

[X]      The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

[]      The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

[]      The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this Judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without permission of the court or probation officer;
2)    the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4)    the defendant shall support his or her dependants and meet other family responsibilities;
5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B (Rev. 11/11)  Sheet 3A - Supervised Release

DEFENDANT:        AHMED HUSSEIN MAHAMUD
CASE NUMBER:      09-CR-191 (01) (MJD/FLN)

# SPECIAL CONDITIONS OF SUPERVISION

a.   If not employed at a regular lawful occupation, as deemed appropriate by the probation officer, the defendant may be required to perform up to 20 hours of community service per week until employed. The defendant may also participate in training, counseling, daily job search, or other employment-related activities, as directed by the probation officer.

b.   The defendant shall submit his person, residence, office, vehicle, or an area under the defendant's control to a search conducted by a United States Probation Officer or supervised designee, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a supervision violation. The defendant shall warn any other residents or third parties that the premises and areas under the defendant's control may be subject to searches pursuant to this condition.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

**FILED UNDER SEAL**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) INDICTMENT CR 11-191 DWF/AJB |
| | ) |
| Plaintiff, | ) (18 U.S.C. § 2339A(a)) |
| | ) (18 U.S.C. § 2339B(a)) |
| v. | ) |
| | ) |
| AHMED HUSSEIN MAHAMUD, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

THE UNITED STATES GRAND JURY CHARGES THAT:

**COUNT 1**
(Conspiracy to Provide Material Support to Terrorists)

From on or about a date unknown through the present, in the State and District of Minnesota and elsewhere, the defendant,

**AHMED HUSSEIN MAHAMUD,**

did knowingly and intentionally conspire with others known and unknown to the grand jury, to provide material support and resources, namely financial support and personnel, knowing and intending that the material support and resources were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956(a)(1) (conspiracy to murder, kidnap, maim or injure persons in a foreign country), all in violation of Title 18, United States Code, Section 2339A(a).

JUN 0 7 2011.

FILED
RICHARD D. SLETTEN, CLERK

JUDGMENT ENT'D _____
DEPUTY CLERK _____

## COUNT 2
(Providing Material Support to Terrorists)

On or about a date unknown, and on or about April 20, 2009, and July 27, 2009, in the State and District of Minnesota and elsewhere, the defendant,

**AHMED HUSSEIN MAHAMUD**,

did provide material support and resources, namely financial support and personnel, knowing and intending that the material support and resources were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956(a)(1) (conspiracy to murder, kidnap, maim or injure persons in a foreign country); all in violation of Title 18, United States Code, Section 2339A(a).

## COUNT 3
(Conspiracy to Provide Material
Support to a Foreign Terrorist Organization)

Beginning on or about a date unknown and continuing to the present, in the State and District of Minnesota and elsewhere, the defendant

**AHMED HUSSEIN MAHAMUD,**

did unlawfully and knowingly conspire and agree with others, known and unknown to the grand jury, to provide material support and resources to al-Shabaab, which the U.S. Secretary of State has designated as a foreign terrorist organization since on or about February 26, 2008, and the designation of which was published in

2

the Federal Register on or about March 18, 2008, to wit: to knowingly provide money to al-Shabaab and personnel to work under al-Shabaab's direction and control, knowing that al-Shabaab had been designated as a foreign terrorist organization, and knowing that al-Shabaab had engaged, and engages, in terrorist activity and terrorism; all in violation of Title 18, United States Code, Section 2339B(a)(1).

### COUNT 4
(Providing Material Support to a
Foreign Terrorist Organization)

On or about a date unknown, and on or about April 20, 2009, and July 27, 2009, in the State and District of Minnesota and elsewhere, the defendant,

### AHMED HUSSEIN MAHAMUD,

did unlawfully and knowingly provide material support and resources to al-Shabaab, which the U.S. Secretary of State has designated as a foreign terrorist organization since on or about February 26, 2008, and the designation of which was published in the Federal Register on or about March 18, 2008, to wit: to knowingly provide money to al-Shabaab and personnel to work under al-Shabaab's direction and control, knowing that al-Shabaab had been designated as a foreign terrorist organization, and knowing that al-Shabaab had engaged, and engages, in terrorist activity and terrorism; all in violation of Title 18, United States Code, Section 2339B(a)(1).

U.S. v Ahmed Hussein Mahamud

## FORFEITURE ALLEGATIONS

Counts 1 through 4 of this Indictment are realleged for the purpose of alleging forfeitures.

Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 981(a)(1)(G) and Title 28, United States Code, Section 2461, the defendant shall forfeit to the United States any and all right, title, and interest in any and all of his assets, foreign or domestic, and shall forfeit all right title and interest in any property, real or personal, which constitutes or is derived from proceeds traceable to his violation of Counts 1, 2, 3, or 4 of the Indictment.

Pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461, if any of the above-referenced property is unavailable for forfeiture, the United States intends to forfeit substitute assets of the defendant.

A TRUE BILL

_____        _____

UNITED STATES ATTORNEY                  FOREPERSON

4

# Exhibit H

**The New York Times** | https://nyti.ms/2jVDR9N

**MIDDLE EAST**

# Who Are Sufi Muslims and Why Do Some Extremists Hate Them?

By MEGAN SPECIA    NOV. 24, 2017

Sufism is a mystical form of Islam, a school of practice that emphasizes the inward search for God and shuns materialism. It has produced some of the world's most beloved literature, like the love poems of the 13th century Iranian jurist Rumi. Its modern-day adherents cherish tolerance and pluralism, qualities that in many religions unsettle extremists.

But Sufism, often known as Islamic mysticism, has come under violent attack in recent years. On Friday, militants stormed a Sufi mosque on the Sinai Peninsula, killing at least 305 people in what officials are calling the worst terrorist attack in Egypt's modern history. The attack followed several assaults on Sufi shrines in Pakistan over the past year carried out by Sunni extremists. (The vast majority of Sufis are Sunni, though some are Shiite.)

What is this form of Islamic belief, and why has it come under assault?

# The roots and practices of Sufism

Sufism, known as tasawwuf in the Arabic-speaking world, is a form of Islamic mysticism that emphasizes introspection and spiritual closeness with God.

While it is sometimes misunderstood as a sect of Islam, it is actually a broader style of worship that transcends sects, directing followers' attention inward. Sufi practice focuses on the renunciation of worldly things, purification of the soul and the mystical contemplation of God's nature. Followers try to get closer to God by seeking spiritual learning known as tariqa.

Confusion about Sufism is common, even among Muslims, according to Imam Feisal Abdul Rauf, an American Sufi cleric of Egyptian descent who preached in New York City for many years and founded the Cordoba House, which promotes a moderate image of Islam in the West.

"It is nothing more than the spiritual dimension" of Islam, the cleric, who goes by Imam Feisal, said in a phone interview. "It is Islam, but we focus on meditation, on chanting sessions, which enable the Muslim to have his or her heart open. The myths people have about Sufis are analogous to the myths people have about Muslims."

For a time, beginning in the 12th century, Sufism was a mainstay of the social order for Islamic civilization, and since that time it has spread throughout the Muslim world, and to China, West Africa and the United States. As Sufism spread, it adapted elements of local culture and belief, making it a popular practice.

Alexander D. Knysh, a professor of Islamic studies at the University of Michigan and expert in modern Sufism, describes it as a "very wide, amorphous movement" practiced within both the Sunni and Shiite traditions.

Sufism has shaped literature and art for centuries, and is associated with many of the most resonant pieces of Islam's "golden age," lasting from roughly the eighth through 13th centuries, including the poetry of Rumi.

In modern times, the predominant view of Sufi Islam is one of "love, peace, tolerance," Mr. Knysh explained, leading to this style of worship becoming synonymous with peace-loving Islam.

## Why extremists have targeted Sufis

While some Muslims view Sufis as quirky, even eccentric, some fundamentalists and extremists see Sufism as a threat, and its adherents as heretics or apostates.

In February, militants aligned with the Islamic State attacked worshipers at the tomb of a Sufi philosopher in a remote part of southern Pakistan, killing more than 80 people, whom the militants described as polytheists. Sufis praying at the tombs of saints — a practice core to the group — have also been attacked in India and the Middle East.

The Islamic State targets Sufis because it believes that only a fundamentalist form of Sunni Islam is valid.

Some fundamentalists see the reverence for saints, which is common in Shiite Islam, as a form of idolatry, because in their view it shows devotion to something other than the worship of a singular God. Some consider Sufis to be apostate, because saints were not part of the original practice of Islam at the time of the Prophet Muhammad, who died in 632.

"The opponents of Sufism see the shrines and these living saints as idols," Mr. Knysh explained. "Their existence and their worship violates the main principle of Islam, which is the uniqueness of God and the uniqueness of the object of worship."

Even though Sunni hard-liners have long viewed Sufis as well as Shiites as heretical, terrorist networks like Al Qaeda and the Islamic State have debated whether killing them is justified.

The two terrorist groups have clashed over whether to focus on the "far enemy," powerful Western countries like the United States, or the "near enemy," repressive governments in the Muslim world. Early in the Iraq war, when the Islamic State's predecessor organization targeted Iraq's Shiite majority, in the hopes of promoting sectarian conflict, Al Qaeda criticized the Iraqi group's leader at the time, Abu Musab al-Zarqawi, for doing so.

When a branch of Al Qaeda captured northern Mali in 2012, militants used pickaxes and bulldozers to destroy the ancient mausoleums of Sufi saints in Timbuktu. But documents recovered in northern Mali revealed that the militants in Mali had acted without the permission of their leaders, who wrote to express their dismay, arguing that the destruction — while theologically justified — was unwise because it caused the population to turn against them.

Though Al Qaeda has also targeted Sufi sites, the Islamic State has set itself apart by calling for brutal attacks against Sufis.

## The status of Sufis in Egypt

While no group has yet claimed responsibility for Friday's attack, it bore some of the hallmarks of previous assaults on Coptic Christians in Egypt. In the fall of 2016, Islamic State's local affiliate claimed to have executed a Sufi cleric who was about 100 years old.

The religious objections of fundamentalists to the Sufi style of worship may not be the only factor behind the attacks on Sufis.

Experts say the amicable ties between Sufis and the Egyptian government may also be factor, giving the attack a political dimension. Egypt's president, Abdel Fattah el-Sisi, who took power after the military overthrew a democratically elected Islamist president, Mohamed Morsi, has vowed to do a better job at protecting religious minorities, who were shunned when Mr. Morsi's party, the Muslim Brotherhood, was in power. By killing Sufis, the militants may be trying to undermine Mr. Sisi's authority.

Like its counterparts in several other Muslim-majority countries, Egypt's government supports the Sufis because it sees them as members of a moderate, manageable faction who are unlikely to engage in political activity, because their priorities are oriented inwardly.

Sufi sheikhs generally accept the legitimacy of the state, leading to tensions with Muslims who oppose their governments and are willing to act on their dissatisfaction — with violence if necessary.

"They think the society is moving in the wrong direction and Sufis are aiding and abetting the authorities on this corrupt path," Mr. Knysh said. "In ways, their reasons are very much political. They say, 'If Sufis support this, we will be against them,' more or less."

Imam Feisal said that attacks on Sufi worshipers, besides being a "major sin," are the result of the politicization of religion in the region over the past few decades. Egypt, in particular, he said, is a place where that politicization has fueled extremism.

"When religion becomes politicized," Imam Feisal said, "it is not good."

Follow Megan Specia on Twitter @meganspecia.

Rukmini Callimachi contributed reporting.

---

© 2018 The New York Times Company

# Exhibit I

U.S. v. Qamar, Case No. 16-cr-227

(E.D. Va.)

AO 245 S (Rev. 2/99)(EDVA rev.1) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

UNITED STATES OF AMERICA

       v.                                 Case Number 1:16cr00227-001

**HARIS QAMAR,**

Defendant.

## JUDGMENT IN A CRIMINAL CASE

The defendant, HARIS QAMAR, was represented by Alan H. Yamamoto, Esquire.

The defendant pleaded guilty to Count 1 of the Criminal Information. Accordingly, the defendant is adjudged guilty of the following count, involving the indicated offense:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 2339B | Attempting to Provide Material Support to a Designated Foreign Terrorist Organization (Felony) | 06/10/2016 | 1 |

As pronounced on February 17, 2017, the defendant is sentenced as provided in pages 2 through 7** of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Signed this _17th_ day of _February_, 2017.

/s/

Leonie M. Brinkema
United States District Judge

**Page 7 of this document contains sealed information.

AO 245 S (Rev. 2/99)(EDVA rev.1) Sheet 2 – Imprisonment

Judgment--Page 2 of 7

Defendant: HARIS QAMAR
Case Number: 1:16cr00227-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of ONE HUNDRED AND TWO (102) MONTHS, with credit for time served.

The Court makes the following recommendations to the Bureau of Prisons:

The defendant to be designated to F.C.I. Cumberland, F.C.I. Petersburg, or F.C.I. Cumberland.

The defendant is remanded into the custody of the United States Marshal.

## RETURN

I have executed this Judgment as follows:

_____
_____
_____

Defendant delivered on _____ to _____, with a certified copy of this Judgment.
at _____

c: P.O. (2) (3)
   Mshl. (4) (2)
   U.S.Atty.
   U.S.Coll.
   Dft. Cnsl.          By  _____
   PTS                      United States Marshal
   Financial
   Registrar           _____
   ob                      Deputy Marshal

Judgment--Page 3 of 7

Defendant: HARIS QAMAR
Case Number: 1:16cr00227-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of TWENTY (20) YEARS.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of supervised release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

While on supervised release, the defendant shall not commit another federal, state, or local crime.

While on supervised release, the defendant shall not illegally possess a controlled substance.

While on supervised release, the defendant shall not possess a firearm or destructive device.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

## STANDARD CONDITIONS OF SUPERVISED RELEASE

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below):
1) The defendant shall not leave the judicial district without the permission of the court or probation officer.
2) The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month.
3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
4) The defendant shall support his or her dependents and meet other family responsibilities.
5) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.
6) The defendant shall notify the Probation Officer within 72 hours, or earlier if so directed, of any change in residence.
7) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by physician.
8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered.
9) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.
11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.
12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.
13) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245 S (Rev. 3/99)(EDVA rev.) Sheet 3 (cont'd) - Supervised Release

Judgment--Page 4 of 7

Defendant: HARIS QAMAR
Case Number: 1:16cr00227-001

## SPECIAL CONDITIONS OF SUPERVISION

While on supervised release, pursuant to this Judgment, the defendant shall also comply with the following additional conditions:

1.  The defendant shall not associate with or have any contact including but not limited to electronic, in person, written, telephone, through third parties, or through social media with any individuals promoting acts of violence or actively involved in terrorist activities.

2.  The defendant shall not possess or use a computer without prior approval from the probation officer; shall consent to the installation of computer monitoring software that will allow the probation officer to track all computer activity; shall place a notice on the computer to warn others of the existence of the monitoring software; and shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

3.  The defendant shall undergo a mental health evaluation and, if recommended, participate in a program approved by the United States Probation Office for mental health treatment with an emphasis on de-radicalization. The defendant shall take all medications as prescribed and waive all rights of confidentiality regarding mental health treatment to allow the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider. All of the costs are waived.

4.  Although mandatory drug testing is waived pursuant to 18 U.S.C §3564 (a)(4), the defendant must remain drug free and his probation officer may require random drug testing at any time. Should a test indicate drug use, then the defendant must satisfactorily participate in, and complete, any inpatient or outpatient drug treatment to which defendant is directed by the probation officer.

AO 245 S (Rev. 3/99)(EDVA rev.) Sheet 5 - Financial Penalties

Defendant: HARIS QAMAR
Case Number: 1:16cr00227-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total monetary penalties in accordance with the schedule of payments set out below.

| Count | Special Assessment | Fine |
|-------|-------------------|------|
| 1 | $100.00 | $0.00 |
| **Total** | **$100.00** | **$0.00** |

### FINE

No fines have been imposed in this case.

### SCHEDULE OF PAYMENTS

Payments shall be applied in the following order:   (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

The special assessment is due in full immediately.   If not paid immediately, the court authorizes the deduction of appropriate sums from the defendant's account while in confinement in accordance with the applicable rules and regulations of the Bureau of Prisons.

Any special assessment, restitution, or fine payments may be subject to penalties for default and delinquency.

If this judgment imposes a period of imprisonment, payment of Criminal Monetary penalties shall be due during the period of imprisonment.

All criminal monetary penalty payments are to be made to the Clerk, United States District Court, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program.

### FORFEITURE

Forfeiture has not been ordered in this case.

AO 245 S (Rev. 3/99)(EDVA rev.) Sheet 7 - Statement of Reasons

UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

F I L E

JUL - 7 2016

CLE...
AL...

UNITED STATES OF AMERICA    )
                            )
              v.            )      No. 1:16mj 300
                            )
HARIS QAMAR                 )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Nicholas Caslen, after being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Washington Field Office, Joint Terrorism Task Force ("JTTF"). I have been an FBI Special Agent since 2011, and worked on the JTTF in both Wichita, Kansas, and Washington, D.C. As part of my duties, I investigate potential criminal and terrorism-related activities associated with suspected Homegrown Violent Extremists. I have participated in numerous counterterrorism investigations, during the course of which I have conducted physical surveillance, executed court authorized search warrants, and used other investigative techniques to secure relevant information regarding various crimes.

2. This affidavit is submitted in support of a criminal complaint charging Haris Qamar with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.

3. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information related to this investigation from other law enforcement and government officials. The statements contained in

this affidavit are based on my own observations, review of documents, recordings, and reliable information provided to me by other law enforcement officials.

4. This affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrant. As a result, it does not include each and every fact observed by me or known to the government. This affidavit summarizes the content of certain recorded communications, which were recorded pursuant to the consent of at least one party to the communication. The majority of these recorded communications were in English, with a small percentage in Arabic. When I assert that a statement was made by an individual, that statement is described in substance and in part, but my assertion is not intended to constitute a verbatim recitation of the entire statement. When I assert that a communication was made on a certain date, I mean that the communication was made "on or about" that date.

    I.    <u>The Relevant Statute and ISIL</u>

5. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ('AQI'), then known as Jam'at al Tawhid wa'al-Jihad as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al Islamiyya fi al-'Iraq wa'sh'Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has never called itself "Al-Qaeda in Iraq (AQI)," this name has frequently been used to describe it through its history. On

2

September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS. To date, ISIL remains a designated FTO.

6. Pursuant to Title 18, United States Code, Section 2339B, it is unlawful for any person to attempt to provide material support or resources to an FTO.

7. Based on my training and experience, I know that: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, are traveling to Syria and Iraq to join ISIL and commonly enter Syria by crossing the border from Turkey; (b) foreign fighters from Western countries are traveling to locations in Turkey, including Istanbul, and then traveling to towns closer to the border where they enter into Syria to join ISIL; (c) Abu Baker al-Baghdadi is the current leader of ISIL; and (d) ISIL is also frequently referred to as ISIS (an acronym for the Islamic State of Iraq and al-Sham or the Islamic State of Iraq and Syria).

8. Haris Qamar ("Qamar") is a United States citizen who was born in 1990 in Brooklyn, New York, and resides in Burke, Virginia. Qamar is employed by a company known as Public Storage and works at various storage facilities in Northern Virginia.

II.     Qamar and Twitter

9. Between May 2015 and April 2016, the FBI became aware of a series of Twitter accounts using variations of the handle "newerajihadi" that were openly supportive of ISIL. Examination of Twitter records and posts publicly placed on Twitter reflect that over 60 accounts that included "newerajihadi" in the account name (such as "newerajihadi21; newerajihadi22; newerajihadi23, etc.) were closed by Twitter; new accounts with higher numbers appended to the "newerajihadi" body were opened shortly after Twitter closed each of the accounts with lower numbers.

3

10. For example, terrorists murdered employees of the Charlie Hebdo magazine in Paris, France, in January 2015. In September 2015, the user of the Twitter account with the handle @newerajihadi20 tweeted his prayer for another similar attack with even greater casualties.

11. On October 28, 2015, the profile photograph on the Twitter account with the handle @newerajihadi20 was a still image from a video released by the Islamic State; the image depicted blood flowing off what appeared to be a white tarp into a collection point. The video from which the still image is derived depicts what appears to be the beheading of blindfolded prisoners by ISIL members near flags bearing ISIL's black flag, and a quote from the Koran directing faithful Muslims to "strike their necks." The still photograph used as the profile photograph for the Twitter account with the handle @newerajihadi20 appears to be the collection of the blood from the prisoners beheaded in the video.

12. On November 2, 2015, the profile photograph on the Twitter account with the handle @newerajihadi21, was a photograph of an ISIL member and murderer known as "Jihadi John" beheading an purported Syrian pilot. I know that this photograph comes from a still image of a video depicting "Jihadi John" and several other ISIL terrorists beheading a group of purported Syrian pilots. In the video, "Jihadi John" speaks to President Obama, saying that "today, we're slaughtering the soldiers of Bashar [Syrian President Bashar Al-Assad], and tomorrow we will be slaughtering your soldiers." In the video, "Jihadi John" goes on to say that ISIL "will begin to slaughter your people on your streets."

13. On November 6, 2015, the user of another Twitter account accused the user of @newerajihadi23 of being a supporter of the Islamic State while living off of welfare; in response, the user of the Twitter account with the handle @newerajihadi23 tweeted that he wished he could "use your tax money to Support The Islamic State."

4

14. On November 6, 2015, the user of the Twitter account with the handle @newerajihadi23, tweeted his prayer that Europe would be conquered "and Auschwitz will be opened again" for non-believers.

15. On November 13, 2015, ISIL terrorists attacked civilians at multiple locations in Paris, France, and murdered more than 100 people. On November 17, 2015, the profile photograph on the Twitter account with the handle @newerajihadi26, was a photograph of dead bodies and blood on the floor of the Bataclan theatre, where ISIL terrorists murdered over 80 people.

16. On November 14, 2015, the user of the Twitter account with the handle @newerajihadi25, in response to a tweet from another individual who appeared to be a member of the U.S. military, tweeted his wish that more veterans would commit suicide, and "Enjoy your trip to hellfire."

17. On March 15, 2016, the user of the Twitter account with the handle @newerajihadi77 posted a photograph containing the media logo for ISIL's media group, and depicting ISIL terrorists trying to tear the heads off of two prisoners of ISIL whose throats had just been slit so deep that they were nearly decapitated. The user of the Twitter account with the handle @newerajihadi77 tweeted this photograph to another Twitter user stating "lol don't worry we r coming for you heathens."

18. On March 19, 2016, in response to a post by another Twitter user regarding damages done by airstrikes in the ISIL capital of Raqqa, Syria, the user of the Twitter account with the handle @newerajihadi79 posted "May Allah swt take revenge on kuffar and kill their families."

19. The FBI identified Qamar as the user of the "newerajihadi" handles on Twitter through records received from Twitter, Inc., and cable and phone companies, as well as through

5

a confidential witness (who is described further below). First, internet protocol ("IP") records provided by Twitter, Inc., reveal that the Twitter account with the handle @newerajihadi9, was accessed by a particular IP address accessed through Cox Communications. According to information received by the FBI from Cox Communications, that IP address in May 2015 was assigned to Qamar's residence in Burke, Virginia, through an account registered to Qamar's mother. Further, a phone number for which Qamar was the subscriber was provided to Twitter in connection with the opening of Twitter accounts @newerajihadi21; @newerajihadi24; @newerajihadi25; @newerajihadi32; and @newerajihadi33.

20. The conclusion that Qamar was the user of the "newerajihadi" handles on Twitter was confirmed by a confidential witness ("CW"). CW is a United States citizen who has provided information to the FBI since May 2013. None of the information that he has provided has been shown to be unreliable. CW receives money from the FBI for his services.

21. CW has associated with Qamar as a friend since September of 2015, and since that time they have met in person on numerous occasions, and also followed each other on social media. CW led Qamar to believe that CW's cousin ("Cousin") joined ISIL. Except for their meetings on September 6 and September 11, 2015, all conversations between CW and Qamar are documented on recordings provided to the FBI by CW.

22. CW reported that, between September 2015 and June 2016, CW often communicated with Qamar through social media, including through Twitter private messaging on accounts using variations of the name "newerajihadi." CW reported that Qamar was the user of the Twitter accounts using handles with variations of the name "newerajihadi." For example, on September 3, 2015, Qamar used the Twitter account with the handle @newerajihadi20 to communicate with CW via direct messaging. CW reported that Qamar often notified him of

6

Qamar's successive "newerajihadi" Twitter handles when the previous one was closed by Twitter. In a recorded conversation, on June 17, 2016, CW asked Qamar which "newerajihadi" account Qamar was using when CW first met Qamar. Qamar answered that he and CW have known each other for about a year, and that Qamar was using the "newerajihadi4" account or "newerajihadi7" account when they first met. Qamar said that he had gone through almost 100 accounts since then.

23. CW's information that the Twitter accounts with handles that included the name "newerajihadi" were maintained by Qamar is corroborated by Qamar's public tweets, in which he announced the use of his new Twitter handles to replace the handles from previous accounts that were closed by Twitter. I obtained screen shots of many of those public tweets.

III.    <u>Qamar and Violence</u>

24. "Flames of War" is a 55-minute long video released by ISIL and narrated by an individual speaking English with an American accent. The film highlights ISIL's seizure of a Syrian Army base near Raqqah, Syria, and shows captured Syrian soldiers being shot point-blank in the back of the head and then falling into the graves that they had just been forced to dig. The film finishes with a statement from Abu Bakr Al-Baghdadi, the leader of ISIL, that ISIL is waiting to fight United States combat forces. During various conversations recorded by CW, Qamar discussed videos produced by ISIL that Qamar had viewed online. Qamar told CW that he had seen "Flames of War" numerous times.

25. On October 2, 2015, Qamar told CW that Qamar loved the bodies, blood and beheadings. Qamar told CW that, when it comes to brutality on the kuffar, he has an "unlimited appetite."

7

26. On October 29, 2015, Qamar told CW that Qamar recalled watching a video of a Kurdish individual being slaughtered, and liked the cracking sound made when the individual's spinal cord was torn. Qamar told CW about a video he saw where an individual was executed by being run over by a tank; Qamar said that he watched it five times and that it was beautiful.

27. On several occasions Qamar has told CW that he could slaughter someone, and described how he would do it. For example, on October 16, 2015, Qamar told CW that Qamar could slaughter someone if given the option. On June 3, 2016, Qamar described how he would slaughter someone with a butter knife.

28. On November 14, 2015, Qamar spoke to CW regarding the attacks that occurred in Paris, France on November 13, 2015. Qamar stated that when he heard the statement by the spokesman for ISIL taking credit for the attacks, he was "giddy." Qamar stated that he admired lone wolf attackers because they love Islam so much that they are willing to die as martyrs for Islam. In the same conversation, Qamar and CW discussed suicide bombings. CW said that he did not believe in suicide bombings, but Qamar responded "I believe in it 100%."

29. On November 20, 2015, Qamar asked CW if CW would ever use a table saw to behead someone. CW responded that he could not do so. Qamar made the noise of a saw and said that he would love to do it, and that he would do it for fun. Qamar stated that he could think of so many creative ways to behead someone. Qamar told CW that he (Qamar) likes carnage.

30. On April 2, 2016, Qamar told CW about how some Sunni Muslims blame their women for being raped. When CW asked Qamar what Qamar would like to do to those people, Qamar said "stick a fucking knife, and just make a slurpee out of their blood." Qamar added, "I'd love to drink a blood slurpee, little bit uh, sugar cane juice in it, perfect."

8

31. On April 22, 2016, during a meeting with CW, Qamar expressed his desire to behead someone. Qamar said that he would like to ask Cousin what the inside of a throat looks like, and suggest that, "when they start slaughtering," Cousin could drink the blood for Qamar. When CW told Qamar that Cousin was not the type of person who would behead anybody, Qamar said that "No, I'm more about slicing the throat and just sticking my hand inside his throat trying to make my hands nice and warm." Qamar told CW that Qamar was thinking about "slicing someone's throat up and then just sticking your hands, and just tearing it apart."

IV.    Qamar and the "Kill List"

32. On September 11, 2015, a "kill list" was posted to the internet by terrorists connected with ISIL, containing the names and addresses of members of the U.S. military. A few days later, Qamar told CW that the residences of several soldiers who appeared on that "kill list" were near Qamar's own home, and that Qamar had observed undercover police cars near those residences. On October 29, 2015, and again on May 12, 2016, Qamar reminded CW of the addresses on the kill list, and told CW the name of the street.

33. On September 16, 2015, from Twitter account with handle @newerajihadi20, Qamar tweeted his prayer that Allah "give strength to the mujahideen to slaughter every single US military officer." As noted above, I know Qamar was the user of this account because he used it on September 3, 2015, to communicate with CW via direct messaging -- and the profile photo for that account depicts the collection of blood from beheaded prisoners.

34. The FBI confirmed that two residences on the list are, in fact, within two miles of Qamar's residence. In light of Qamar's statement to CW that Qamar observed undercover police cars near those residences, I believe that Qamar likely drove past those residences after their occupants were included on the "kill list."

9

V.  Qamar and Discussion About Traveling to Join ISIL

35.  On September 25, 2015, Qamar told CW that Qamar tried to join the Islamic State in 2014, but that his parents prevented him from going.  Qamar said that his parents threatened to notify law enforcement authorities.  Qamar said that he fought with his father and called his father a traitor to Islam.

36.  On October 9, 2015, Qamar told CW that, prior to traveling to join the ISIL, Qamar was trying to get a passport renewed because his old passport had expired.  Qamar said that his parents control the passport, and that he tried to go without them finding out.  He said that he attempted to get his passport from his parents when he got a new job by telling them he needed it as a second form of identification.  On January 4, 2016, Qamar told CW that he tried to get a new passport in person, but was told that he needed his expired passport to renew it or his birth certificate to obtain a new one.  Qamar said that he was unable to leave because his passport had expired, and that he was unable to renew it because his parents took it and his birth certificate away from him.  On March 16, 2016, Qamar told CW that he bought a ticket and lost $700.

37.  On November 18, 2015, CW asked Qamar if his father gave him back his passport would he go and join ISIL.  In response, Qamar said, if that happened, "I'm done, I leave."

38.  Qamar's statements to CW are corroborated by independent records.  According to records obtained from TAP Air Portugal, on July 22, 2014, Qamar purchased a ticket to fly from Newark, New Jersey, to Istanbul, Turkey on July 27, 2014, for $686.85, but failed to show up for the flight.  I know that the TAP Air Portugal record is for the Harris Qamar that is the subject of this affidavit, because, according to AT&T records, Haris Qamar, of Burke, Virginia, is the subscriber of the phone number that was provided to the airline in connection with the purchase

10

of the ticket. Moreover, the ticket was purchased through a pre-paid VISA card that was registered on-line using Qamar's name, address, and phone number.

VI.    Qamar Expresses Ambivalence About Traveling to Join ISIL

39. On September 18, 2015, Qamar quoted Anwar al-Awlaki, and, referring to dying on the battlefield as a martyr for Islam, told CW that "you either die a shaheed or you die a coward."

40. On October 16, 2015, CW told Qamar that Qamar did not have to travel to join ISIL in order to be seen as a martyr in the eyes of Allah, and that he would die a martyr for Islam so long as his heart was on the battlefield, even if he dies in his bed. Qamar responded that Qamar did not want to risk going to hell, and that dying as a martyr on the battlefield was a guaranteed way of avoiding that risk.

41. On November 20, 2015, CW and Qamar spoke about Qamar joining and/or aiding the Islamic State. Qamar said that his parents knew that he was a fan of the Islamic State, and that, as a result, his parents wanted him to get married. Qamar said that he told his parents that he would not marry anyone that was not a supporter of the Islamic State. Qamar said that, even if he had a nice house and a profitable business, he would attempt to find a way to funnel money to the Islamic State until he left the country or got caught. He said that he wanted to live and have his kids in the Islamic State, and not in the United States

42. On November 28, 2015, Qamar initially told CW that the only thing keeping Qamar in the United States was his family, and he would join the Islamic State if he did not have a family. Qamar then claimed that that he would in fact go despite his family, but that they were controlling his passport.

11

43. On December 1, 2015, Qamar told CW that, if Qamar's father learned that Qamar joined the Islamic State, his father would sell their house, destroy his youngest brother, and possibly commit suicide.

44. On December 3, 2015, Qamar told CW that Qamar felt like he needed to start preparing for a trip to join the Islamic State, such as by saving money. Qamar said that he needed to be ready to go if Qamar and CW needed to go at a moment's notice. Qamar speculated that he should buy a plane ticket and have it ready.

45. On December 16, 2015, CW told Qamar that CW planned to travel overseas for the purposes of joining ISIL. CW told Qamar that there was a small window of opportunity for both of them to go join "Dawlah." Qamar told CW "Insha'Allah when you do go I'll follow insha'Allah soon after. Save me a spot."

46. On January 7, 2016, CW and Qamar again discussed CW's plans to join ISIL, and the possibility of Qamar joining him in doing so. Qamar said that he wanted to go, but that his parents did not want him to do so. Qamar told CW about a fight that Qamar had with his father and brother about Qamar's support for the Islamic State in late 2015. Qamar exhibited ambivalence when CW offered to help Qamar obtain a new birth certificate so that he could obtain a new passport without his parents' knowledge.

47. On January 12, 2016, Qamar told CW that Qamar wanted to fight for the Islamic State for the sake of Allah, but that he did not want to "jump on the train" and follow everyone, or do so because of peer pressure. When CW asked whether Qamar felt that CW was pressuring Qamar to join the Islamic State, Qamar responded "No, no no."

48. On January 27, 2016, CW told Qamar that it appeared that Qamar was not ready to travel to join the Islamic State. In response, Qamar said that "insha'Allah one day." Qamar

12

stated that his father would die of shock if Qamar left the United States to join the Islamic State, and that Qamar was concerned about what would happen to his mother and youngest brother.

49. On February 14, 2016, Qamar told CW of Qamar's frustration that, despite his wish to sever heads, he could not "do anything from here. I can't do anything and I can't take it."

50. On February 27, 2016, Qamar told CW that he was jealous of the "brothers" fighting for the Islamic State, and prayed that someday he would end up over there. Qamar again spoke of his frustration because he could not do anything in the United States.

51. On March 16, 2016, CW told Qamar that, due to issues with his connections overseas, CW no longer could travel to join the Islamic State. Qamar consoled CW, saying "trust me, we'll go one day...we'll go one day insha'Allah, we will have money and we will go and we'll go at a time where, we'll see we'll see."

52. In April 2016, media sources reported that Khweis Mohammed Jamal, a former resident of Alexandria, Virginia, defected to Kurdish forces after traveling to Iraq and joining ISIL. In a conversation on April 2, 2016, and apparently referring to Khweis, Qamar told CW that Khweis was an idiot for leaving ISIL, and indicated that Qamar would have liked to have traded places with Khweis.

53. On April 2, 2016, CW told Qamar that Cousin had successfully made it to an Islamic State camp and was working with ISIL to help bring fighters to the Islamic State from the West.

54. During a conversation on April 25, 2016, Qamar said that he would do anything to be able join the Islamic State, but that his biggest obstacle was his parents. CW said that Qamar needed to respect his parents. Qamar said that his parents were asking him to do something that was tearing his heart apart. CW said that the reality was that they (Qamar and CW) could not go

13

to join the Islamic State now. Qamar said that "if the most we can do" is just send help from

here, he would try to do so.

VII.  Qamar and the ISIL Lone Wolf Propaganda Video

55. On May 26, 2016, Qamar and CW discussed a video that ISIL was purportedly

making to encourage lone wolf attacks in Washington, D.C. CW told Qamar that Cousin was

assisting the Islamic State in making that video, and had asked CW to provide photographs of

possible targets in and around Washington, D.C., for use in the video. In response, Qamar

offered CW ideas of where to go to take these photographs. Qamar's list included a number of

D.C. area locations and landmarks, including specific locations and landmarks in Arlington,

Virginia, which could be targeted for terrorist attacks. Qamar said that one of those locations

was a particularly good target for attack "because it is fucking terrifying."

56. Qamar said that taking photographs and providing them to the Islamic State was

different from being a "fanboy" online, and constituted active support for ISIL. Qamar said that,

once the photos come out in the video, the U.S. government would try to figure out who took the

photos. Qamar told CW that phones have GPS, and everything is recorded. Qamar said that, as

a result, that CW should purchase and use a cheap digital camera for the photos instead of taking

them with his cell phone. Qamar reminded CW to pay cash for the camera and not use a credit

card. Qamar told CW to upload the pictures to the internet via a wi-fi connection at a coffee

shop or store that provides a wi-fi connection, and to use anonymization software.

57. On June 3, 2016, Qamar offered to assist CW in taking the photographs. That same

day, CW picked up Qamar in Springfield, Virginia, in a car that the FBI had fitted with a video

recorder. CW wore an audio recorder.

14

58. In the car, CW told Qamar that Cousin loved Qamar's ideas about targeting particular D.C. area locations and landmarks. CW said that CW was going to drive by those places, because Cousin wanted the pictures that very week. As CW drove them to a location in Arlington, Virginia with a view of particular locations and landmarks in Virginia and Washington, D.C., Qamar told CW that they should take pictures along the way. As Qamar and CW approached that location, Qamar began to take video and photographs outside the car window. Qamar told CW that they needed to make sure that they kept their reflections out of the mirrors lest the government identify them through finding their reflection in a mirror on a photograph.

59. As Qamar and CW arrived, I saw them taking photographs at the above mentioned location in Arlington, Virginia. I saw Qamar taking photographs as CW held something out in front of Qamar. As explained below, CW later provided to me the camera used by Qamar and CW to take those photographs; I could then see that the photograph taken by Qamar was that of a cell phone (that I know to have been held by CW) bearing a photo of the black flag of ISIL in the foreground, with a view of a potential target of a terrorist attack in the background.

60. After that location, CW and Qamar headed across the 14th Street Bridge into Washington, D.C. CW reported that, as CW drove the car, Qamar took photographs of various landmarks and locations in Washington, D.C. CW and Qamar then drove back into Virginia across the 14th Street Bridge. As they drove past the Pentagon, Qamar took a video of the Pentagon and yelled a slogan indicating support for the expansion of ISIL. Qamar said "bye bye DC, stupid ass kufar, kill'em all". Qamar said that he hates the United States and hates being here; he said that he gets a "burning sensation in my body because this place is so disgusting."

15

61. After Qamar and CW stopped for dinner, Qamar said that he learned to be a chameleon, and that he could lie about anything. When CW asked if Qamar was lying about his support for ISIL, Qamar said that he was not lying about that. Qamar said, "I'm a professional liar, how do you think I'm a Dawlah supporter and no one fucking knows?"

62. After dinner, Qamar reminded CW to check the photographs before uploading to ensure that they did not contain reflections of Qamar or CW. Qamar advised CW to open a Gmail account, and upload the photographs to that account. Rather than emailing the photos to Cousin, Qamar advised CW to give Cousin the user name and password for the Gmail account, so that Cousin could log into the account and download the photographs himself. Qamar said that if CW gets caught, CW could claim the account was hacked.

63. CW paid for their dinner after Qamar realized that Qamar left his money in Qamar's car when CW picked him up earlier that day. When CW dropped Qamar off at Qamar's car, Qamar gave CW money to cover his portion of the cost of the dinner. Later, they arranged to meet again on June 10, 2016, to take additional photographs for use in an ISIL video.

64. CW provided to me the camera containing the photos taken by CW and Qamar on June 3, 2016, as well as the audio recording of his meeting with Qamar.

65. On June 10, 2016, CW and Qamar met again with the purpose of taking additional photographs to provide to Cousin. CW picked Qamar up in Springfield, Virginia, and they drove to a particular location in Arlington, Virginia. At that location, I saw Qamar taking photographs. Qamar and the CW then proceeded to two other landmarks in Arlington, Virgina, and were observed taking photographs at each location by FBI personnel.

66. CW reported that, later in the evening, Qamar asked CW where the orders were coming from to take the photographs. Qamar said he did not care, as long as the photographs

16

were going to Dawlah. Qamar asked whether CW had uploaded the photographs taken on June 3rd, in the manner in which Qamar coached CW to do so (and was told that CW had done so).

Conclusion

67. Based on the foregoing, there is probable cause to believe that, between on or about May 26, 2016, and June 10, 2016, in Arlington County and elsewhere in the Eastern District of Virginia, Haris Qamar knowingly attempted to provide material support and resources to a foreign terrorist organization, namely ISIL, in violation of 18 U.S.C. § 2339B.

Wherefore, I request the issuance of an arrest warrant pursuant to the Federal Rules of Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

Nicholas Caslen
Special Agent, FBI

Subscribed to and sworn before me on this 7th day of July, 2016.

/s/

John F. Anderson
JOHN F. ANDERSON
UNITED STATES MAGISTRATE JUDGE

17

U.S. v. Farrokh,

Case No. 16-cr-20 (E.D. Va.)

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division



JUL 15 2016

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

Joseph Hassan Farrokh

Defendant.

Case Number:   1:16-CR-00020-001

USM Number:   89201-083

Defendant's Attorney:   Joseph T. Flood, Esquire

## JUDGMENT IN A CRIMINAL CASE

The defendant pleaded guilty to Count 1 of the Criminal Information.

Accordingly, the defendant is adjudicated guilty of the following counts involving the indicated offenses.

| Title and Section | Nature of Offense | Offense Class | Offense Ended | Count |
|---|---|---|---|---|
| 18 U.S.C. §2339B | Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization | Felony | 1-15-2016 | 1 |

As pronounced on July 15, 2016, the defendant is sentenced as provided in pages 2 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

Signed this _15_ day of _July_, 2016.

Anthony J. Trenga

United States District Judge

| Defendant's Name: | Farrokh, Joseph Hassan |
|---|---|
| Case Number: | 1:16-CR-00020-001 |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of ONE HUNDRED TWO (102) MONTHS, with credit for time served.

The Court makes the following recommendations to the Bureau of Prisons:

    1) that the defendant be considered for placement at FPC Beckley, West Virginia, FPC Lewisburg, Pennsylvania, FPC McKean, Pennsylvania or FCI Butner, North Carolina, if available and appropriate.

    2) that the defendant be evaluated and if appropriate, participate in the BOP 500 Hour Residential Drug Abuse Treatment Program (RDAP).

    3) that the defendant be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center, if available and appropriate.

The defendant is remanded to the custody of the United States Marshal.

# RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to _____

at_____, with a certified copy of this Judgment.

                                      _____

                                      UNITED STATES MARSHAL

By                       _____

                                        DEPUTY UNITED STATES MARSHAL

| | |
|---|---|
| Defendant's Name: | Farrokh, Joseph Hassan |
| Case Number: | 1:16-CR-00020-001 |

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of TEN (10) YEARS.

The Probation Office shall provide the defendant with a copy of the standard conditions and any special conditions of Supervised Release.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and periodic drug tests thereafter, as determined by the court.

The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or restitution obligation, it is a condition of Supervised Release that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

# STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court set forth below:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance or any paraphernalia related to such substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer for a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

| | |
|---|---|
| **Defendant's Name:** | **Farrokh, Joseph Hassan** |
| **Case Number:** | **1:16-CR-00020-001** |

## SPECIAL CONDITIONS OF SUPERVISION

While on Supervised Release pursuant to this Judgment, the defendant shall also comply with the following additional special conditions:

1) The defendant shall provide the probation officer access to any requested financial information.

2) The defendant shall have no contact with individuals actively involved in terrorist activities or whom he knows has past or current ties to terrorism.

3) The defendant shall not possess or use a computer without prior approval from the probation officer, and shall consent to the installation of computer monitoring software that will allow the probation officer to track all computer activity, including keystrokes, application information, Internet searching, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software. The costs of the monitoring shall be paid by the defendant.

4) The defendant shall participate in a program approved by the United States Probation Office for substance abuse testing and shall participate in treatment if recommended.

5) The defendant shall participate in a mental health counseling as directed by the Probation Officer, including "de-radicalization" therapies if available, and shall be required to waive any right of confidentiality as to any mental health treatment received in order to allow release of information to the Probation Officer, so the Probation Officer, and if necessary, the court, can determine whether the defendant should continue mental health treatment or medication.

Case 9:15-cr-80070-AJT Document 49 Filed 07/15/16 Page 6 of 6 PageID# 198 of 281

| | | |
|---|---|---|
| Defendant's Name: | Farrokh, Joseph Hassan | |
| Case Number: | 1:16-CR-00020-001 | |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

| | Count | Assessment | Fine | Restitution |
|---|---|---|---|---|
| | 1 | $100.00 | $0.00 | $0.00 |
| TOTALS: | | $100.00 | $0.00 | $0.00 |

# FINES

No fines have been imposed in this case.

AO 245H (Rev. 09/11) (VAED rev. 2) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

| | |
|---|---|
| **Defendant's Name:** | **Farrokh, Joseph Hassan** |
| **Case Number:** | **1:16-CR-00020-001** |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

The special assessment shall be due in full immediately.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed. Payments shall be applied in the following order: (1) assessment (2) restitution principal (3) restitution interest (4) fine principal (5) fine interest (6) community restitution (7) penalties and (8) costs, including cost of prosecution and court costs.

Nothing in the court's order shall prohibit the collection of any judgment, fine, or special assessment by the United States.

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

**JAN 1 6** 2016

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 1:16-mj-24
)
JOSEPH HASSAN FARROKH, )
)
Defendant. )

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Walter T. Johnson, Jr., after being duly sworn, depose and state as follows:

1.    I am a Special Agent with the United States Secret Service ("USSS"), and have

been so employed for over 17 years.  I have served as a Task Force Officer in the Federal Bureau

of Investigation's Washington Field Office, Joint Terrorism Task Force for over a year.  In July

2014, I was assigned to investigate global terrorist organizations operating against U.S. interests

in Africa.  I have participated in multiple terrorism-related and criminal investigations, including

cases involving individuals providing financial support to terrorist organizations, attempting to

travel to join terrorist organizations, and conspiring to communicate threats and solicit murder.

2.    This affidavit is submitted in support of a criminal complaint charging Joseph

Hassan Farrokh with attempting to provide material support and resources to a designated foreign

terrorist organization, in violation of Title 18, United States Code, Section 2339B.

3.    The information contained in this affidavit is based on my personal knowledge

and observations made during the course of this investigation, personal review of records,

documents, and other physical evidence obtained during this investigation, including recorded

telephone, audio, and in-person communications and information provided to me by FBI Agents

and other government personnel with knowledge relating to this investigation, particularly including the FBI sources of information identified below as "CHS #1," "CHS #2," and CHS #3.

4.     This affidavit summarizes the content of certain recorded communications, which were recorded pursuant to lawful court orders or the consent of at least one party to the communication. The majority of these recorded communications were in English, with a small percentage in Arabic. Since this affidavit is submitted for the limited purpose of supporting the criminal complaint, I have not included every fact known to me concerning this investigation. When I assert that a statement was made by an individual, that statement is described in substance and in part, but my assertion is not intended to constitute a verbatim recitation of the entire statement. When I assert that a communication was made on a certain date, I mean that the communication was made "on or about" that date.

I.     ISIL's DESIGNATION AS A FOREIGN TERRORIST ORGANIZATION

5.     On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.  On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq ("AQI") as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  Although the group has

2

never called itself "Al-Qaeda in Iraq (AQI)," this name has frequently been used to describe it

through its history. To date, ISIL remains a designated FTO. In an audio recording publicly

released on or around June 29, 2014, ISIL announced a formal change of its name to the "Islamic

State." The terrorist organization ISIL has spread its violent message to individuals who identify

with ISIL beyond the borders of Iraq and Syria.

II.     FACTS ESTABLISHING PROBABLE CAUSE

6.     Joseph Hassan Farrokh is a 28-year old United States citizen who was born in

Pennsylvania. Farrokh has resided in Woodbridge, Virginia, since July 2015.

7.     Mahmoud Amin Mohamed Elhassan is a 25-year old resident of Woodbridge,

Virginia. Elhassan is originally from Sudan. He became a legal permanent resident of the

United States in 2012.

8.     The FBI confirmed that on October 2, 2015, in a conversation about events in

Syria between Farrokh and Elhassan, Farrokh said that he had no patience and that he wanted to

go right away and "chop their heads." When Elhassan characterized Farrokh's attitude as that of

an "extremist," Farrokh said that he just belongs on the battlefield and would rather go by

himself.

9.     An individual to whom I will refer here as "CHS #3" is a confidential human

source who has provided information to the FBI since 2012. CHS #3 has been convicted of

criminal offenses, but received a sentence reduction for his cooperation. CHS #3 has received

over $10,000 from the FBI in the course of his cooperation. His reporting has been corroborated

by electronic and other means, and he has provided no information in the course of his

cooperation that has been determined to be untrue. CHS #3 is personally acquainted with both

Farrokh and Elhassan.

3

10. CHS #3 reported that he first met Farrokh in August 2015. It was Elhassan who introduced CHS #3 to Farrokh. Elhassan believed CHS #3 maintained connections to individuals engaged in jihad outside the United States. CHS #3 said that he was with Elhassan and Farrokh together at this August 2015 meeting. The three of them met again on October 17, 2015. While they were all together, Farrokh asked CHS #3 for help in getting to Syria while in the presence of Elhassan. CHS #3 said that he would try to find someone who could help get Farrokh to "Dawlah." As noted in paragraph 5 above, and consistent with my knowledge of the designated foreign terrorist group ISIL, I know that when Farrokh and Elhassan discuss "Dawlah" they mean ISIL.

11. CHS #3 reported that, in November 2015, CHS #3 told Elhassan that CHS #3 had a message for Farrokh, which Elhassan understood to be an update from the "Dawlah" facilitator who Farrokh asked CHS #3 to contact. CHS #3 then asked Elhassan to pass that message to Farrokh and to have Farrokh meet CHS #3, as CHS #3 did not have Farrokh's contact information. The FBI confirmed that on November 1, 2015, Elhassan notified Farrokh that CHS #3 had information for Farrokh.

12. The FBI confirmed a conversation on October 31, 2015 between Farrokh's mother and Farrokh wherein Farrokh's mother told Farrokh he sounded aggressive; in response, Farrokh told his mother that he asked Allah to increase his torment on the Christians and to make their faces burn in hell's fire; he asked Allah to destroy the Christians because they are the enemies of Allah and the enemies of humanity.

13. On November 13, 2015, CHS #1 telephoned Farrokh and told Farrokh that CHS #3 had vouched for Farrokh. Farrokh and CHS #1 agreed to meet on the weekend of November

4

20, 2015. Farrokh understood CHS #1 to be an ISIL facilitator who could assist him in joining
ISIL overseas.

14.     On November 20, 2015, CHS #1 telephoned Farrokh and set up a meeting for
later that day. CHS #1 told Farrokh that he would bring a trusted "brother," hereinafter referred
to as "CHS #2." Through a text message, Farrokh sent CHS #1 the address of a restaurant in
Springfield, Virginia, for the meeting.

15.     At about 3:00 p.m., on November 20, 2015, Farrokh met CHS #1 and CHS #2 at a
parking lot in Springfield, Virginia, as planned. All three men sat in CHS #1's car. The meeting
was recorded by the FBI. Farrokh expressed concern about trusting CHS #1 and CHS #2, and
said that he did not want to go to jail for 15 years. CHS #1 and CHS #2 told Farrokh that he
could leave if he did not feel comfortable, and yet they would still remain brothers; they said that
Farrokh did not have to talk if he did not feel comfortable.

16.     Farrokh suggested that they swear an oath that anyone working with the kuffar
would suffer the curse of Allah (I know that "kuffar" is a term that can be used to refer to non-
Muslims). Farrokh swore that oath; he said that he was smiling during the oath because if he goes
to jail he would feel good because it was for Allah. Farrokh understood that he was meeting with
CHS#1 because he was a facilitator for ISIL and would assist Farrokh in gaining membership to
ISIL in Syria. Farrokh understood CHS#2 to be CHS#1's "trusted brother" also aligned with
ISIL's cause.

17.     Farrokh said that no one could prove to him anything that the "Dawlah" has done
is against Islam. Farrokh asked what would be his chances of successfully getting into Syria.
CHS #1 and CHS #2 told him that now the route is through Jordan because it was now hard to
get into Syria through Turkey.

5

18.     Farrokh asked how soon he could go to Syria if he wanted to go. CHS #1 gave Farrokh a time frame of between one to two months. CHS #1 told Farrokh that they would need copies of his passport and driver's license to pass to brothers at the border to ensure that Farrokh was trusted and not being watched by law enforcement. Farrokh responded that would be no problem. CHS #2 asked Farrokh what group Farrokh wanted to join. Farrokh answered; "Dawlah," of course," and said that "now I'm saying something I can go to jail for." Farrokh said that he feels like he was made to be a mujahideen and that he has asked Allah every day to make him a shaheed (an Arabic term meaning holy martyr). Farrokh said that he wanted to kill for Allah's sake and be killed for Allah's sake, and that he asks that of Allah every day.

19.     Farrokh asked CHS #1 and CHS #2, "So, what's the next step?" CHS #1 said that Farrokh would need to do Bay'ah (based on my training and experience, I know that doing "Bay'ah" essentially consists of declaring an oath of allegiance). CHS #1 said that Farrokh would not do Bay'ah that day, but that he (Farrokh) should go home and think about it and then, if Farrokh wanted to meet the next day, he could do it then. Farrokh asked CHS #1 whether he (Farrokh) would have to do something in America if he did Bay'ah. CHS #1 said that Farrokh would not have to do anything in America, but that ultimately it would be Farrokh's decision. As they departed, Farrokh said that he has been asking Allah to help him get to Syria for a year now, and that they made him very happy.

20.     On November 21, 2015, following an exchange between CHS #1 and Farrokh, the three men met again in the afternoon in CHS #1's vehicle in a Springfield, Virginia parking lot. The meeting was recorded by the FBI. CHS #2 said that it was up to Farrokh if Farrokh did not want to go to Syria, or was uncomfortable with dying as a martyr in jihad, but that he and CHS #1 would still be brothers in Allah with Farrokh. In response, Farrokh said that he was really

6

happy when he left the meeting the previous day because this was what he had been waiting for. He said that in the past he had other ways to get to Syria but they weren't secure, and that he needed a connection because he didn't want to get arrested.

21.     CHS #1 instructed Farrokh to print a copy of an application for a visa to enter Jordan from the internet, fill it out by hand, and send a picture of it to CHS #1 to start their internal vetting process to make sure they could trust Farrokh and that Farrokh was not being monitored by law enforcement. Farrokh was hesitant at first, saying that he was worried that he would be arrested if he gave them his passport and other documentation that would show that he had the intention to go. Farrokh later provided a copy of his U.S. passport, and stated he would send to CHS #1 a picture of his Virginia driver's license.

22.     CHS #1 and CHS #2 told Farrokh that it would be necessary for Farrokh to prove his commitment and become a member of the mujahideen by giving his Bay'ah. Farrokh said that he knew that he would need to give his Bay'ah once he got overseas, but did not understand why he needed to give it here, as it was something that the kuffar could use against him, and could result in him going to prison for 15 years. CHS #1 said that, by giving the Bay'ah here, Farrokh would be saying that he is now with "Dawlah." CHS #2 said that he (CHS #2) was a fighter, and he (CHS #2) was going to go, and if Farrokh wanted to join him he would be his brother, but that Farrokh has a heart, has a brain, and can think for himself. CHS #2 told Farrokh to just tell them if he (Farrokh) wasn't ready and that doing so would be ok. CHS #1 told Farrokh that it was fine if Farrokh wanted to keep the copy of his passport with him. Farrokh ultimately stated "Yeah, so let's do it."

23.     CHS #1 then explained each line of the Bay'ah in English, and specified that the Bay'ah was to the Caliph, "Abu Bakr," but that Abu Bakr's true name was Amir al Muhaimin the

7

Khalifa Sheikh Abdullah Ibrahim Bin Alwad Bin Ibrahim al-Kharachi. CHS #1 asked Farrokh
"you are ready brother?" Farrokh responded "yes." Farrokh then repeated each line of the Bay'ah
in Arabic, after CHS #1 read it to him.

24.     After their meeting on November 21, 2015, CHS #1 thanked Farrokh for meeting
with him. Farrokh responded through a text message, "I love you for the sake of Allah." Farrokh
also texted a photo of his Virginia driver's license to CHS #1.

25.     On November 24 and 25, 2015, Farrokh and CHS #1 conferred regarding the
application for a visa to enter Jordan. On November 25, 2015, CHS #1 received from Farrokh a
picture of Farrokh's completed Jordanian visa application. On December 3, 2015, they
exchanged texts regarding meeting together later that month.

26.     The FBI confirmed that on December 9, 2015, Farrokh told Elhassan that, on
December 3, 2015, he (Farrokh) put in his two-week notice at work.

27.     On December 15, 2015, CHS #1 met Farrokh in Baileys Crossroads, Virginia. The
meeting was recorded by the FBI.   Farrokh presented CHS #1 with his Jordanian visa
application. CHS #1 told Farrokh that Farrokh was cleared by the "Dawlah" to travel to Jordan
where he would be met by an individual named "Abu Mohammed" (a fictitious Jordanian
contact). CHS #1 told Farrokh that he would not just be given a gun and pointed in the direction
to go fight; CHS #1 said that, before being sent into Syria, Farrokh would need to spend about 30
days to learn the culture, some language, and receive weapons training.

28.     Farrokh asked CHS #1 if Farrokh could limit his time in training before going to
fight with the "Dawlah" in Syria because he feared arrest in Jordan if his family realized that he
had left to join "Dawlah." Farrokh said that he told his family that he was traveling to Saudi
Arabia to study and would return, but that his family might get suspicious if he does not return.

8

29.     Farrokh told CHS #1 that he would start researching flights, possibly out of

Richmond, Virginia to avoid what he believes to be stricter law enforcement scrutiny at large

airports. CHS #1 told Farrokh to travel between January 15th and January 20th, 2016 and

preferably on a holiday if there is one within that time frame. Farrokh told CHS #1 that he would

send CHS #1 his flight information soon so that CHS #1 could inform "Abu Mohammed" and

CHS #2 of Farrokh's arrival, so that they could greet Farrokh at the airport in Jordan.

30.     Farrokh expressed concern that airport security or TSA would search his phone.

Farrokh told CHS #1 that he would trim and style his beard to appear more American. Farrokh

said that he had not been training and working out because he felt that doing so would raise

suspicions; Farrokh said, however, that "Allah made me for jihad."

31.     Farrokh said that he was not interested in coming back to the US, but asked if his

wife and family could eventually join him in Syria. He said that he was very excited and that he

gives praise to Allah every time he sees the "black flag" (which I believe is a reference to the flag

of ISIL).

32.     CHS #1 told Farrokh that if, before leaving the U.S., Farrokh thought of anything

that would benefit him while he is fighting with "Dawlah," then Farrokh could send it to an

address provided by CHS #1 so that a trusted brother could send it overseas in a shipment that

would not be tied to Farrokh. Farrokh said that CHS #1's idea was a good one. When CHS #1

followed-up with Farrokh and asked if he needed to send anything overseas in advance of his

trip, Farrokh declined and said he would take everything with him when he travelled.

33.     On December 19, 2015, Farrokh exchanged text messages with CHS #1 about

Farrokh's travel plans. Farrokh asked CHS #1's opinion of Farrokh's plan to minimize suspicion

about his travel by buying a round trip plane ticket, and reserving a hotel room in Jordan that

could be cancelled upon his arrival in Jordan. CHS #1 told Farrokh that Farrokh should do

whatever made him comfortable. Farrokh said that he was not familiar with smaller airports in

the area, and asked CHS #1's opinion of Farrokh flying out of Reagan Airport. CHS #1 told

Farrokh that smaller airports were better. Farrokh wrote that he would let CHS #1 know once he

purchased a ticket.

34.     On December 21, 2015, Farrokh texted CHS #1 that Farrokh had purchased his

airplane ticket for Jordan, departing January 15, 2016 from Richmond, Virginia, and connecting

in Chicago, Illinois. In fact, as described below, Farrokh attempted to depart from the Richmond

International Airport to begin the first leg of his journey to Syria, intending to fight for ISIL.

35.     On January 1, 2016, the FBI taped a conversation between Elhassan and CHS #3.

In that conversation, Elhassan admitted that, from discussions and private communications with

Farrokh, Elhassan knew of Farrokh's plans to travel to Syria to join ISIL. Elhassan made

statements acknowledging that Farrokh was falsely telling his family that he intended to travel to

Saudi Arabia to study. Elhassan told CHS #3 that Farrokh was close to leaving for ISIL, and that

Farrokh was not going through Turkey, but through the same route he talked about before with

CHS #3 (which I believe refers to Jordan). Elhassan said that he did not want to see Farrokh go

to prison; Elhassan said that Farrokh had sent Elhassan an article about a sting by police in

Rochester, New York, against a man who wanted to join the Dawlah. Elhassan asked CHS #3 if

Elhassan could trust "the brother" (a reference to CHS #1) that CHS #3 put in touch with

Farrokh.

36.     The FBI has confirmed that Elhassan has repeatedly cautioned Farrokh to watch

what he says openly about ISIL on the phone. CHS #3 reported that, on January 1, 2016,

Elhassan expressed concern that law enforcement authorities might be listening to his

10

conversations.

37.     On January 8, 2016, Farrokh met with CHS #2 in CHS #2's car in Falls Church, Virginia. The meeting was recorded by the FBI. In the course of the meeting, CHS #2 said that, once Farrokh reached the Islamic State, Farrokh would receive training, including training on weapons, and then go to the front lines. CHS #2 said that, as an American, Farrokh should know that United States Special Forces were fighting the Islamic State in Syria. In response, Farrokh said that "honestly, this is the best." Farrokh said that he wanted to die a martyr.

38.     At approximately 7:55 a.m. on January 15, 2016, the day of departure for Farrokh's previously scheduled flight to Jordan, Farrokh left his residence in Woodbridge, Virginia, in a red taxicab driven by Elhassan. Farrokh was observed with two bags. Elhassan drove southbound on Interstate 95 towards Richmond. Upon reaching the vicinity of the Richmond International Airport, Farrokh and Elhassan stopped at a commercial and retail area approximately one mile from the airport. Farrokh and Elhassan stayed together at this commercial area for approximately two hours. At approximately noon, a yellow taxicab arrived and Farrokh entered this taxicab which drove him the approximate one mile to the Richmond International airport. Elhassan departed the commercial area near the airport and drove northbound on Interstate 95. He was surveilled by law enforcement agents as he proceeded on Interstate 95.

39.     Farrokh entered the airport terminal and proceeded to check-in for his flight to Jordan via Chicago. Upon checking in, Farrokh cleared through the departure security area carrying two bags. Upon clearing the security checkpoint, Farrokh proceeded to walk to his departure gate. Farrokh was arrested by the FBI as he was approaching his departure gate.

11

40.     Subsequent to Farrokh's arrest, FBI agents approached Elhassan that afternoon at a location in Woodbridge, Virginia, where he voluntarily consented to an interview. During the course of the interview, Elhassan verbally acknowledged to the interviewing agents more than once that he knew it was illegal to knowingly lie to federal agents. He then proceeded to make a number of false statements in response to the agents' questions. Elhassan admitted knowing Farrokh and stated that he had first met Farrokh approximately two months ago and that the two would occasionally talk by telephone. When asked when he had last seen Farrokh, Elhassan told the agents that it had been around 11:30 a.m. that day in the Woodbridge, Virginia area. He further stated that Farrokh was going to the airport to fly to California to attend the funeral of a friend and that Farrokh had told him that he would be gone for two weeks. When asked which airport Farrokh was departing from, Elhassan initially hesitated then said that Farrokh was flying out of Dulles airport. At the conclusion of the interview, Elhassan was placed under arrest.

## CONCLUSION

41.     Based on the foregoing, there is probable cause to believe that, from on or about November 20, 2015, and continuing to January 15, 2016, in Prince William County and elsewhere in the Eastern District of Virginia, Joseph Hassan Farrokh knowingly attempted to provide material support and resources, to wit: personnel to include himself, to a foreign terrorist organization, namely the Islamic State of Iraq and the Levant (ISIL), in violation of 18 U.S.C. § 2339B.

Walter T. Johnson, Jr.
Special Agent, United States Secret Service

12

Subscribed to and sworn before me on this 16 day of January 2016.

_____ /s/ _____

John F. Anderson
United States Magistrate Judge
JOHN F. ANDERSON
UNITED STATES MAGISTRATE JUDGE

U.S. v. Dakhlalla

15-cr-98 (N.D. Miss.)

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

|  | Northern |  | District of |  | Mississippi |  |
|---|---|---|---|---|---|---|

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| V. | |
| Muhammad Oda Dakhlalla | |

| | Case Number: | 1:15CR00098-001 |
|---|---|---|
| | USM Number: | 16907-042 |

Mr. Gregory S. Park
Defendant's Attorney

## THE DEFENDANT:

X pleaded guilty to count(s)    1 of the Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2339B(a)(1) | Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization | 08/08/15 | 1 |

The defendant is sentenced as provided in pages 2 through ____6____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) ____

X Count(s)    3 of the Indictment    is/are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

August 24, 2016
Date of Imposition of Judgment

Signature of Judge

Sharion Aycock, Chief U.S. District Judge
Name and Title of Judge

August 30, 2016
Date

AO 245B    (Rev. 12/03) Judgment in Criminal Case
          Sheet 2 — Imprisonment

Judgment — Page   2   of    6

DEFENDANT:         Muhammad Oda Dakhlalla
CASE NUMBER:      1:15CR00098-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

Ninety-Six (96) months on Count 1 of the Indictment.

☐   The court makes the following recommendations to the Bureau of Prisons:

X   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

     ☐   at _____ ☐ a.m. ☐ p.m. on _____ .

     ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐   before 2 p.m. on _____ .

     ☐   as notified by the United States Marshal.

     ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
           Sheet 3 — Supervised Release

DEFENDANT:       Muhammad Oda Dakhlalla                    Judgment—Page ___3___ of ___6___
CASE NUMBER:     1:15CR00098-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

Fifteen (15) years on Count 1 of the Indictment.

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of
     future substance abuse. (Check, if applicable.)

X    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

X    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a
     student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
Sheet 3C — Supervised Release

DEFENDANT:     Muhammad Oda Dakhlalla
CASE NUMBER:     1:15CR00098-001

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in a program of testing and treatment for substance abuse, as directed by the probation officer, until such time as the defendant is released from the program by the probation officer.

2. The defendant may be required to submit to periodic unannounced examinations of the computer system for his computer or computer-related device(s), which may include retrieval and copying of all memory from hardware/software and/or removal of such system for the purpose of conducting a more thorough inspection. The defendant may be required to have installed on the computer any hardware/software to monitor the defendant's computer use or prevent access to particular materials. The defendant shall provide the probation officer with accurate information about the entire computer system or computer related device(s); all passwords used by the defendant; and his internet service provider; and will abide by all rules of the computer restrictions and monitoring program(s).

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____     _____
              Defendant                                     Date

DEFENDANT: Muhammad Oda Dakhlalla
CASE NUMBER: 1:15CR00098-001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100 | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

** All payments are to be made payable to Clerk of Court by money order or cashier's check and mailed to: Clerk of Court, 911 Jackson Avenue, Room 369, Oxford, MS 38655. **

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |

| **TOTALS** | $ | $ |  |
|---|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

Judgment — Page ___6___ of ___6___

DEFENDANT:        Muhammad Oda Dakhlalla
CASE NUMBER:      1:15CR00098-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**   X   Payment of $ _____100_____ due immediately, balance due

       ☐   not later than _____ , or
       X   in accordance   ☐ C,  ☐ D,  ☐ E, or  X F below; or

**B**   ☐   Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   X   Special instructions regarding the payment of criminal monetary penalties:

    * Installment payments made during any period of supervision shall commence 60 days after commencement of the supervision
period and shall be paid as determined by application of the criminal monetary payment schedule adopted by this Court to the
defendant's verified disposable income.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the Clerk of the Court, 911 Jackson Avenue, Room 369, Oxford, MS 38655.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: UNITED STATES' CRIMINAL
COMPLAINT AND APPLICATION FOR
AN ARREST WARRANT FOR
JAELYN DELSHAUN YOUNG and
MUHAMMAD ODA DAKHLALLA

**UNDER SEAL**

No. 3:15MJ 32-SAA

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Special Agent Stephen E. Thomason, first being duly sworn, deposes and states:

### INTRODUCTION

1. I make this affidavit in support of an application for a criminal complaint and arrest warrant charging JAELYN DELSHAUN YOUNG and MUHAMMAD ODA DAKHLALLA, with violating 18 U.S.C. § 2339B, in that they did knowingly and willfully conspire and attempt to provide material support or resources to a Foreign Terrorist Organization, that is the Islamic State of Iraq and the Levant ("ISIL").

2. I am a Special Agent with the Federal Bureau of Investigation, and I have worked in that capacity for 18 years. I am currently assigned to the FBI's Jackson Field Division, Oxford Resident Agency. I am currently assigned to an FBI Counterterrorism squad, which includes the Mississippi Joint Terrorism Task Force (JTTF). As such, I am charged with enforcing federal law. My primary duty and assignment obligates me to investigate federal crimes. The information contained in this affidavit is based on my personal knowledge, my training and experience, and information supplied to me by other law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause to support the criminal complaint and does not purport to set forth all the knowledge of or investigation into this matter.

3. A person violates 18 U.S.C. § 2339B when he or she

> Knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, . . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . . or that the organization has engaged or engages in terrorist activity.

Section 2339B(g)(4) defines "material support or resources," as used in Section 2339B:

1

> [T]he term "material support or resources," means any property,
> tangible or intangible, or service, including currency or monetary
> instruments of financial securities, financial services, lodging,
> training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel (1 or
> more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

4. On October 15, 2004, the United States Secretary of State designated AQI, then known
   as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under
   Section 219 of the Immigration and Nationality Act and as a Specially Designated
   Global Terrorist under section 1(b) of Executive Order 13224.

5. On May 15, 2014, the Secretary of State amended the designation of AQI as a FTO
   under Section 219 of the Immigration and Nationality Act and as a Specially Designated
   Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias
   Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also
   added the following aliases to the ISIL listing: the Islamic State of Iraq and al'Sham
   ("ISIL"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al'Islamiyya fi al-'Iraq
   wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media
   Production. Although the group has never called itself "Al-Qaeda in Iraq (AQI)," this
   name has frequently been used to describe it through its history. To date, ISIL remains a
   designated FTO. In an audio recording publicly released on June 29, 2014, ISIS
   announced a formal change of ISIL's name to Islamic State ("IS").

### Background of the Investigation and Statement of Probable Cause

6. The investigation has revealed that YOUNG and DAKHLALLA are supporters of ISIL
   and wish to travel to Syria to join ISIL.

7. On or about May 13, 2015, FBI Employee 1 had online contact with an individual who
   expressed a desire to travel to Syria in support of ISIL and made several supportive
   statements of ISIL.

8. On or about May 21, 2015, YOUNG was identified by FBI Employee 1 through social
   media platforms as a supporter of ISIL. YOUNG is a 19-year-old female United States
   citizen who currently resides in Starkville, Mississippi.

9. On or about May 25, 2015, YOUNG's Twitter page contained the following messages:
   "@1_Modest_Woman $$$ for plane tickets"

   "The only thing keeping me away is $$$ but working all of this overtime will be
   worth when I am finally there. #baqiya[1]"

---

[1] Baqiya is an Islamic term with a literal meaning of "remains", likely referring to the ISIL slogan "baqiya wa
tatamaddad" which translates as "remaining and expanding."

"I just want to be there :( #IS."

10. YOUNG engaged FBI Employee 1 on various internet and social media platforms. Investigation confirms that all of these platforms are registered to YOUNG. During one such online interaction, on May 29, 2015, YOUNG made it clear that, in relation to the Muslim family with whom she spends a great deal of time, and her local community as a whole, "many of the family members and members of the community do not support Dawlah . . ."[2] YOUNG expressed that she disagreed with those family and community members and stated ". . . Dawlah is correct."

11. In that same conversation, YOUNG announced that she is preparing for "hijjrah," a common reference to journeying to the Islamic State. She further stated, "I have [a] hijjrah partner and we are planning to leave before August." She went on to discuss some of her concerns about being monitored by Government agencies, and she also added that her travel partner was a "brother" and that she would have to have "nikkah"[3] with him so they could travel together without an escort.

12. Investigation has revealed that YOUNG's hijjrah partner is DAKHLALLA. DAKHLALLA is a 22-year-old man. He is a United States citizen currently living in Starkville, Mississippi.

13. In this same conversation with FBI Employee 1, YOUNG announced "Alhamdulillah[4] we found jobs . . . and have been saving up. We have enough for tickets and other expenses but now we are just waiting on my passport which of course takes forever all of a sudden." YOUNG informed FBI Employee 1 that she and DAKHLALLA would initially travel to Turkey, and then from Turkey they would enter Syria. She stated ". . . In sha Allah[5] the planning will land us in Dawlah with the grace of Allah swt."[6]

14. On or about June 1, 2015, after being introduced to FBI Employee 2 (as a purported ISIL facilitator) by FBI Employee 1, YOUNG reached out to FBI Employee 2 over social media stating "I need help crossing from Turkey to Syria with my hijjrah partner. We will leave before August Ukhti[7] and we don't know Turkey at all very well (I haven't even travelled outside U.S. before)." YOUNG expressed a readiness to swear allegiance and join ISIL, stating "Alhamdulillah Ukhti, and yes Ukhti we are. We know

---

[2] Dawlah is a reference to "ad-Dawlah al-Islamiyah," which translates to Islamic State. The term Dawlah is ISIL's preferred name for itself.

[3] A nikkah is an Islamic marriage.

[4] Alhamdulillah translates in Arabic to "God be praised."

[5] "God willing."

[6] "Swt" likely refers to "Subhanahu wa talala," an Arabic phrase meaning "may He be glorified and exalted."

[7] Ukhti translates in Arabic to "my sister."

this is the true Khalifa[8]." YOUNG then discussed what skills she and DAKHLALLA possessed that would be useful, stating "I am skilled in math and chemistry and worked at an analytical lab here at my college campus. My partner is very good with like computer science/media. We learn very fast and would love to help with giving medical aid to the injury In sha Allah."

15. On or about June 3, 2015 FBI Employee 1 made contact with DAKHLALLA via social media. Investigation has confirmed that the user name used by DAKHLALLA is registered in his name. FBI Employee 1 and DAKHLALLA discussed hijjrah, and then DAKHLALLA told FBI Employee 1 "I am good with computers, education and media. What could I contribute to Dawlah? In sha Allah." He went on to state, "Aaminah (YOUNG) and I have our nikkah approved by my father. In sha Allah we will be married before we reach Dawlah. Alhamdulillah . . . would we be appointed to a city or would we choose to go where we want to live when we arrive?"

16. On or about June 2, 2015, YOUNG discussed with FBI Employee 2 what DAKHLALLA would do once they arrived in Syria, specifically would he be "media or Mujahideen." YOUNG stated "He wants to help with media group and really wants to correct the falsehoods heard here. US has a thick cloud of falsehood and very little truth about Dawlah makes it through and if it does then usually the links are deleted (like on youtube and stuff). DAKHLALLA says a lot of Muslims are caught on their doubts of IS bc of what US media says and he wants to assure them the US media is all lies when regarding Dawlah. After he sees change in that, he wanted to join the Mujahideen Ukhti."

17. In the same conversation, YOUNG also discussed her nikkah to DAKHLALLA. She confirmed that they had DAKHLALLA's father's blessing, and she stated, "our nikkah will be this Saturday (June 6, 2015) and In sha Allah we will be in Dawlah before end of July. Our story will be that we are newlyweds on our honeymoon." Young also stated that "We won't be flying to Istanbul. We will fly to a different country and take a bus to Istanbul." In order to avoid suspicion YOUNG stated that they would fly to Greece first as that would further support their cover story. On or about June 17, 2015, YOUNG confirmed that the wedding took place on June 6, 2015.

18. On or about June 9, 2015, YOUNG discussed some of her travel concerns with FBI Employee 2. FBI Employee 2 reassured YOUNG, and YOUNG replied, "Okay, I trust you Ukhti :) He (DAKHLALLA) just really wants to make it to Dawlah to rectify the falsehoods here. I cannot wait to get to Dawlah so I can be amongst my brothers and sisters under the protection of Allah swt and to raise little Dawlah cubs In sha Allah."

---

[8] This appears to reference the caliphate, a form of Islamic government led by a caliph (or khalifa), a person considered a political and religious successor to the prophet Mohammad and a leader of the entire Muslim community. ISIL claims to practice this type of government.

19. Between on or about June 9, 2015, and June 11, 2015, DAKHLALLA and FBI Employee 1 communicated several times over social media. FBI Employee 1 congratulated DAKHLALLA on his marriage to YOUNG. On June 10, 2015, after confirming his marriage, DAKHLALLA asked "Ya Akhi,[9] could you tell me of what I would have to do once I make it to Dawlah? In sha Allah I will go through training and Shariah[10] first? I am not familiar with Shariah but from what Aaminah (YOUNG) and I researched, Dawlah follows Shariah correctly, right Akhi?" FBI Employee 1 confirmed DAKHLALLA's statement that all aspects of life in Dawlah follow sharia and are to be strictly followed by everyone.

20. On or about June 13, 2015, YOUNG informed FBI Employee 2 that she and DAKHLALLA were going to pay to expedite the issuance of their passports.

21. On or about June 21, 2015, DAKHLALLA stated to FBI Employee 1, "Assalamu alaikum Akhi and Jzk[11], Aaminah (YOUNG) has heard from the sister (FBI Employee 2) but we can't make any further movements until our passports come in. We got them expedited but until then we are stuck in a rut. In sha Allah we will make it to Dawlah before eid[12] and if not then we will make sure to spend it with our families . . . since it will be our last with them. Allahu a'lam but please make dua[13] for us that things will start to happen quickly."

22. The investigation has revealed via bank records that DAKHLALLA made a $340 electronic transfer payment which posted to his bank account on or about July 1, 2015, for the purpose of expediting two passport applications. The investigation has also revealed that YOUNG and DAKHLALLA applied for passports on or about June 26, 2015, and paid to have those applications expedited.

23. On or about June 25, 2015, YOUNG contacted FBI Employee 2 over social media to complain about the amount of time that it was taking to get their passports, and the hope that they would arrive by July 13. On or about June 26, 2015, YOUNG said, in response to FBI Employee 2 expressing a wish to celebrate eid together, that "Wa alaikum salaam Ukhti. Even if our passports make it just 2 or 3 days before eid, In sha Allah my husband and I will rush to Dawlah to make it. But as for the planning, Ukhti, will we meet you as soon as we reach Istanbul or 1 or 2 days after? This way I can arrange a stay. We will try to spend as little time in Greece as possible."

---

[9] Akhi translates to "brother" in Arabic.

[10] Sharia law is the Islamic legal system derived from the religious precepts of Islam.

[11] Jzk is shorthand for Jazik Allah Khayr, an Arabic term used as an expression of gratitude.

[12] Referencing Eid al-Fitr, a feast day/holiday marking the end of Ramadan.

[13] Prayer.

24. On or about July 1, 2015, YOUNG asked, "when we make it to Istanbul, do we absolutely have to buy a sim card or can we contact you via a laptop?"

25. On or about July 8, 2015, in an online interaction with FBI Employee 2, YOUNG announced that "our passports should be in by next weekend. We will just fly to Istanbul now since we just want to get to Dawlah . . . our hearts ache :( but we have little expenses remaining so can't stay in Istanbul long Ukhti."

26. On or about July 12, 2015, DAKHLALLA contacted FBI Employee 1 and stated, "Salaam again. I wanted to ask about the military experience there. Would I be with people that speak English as well or do they put me with everyone at basic training? I am excited about coming to Dawlah, but I feel I won't know what all I will be doing."

27. On or about July 13, 2015, DAKHLALLA informed FBI employee 1 "I wish to be a mujahid akhi. I am willing to fight. I want to be taught what it really means to have that heart in battle!"

28. On or about July 16, 2015, YOUNG stated, "Wa alaikum salaam Ukhti, we are extremely furious :( and sad. They said our passports still pending even though they said it should be sent by this week. So we went to our city clerk and she said NPIC will put passports for smaller cities last and take care of one coming from larger cities first, then she turned and look to my husband kind of mean and said that she also suspects they also might be taking longer because of the type of name he has. He has an Arabic name. I am so angry because now Eid is Friday in Dawlah and we are missing it :(."

29. On or about July 17, 2015, YOUNG stated, "What makes me feel bettee after just watching the news is that an akhi carried out an attack against US marines in TN! Alhamdulillah, the numbers of supporters are growing. *better"

30. On or about July 26 and 27, 2015, YOUNG asked FBI Employee 2 "Assalamu alaikum Ukhti, the things going on in Turkey are reaching here. Are the borders still 'open'?" YOUNG then added "[w]e have been hearing about Turkey's actions as well and In sha Allah, Dawlah will begin to expand into Europe soon."

31. In that same series of communications with FBI Employee 2 on July 26 and 27, 2015, YOUNG stated "No Ukhti :( I read that some passports take up to 11 weeks! We just do not have that kind of time! College starts in about 3 weeks and it will beharder to disappear without getting caught while on thr flight to Turkey. Ya Ukhti, if I had the knowledge that I had about Dawlah whenI reverted earlier this year we would have already been together in Dawlah." YOUNG went on to say "UKHTI!!WE HAVE OUR PASSPORTS! WE CALLED AND THEY WERE SENT OUT 4 DAYS AGO! THEY MAD EIT TO OUR MAILBOX AND WE WILL SOON CHOOSE OUR FLIGHTS!! ALHAMDULILLAH AND JZK FOR YOUR DUA!!!" She also stated "My husband has his and mine should be here by this weekend." YOUNG further stated "We are sooooo happy!!" YOUNG went on to say "We will apply for Turkish Visa!!!!!"

32. On or about July 29 and 30, 2015, in conversations YOUNG stated, "Alhamdulillah Ukhti, and we have saved some expenss. In sha Allah it will be enough, will we need to pay for a taxi or train? You don't need to tell me specifics but we just want to calculate to make sure we have enough." YOUNG went on to say, "You will leave IS to come get us in Istanbul?"

33. On or about July 30, 2015, DAKHLALLAH stated to FBI Employee 1 "Asalaamu alaikum ya akhi, we received our passports just recently. We will be making flight arrangements soon inshallah!" DAKHLALLAH went on to say "Also sorry for replying so late but we have been planning and stressing and praying."

34. On or about July 31, 2015, YOUNG stated, "Jzk Ukhti we have applied for our visas and will have them soon and then we should be in Istanbul by next weekend. Ukhti, could you make sure the brother has a veil ready for me to wear? I feel ashamed to not wear one but I wouldn't be able to leave as easily if at all."

35. On or about August 3, 2015, DAKHLALLA stated "Salaamu alaikum again brother, my wife is getting worried about what if an IS member tests us to see if we are Sunni. We want to know if there are questions they may ask that would be difficult. Some people called this 'the abu Wahib test'. Wallahi we are sunnis, but we don't want to be mistaken because of some test. Please let me know if you have anything on this matter."

36. On or about August 1 and 3, 2015, YOUNG stated "JZK Ukhti and we have our visas now :) We will finish packing and buy our plane tickets. I am so excited but my husband is still nervous about getting only to realize that we will be arrested by the Turkish police or something. I tell him not to worry." YOUNG also stated "because I don't think they would put so much effort to arrest us in Turkey when they could just give Intel to US to arrest us before leaving" Also she stated "but he will be a bit worried until he gets there and see all is fine. Other than that, he and I keep talking about Dawlah. Alhamdulillah, soon we will taste the freedom of Khalifah" YOUNG later stated "Assalamu alaikum Ukhti, we are curious. In Dawlah will there be Quaranic, Shariah and Aqeedah classes in English?" YOUNG added "Also we will arrive in Istanbul @ noon In sha Allah."

37. On or about August 4, 2015, DAKHLALLAH said "Wa alaykum salaam and Jzk Akhi for your dua. She worries so much but not because she doesn't trust Allah, she does, but because she is so anxious to see her sisters and perfect her deen. Wallahi, I can tell that she loves her sisters that she has not yet me but she loves them because they are in Dawlah and they love Allah swt and I know that as soon as we reach Turkey In sha Allah, she will be relieved and that when we reach Dawlah she may nearly pass out from happiness. We make dua every night and In sha Allah we will see you soon Akhi."

38. On or about August 4, 2015, YOUNG stated, "We will be flying direct. We live in a small town with a very small (poo) airport that doesn't have much, if an, security. In fact when we get to Dawlah In sha Allah I can tell you about it. That's one US

weaknesses – small towns' airports have poor funding and less educated staff so it is easier to get through."

"Alhamdulillah Ukhti, about the classes. I was sure there were classes/etc in English and I can not wait to learn and improve my Arabic :)."

39. Also on or about August 4, 2015, YOUNG stated, "We will leave from US on Saturday and arrive in Turkey on Sunday. As far as clothing, we don't have anything out of the ordinary but I think I will stand out pretty well, especially my hair (big bushy curly hair) but we will choose outfits with logos or such so that we may be recognized."

40. On or about August 5, 2015, YOUNG stated "Wa alaikum salaam. Yes Ukhti, we should be in Istanbul around 11 am and through customs around noon or 1 In sha Allah" YOUNG went on to say "Ukhti -_-the kuffs are reporting that IS has a sex slave trade business for girls as young as 1-9 years old… these ppl believe it too. I can not wait to be in Dawlah. These likes are so toxic, I am getting very angry at them for believing such stupidity."

41. On or about July 26, 2015, DAKHLALLA received his passport. On or about July 30, 2015, YOUNG received her passport. On or about August 7, 2015, they purchased airline tickets for Delta Airlines Flight # 5073 flying from Columbus, Mississippi, with U. S. connections to Amsterdam, the Netherlands, to arrive at their final ticketed destination of Istanbul, Turkey.

42. On or about August 8, 2015, YOUNG and DAKHLALLA traveled to the Golden Triangle Regional Airport in Columbus, Mississippi, in order to travel to an area controlled by ISIL in order to provide material support or resources to ISIL.

43. YOUNG and DAKHLALLA were both interviewed on August 8, 2015 and confessed to attempting to travel to Turkey to join ISIL.

44. Based on the foregoing I submit there is probable cause to believe that JAELYN DELSHAUN YOUNG and MUHAMMAD ODA DAKHLALLA, in the Northern District of Mississippi, have attempted and conspired to knowingly provide material support or resources to a designated foreign terrorist organization, to wit: ISIL, thereby committing a violation of Title 18, United States Code, Section 2339B, and I request that an arrest warrant be issued as specified in the criminal complaint.

45. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

STEPHEN E. THOMASON
Special Agent
Federal Bureau of Investigation

8

SWORN TO AND SUBSCRIBED BEFORE ME, THIS THE ___ DAY OF
AUGUST, 2015.

S. ALLAN ALEXANDER
United States Magistrate Judge

Classified By: K39H68V89
Derived From: Multiple Sources
Declassify On: 20401231

U.S. v. Wolfe

Case No. 14-cr-213 (W.D. Tex.)

AO 245 B (Rev. 06/05)(W.D.TX.) - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## Western District of Texas
### AUSTIN DIVISION

**FILED**

2015 JUN 17  AM 10: 03

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____

UNITED STATES OF AMERICA

v.

MICHAEL TODD WOLFE
Aliases: Michael Wolfe; "Faruq"; Michael T. Wolfe

Defendant.

Case Number   A-14-CR-213 (1) SS
USM Number   39321-380

## AMENDED JUDGMENT IN A CRIMINAL CASE[1]
### (For Offenses Committed On or After November 1, 1987)

The defendant, MICHAEL TODD WOLFE, was represented by Horatio R. Aldredge.

The defendant pled guilty to Count 1 of the Information on June 27, 2014. Accordingly, the defendant is adjudged guilty of such Count, involving the following offense:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 2339B | Attempt to Provide Material Support to a Designated Foreign Terrorist Organization | June 17, 2014 | 1 |

As pronounced on June 5, 2015, the defendant is sentenced as provided in pages 2 through 7 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid. If ordered to pay restitution, the defendant shall notify the Court and United States Attorney of any material change in the defendant's economic circumstances.

Signed this the _16_ day of June, 2015.

SAM SPARKS
United States District Judge

---

[1]Amended to correct name.

AO 245 B (Rev. 06/05)(W.D.TX.) - Imprisonment

Judgment--Page 2

Defendant:  MICHAEL TODD WOLFE
Case Number:  A-14-CR-213 (1) SS

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of EIGHTY-TWO (82) months.

The defendant shall remain in custody pending service of sentence.

The Court recommends that the BOP place defendant as close to Austin, TX as possible for family visitation purposes.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

AO 245 B (Rev. 06/05)(W.D.TX.) - Supervised Release

Judgment--Page 3

Defendant:  MICHAEL TODD WOLFE
Case Number:  A-14-CR-213 (1) SS

**SUPERVISED RELEASE**

Upon release from imprisonment, the defendant shall be on supervised release for a term of FIVE (5) years.

While on supervised release, the defendant shall comply with the mandatory, standard and if applicable, the special conditions that have been adopted by this Court, and shall comply with the following additional conditions:

X    The defendant shall submit to an evaluation for mental health counseling as directed by the probation officer, and if deemed necessary by the probation officer, the defendant shall participate in a mental health program approved by the probation officer.  The defendant may be required to contribute to the cost of the services rendered (copayment) in an amount to be determined by the probation officer, based upon the defendant's ability to pay.

X    The defendant shall submit to an evaluation for substance abuse or dependency treatment as directed by the probation officer, and if deemed necessary by the probation officer, the defendant shall participate in a program approved by the probation officer for treatment of narcotic addiction or drug or alcohol dependency which may include testing and examination to determine if the defendant has reverted to the use of drugs or alcohol. During treatment, the defendant shall abstain from the use of alcohol and any and all intoxicants.  The defendant may be required to contribute to the costs of services rendered (copayment) in an amount to be determined by the probation officer, based on the defendant's ability to pay.

X    The defendant shall disclose all assets and liabilities to the probation office and shall not transfer, sell, give away, or otherwise convey any asset, without first consulting with the probation office.

X    The defendant shall submit his or her person, property, house, residence, office, vehicle, papers, computers as defined in 18 U.S.C. Section 1030(e)(1), and other electronic communications or data storage devices or media to a search conducted by a United States probation officer.  Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search must be conducted at a reasonable time and in a responsible manner.  The United States probation officer may conduct such a search when a reasonable suspicion exists that the defendant may have violated a condition of supervision or a violation of law.

X    The defendant shall take any and all prescribed medication as directed by a medical doctor/psychiatrist.

X    The defendant shall work toward obtaining a General Education Development (GED) certificate during his term of supervision.

AO 245 B (Rev. 05/04)(W.D.TX.) - Supervised Release

Judgment--Page 4

Defendant: MICHAEL TODD WOLFE
Case Number: A-14-CR-213 (1) SS

## CONDITIONS OF SUPERVISION

**Mandatory Conditions:**

1) The defendant shall not commit another federal, state, or local crime during the term of supervision.

2) The defendant shall not unlawfully possess a controlled substance.

3) The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release on probation or supervised release and at least two periodic drug tests thereafter (as determined by the court) for use of a controlled substance, but the condition stated in this paragraph may be ameliorated or suspended by the court if the defendant's presentence report or other reliable sentencing information indicates low risk of future substance abuse by the defendant.

4) In supervised release cases only, the defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from custody of the Bureau of Prisons.

5) If convicted of a felony, the defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

6) The defendant shall cooperate in the collection of DNA as directed by the probation officer, if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. § 14135a).

7) If convicted of a sexual offense and required to register under the Sex Offender and Registration Act, that the defendant comply with the requirements of the Act.

8) If convicted of a domestic violence crime as defined in 18 U.S.C. § 3561(b), the defendant shall participate in an approved program for domestic violence.

9) If the judgment imposes a fine or restitution, it is a condition of supervision that the defendant pay in accordance with the Schedule of Payments sheet of the judgment.

**Standard Conditions:**

1) The defendant shall not leave the judicial district without permission of the court or probation officer.

2) The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer.

3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

4) The defendant shall support his or her dependents and meet other family obligations, and shall comply with the terms of any court order or order of an administrative process requiring payments by the defendant for the support and maintenance of a child or of a child and the parent with whom the child is living.

5) The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons.

6) The defendant shall notify the probation officer at least ten days prior to any change in residence or employment.

7) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician.

8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

9) The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer.

10) The defendant shall permit a probation officer to visit him or her at any time, at home or elsewhere, and shall permit confiscation of any contraband observed in plain view of the probation officer.

11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

AO 245 B (Rev. 05/04)(W.D.TX.) - Supervised Release

Judgment--Page 5

Defendant: MICHAEL TODD WOLFE
Case Number: A-14-CR-213 (1) SS

12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.

13) As directed by the probation officer, the defendant shall notify third parties of risks that my be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications, and to confirm the defendant's compliance with such notification requirement.

14) If convicted of a sex offense as described in the Sex Offender Registration and Notification Act or has a prior conviction of a State or local offense that would have been an offense as described in the Sex Offender Registration and Notification Act if a circumstance giving rise to federal jurisdiction had existed, the defendant shall participate in a sex offender treatment program approved by the probation officer. The defendant shall abide by all program rules, requirements and conditions of the sex offender treatment program, including submission to polygraph testing, to determine if the defendant is in compliance with the conditions of release. The defendant may be required to contribute to the cost of the services rendered (copayment) in an amount to be determined by the probation officer, based on the defendant's ability to pay.

15) The defendant shall submit to an evaluation for substance abuse or dependency treatment as directed by the probation officer, and if deemed necessary by the probation officer, the defendant shall participate in a program approved by the probation officer for treatment of narcotic addiction or drug or alcohol dependency which may include testing and examination to determine if the defendant has reverted to the use of drugs or alcohol. During treatment, the defendant shall abstain from the use of alcohol and any and all intoxicants. The defendant may be required to contribute to the cost of the services rendered (copayment) in an amount to be determined by the probation officer, based upon the defendant's ability to pay.

16) The defendant shall submit to an evaluation for mental health counseling as directed by the probation officer, and if deemed necessary by the probation officer, the defendant shall participate in a mental health program approved by the probation officer. The defendant may be required to contribute to the cost of the services rendered (copayment) in an amount to be determined by the probation officer, based upon the defendant's ability to pay.

17) The defendant shall participate in a cognitive behavioral treatment program as directed by the probation officer, and if deemed necessary by the probation officer. Such program may include group sessions led by a counselor or participation in a program administered by the probation office. The defendant may be required to contribute to the cost of the services rendered (copayment) in an amount to be determined by the probation officer, based upon the defendant's ability to pay.

18) The defendant shall participate in workforce development programs and services as directed by the probation officer, and if deemed necessary by the probation officer, which include occupational/career development, including but not limited to assessment and testing, education, instruction, training classes, career guidance, job search and retention services until successfully discharged from the program. The defendant may be required to contribute to the cost of the services rendered (copayment) in an amount to be determined by the probation officer, based upon the defendant's ability to pay.

19) If the defendant is excluded, deported, or removed upon release on probation or supervised release, the term of supervision shall be a non-reporting term of probation or supervised release. The defendant shall not illegally reenter the United States. If the defendant lawfully reenters the United States during the term of probation or supervised release, the defendant shall immediately report in person to the nearest U.S. Probation Office.

20) If the judgment imposes other criminal monetary penalties, it is a condition of supervision that the defendant pay such penalties in accordance with the Schedule of Payments sheet of the judgment.

21) If the judgment imposes a fine, special assessment, restitution, or other criminal monetary penalties, it is a condition of supervision that the defendant shall provide the probation officer access to any requested financial information.

22) If the judgment imposes a fine, special assessment, restitution, or other criminal monetary penalties, it is a condition of supervision that the defendant shall not incur any new credit charges or open additional lines of credit without the approval of the probation officer, unless the defendant is in compliance with the payment schedule.

AO 245 B (Rev. 05/04)(W.D.TX.) - Supervised Release

Judgment--Page 6

Defendant: MICHAEL TODD WOLFE
Case Number: A-14-CR-213 (1) SS

The Court further adopts such of the following special conditions applied to the supervised person by the judge at the time of sentencing:

1) **Community Confinement:** The defendant shall reside in a Community Corrections Center for a period of _____ months to commence on _____. Further, once employed, the defendant shall pay 25% of his/her weekly gross income for his/her subsistence as long as that amount does not exceed the daily contract rate.

**Location Monitoring Program:**

2) *Radio Frequency Monitoring:* The defendant shall participate in the Location Monitoring Program with Radio Frequency Monitoring for a period of _____ days/months. You shall abide by the rules and regulations of the Participant Agreement Form. During this time, you will remain at your place of residence except for employment and other activities approved in advance by your probation officer. You will maintain a telephone at your place of residence without "caller ID," "call forwarding," "call waiting," "call back/call block," a modem or a portable cordless telephone for the above period as directed by the probation officer. You will wear an electronic monitoring device and follow location monitoring procedures specified by your probation officer. You shall pay all or part of the costs of the program based on the ability to pay as directed by the probation officer.

3) *Global Positioning Satellite (GPS):* The defendant shall participate in the Location Monitoring Program for a term not to exceed _____ days/months, which will include remote location monitoring using _____Active _____Passive Global Positioning Satellite (GPS) tracking. You shall abide by the rules and regulations of the Participant Agreement Form. During this time, you will remain at your place of residence except for employment and other activities approved in advance by your probation officer. You will maintain a telephone at your place of residence without "caller ID," "call forwarding," "call waiting," "call back/call block," a modem or a portable cordless telephone for the above period as directed by the probation officer. At the direction of the probation officer, you shall wear a transmitter and be required to carry a tracking device. You shall pay all or part of the costs of the program based on the ability to pay as directed by the probation officer.

4) **Community Service:** The defendant shall perform _____ hours of community service work without pay, at a location approved by the probation officer, at a minimum rate of four hours per week, to be completed during the first _____ months of supervision.

5) **Sex Offender Search & Seizure Condition:** If required to register under the Sex Offender Registration and Notification Act, the defendant shall submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of probation or supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions.

AO 245 B (Rev. 06/05)(W.D.TX) -CMP

Case 9:16-cr-00021-RC Case 1:14-cr-00213-SS Document 196 Entered on FLSD Docket 05/09/2017 Page 236 of 281 Page 236 of 281

Judgment--Page 7

Defendant: MICHAEL TODD WOLFE
Case Number: A-14-CR-213 (1) SS

## CRIMINAL MONETARY PENALTIES/ SCHEDULE

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth. Unless the Court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. Criminal Monetary Penalties, except those payments made through Federal Bureau of Prisons' Inmate Financial Responsibility Program shall be paid through the Clerk, United States District Court, 501 West Fifth Street, Suite 1100 Austin, Texas 78701.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

|        | **Assessment** | **Fine** | **Restitution** |
|--------|------------|------|-------------|
| TOTAL: | $100.00    | $0   | $0          |

### Special Assessment

It is ordered that the defendant shall pay to the United States a special assessment of $100.00. Payment of this sum shall begin immediately.

### Fine

The fine is waived because of the defendant's inability to pay.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column above. However, pursuant to 18 U.S.C. § 3664(i), all non-federal victims must be paid before the United States is paid.

If the fine is not paid, the court may sentence the defendant to any sentence which might have been originally imposed. See 18 U.S.C. §3614.

The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. §3612(f). All payment options may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. §3612(g).

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

**FILED**

**2014 JUN 18  AM 9: 39**

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
                    DEPUTY

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Michael Todd Wolfe, aka "Faruq" | ) |
| | ) |
| | ) |
| | ) |
| | ) |

Defendant(s)

Case No.

A 14 M-288

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 2013 through Present___ in the county of ___Travis___ in the
___Western___ District of ___Texas___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 2339A | Attempt to Provide Material Support to Terrorists |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Blake Crow
Printed name and title

Sworn to before me and signed in my presence.

Date: ___06/18/2014___

_____
Judge's signature

City and state: ___Austin, Texas___

Honorable Mark Lane, U.S. Magistrate Judge
Printed name and title

FILED

UNITED STATES DISTRICT COURT 2014 JUN 18  AM 9: 39
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )

UNITED STATES OF AMERICA

vs.

MICHAEL TODD WOLFE, a/k/a, "Faruq."

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )

CRIMINAL NO. _A-14-m-288_

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Blake E Crow, Special Agent, Federal Bureau of Investigation, Austin, Texas, being

duly sworn, depose and state the following:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been

so employed for nine years. I previously served approximately seven years as a commissioned

officer in the United States Air Force. I am currently assigned to the San Antonio Division,

Austin Resident Agency, working with the Central Texas Joint Terrorism Task Force

(CTXJTTF). As part of my duties with the CTXJTTF, I am assigned to investigate counter

terrorism matters in the Western District of Texas and elsewhere. I have held this assignment for

approximately seven years. In preparation for this assignment, and as part of my continuing

education, I have successfully completed approximately 450 hours of national security-focused

training, to include formal courses, seminars, conferences and training exercises. I have also

read and/or studied numerous publications related to historical and current terrorism topics

authored by analysts, investigators, and, in some cases, actual members or supporters of

designated Foreign Terrorist Organizations. I have participated in all aspects of counter

1

terrorism investigations, including but not limited to conducting surveillance, telephone and email analysis obtained as a result of subpoenas, subject interviews, witness interviews, and operations of confidential informants and undercover employees. Among other duties, I am currently involved in the investigation of Michael Todd Wolfe, aka, "Faruq," who resides in the Western District of Texas, Austin Division, area of responsibility.

2.      I respectfully submit this affidavit in support of a criminal complaint and arrest warrant for Michael Todd Wolfe, a/k/a, "Faruq" ("Wolfe"). This affidavit is submitted for the purpose of establishing probable cause that beginning in approximately August 2013 and continuing through the present, in the Western District of Texas, Austin Division, Wolfe attempted to provide material support and resources to terrorists, including but not limited to personnel, including himself, knowing or intending that they be used in preparation for, or in carrying out, a crime of terrorism, including conspiracy to kill, kidnap, maim, or injure persons and damage property in a foreign country in violation of Title 18, United States Code, Section 956(a)(1) in violation of Title 18, United States Code, Section 2339A.

3.      The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various FBI agents, Task Force Officers, witnesses, reports, and other sources. This affidavit is intended merely to show that there is sufficient probable cause to support the requested arrest warrant. Accordingly, this affidavit does not purport to set forth all facts known to me or the FBI regarding this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Summaries of conversations do not include references to all topics covered in the communications. All verbatim quotations of verbal statements are

preliminary and in draft only. Verbatim quotations of written statements include original errors. All dates are approximate.

## THE DEFENDANT

4.  Michael Todd Wolfe, a/k/a, "Faruq" (Wolfe) is a United States citizen born in Houston, Texas. He resides in the Western District of Texas.

## VIOLATION COMMITTED

5.  Title 18, U.S.C. Section 2339A - Providing material support to terrorists, provides in pertinent part:

> (a) Offense. – Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 956. . . or attempts or conspires to do such an act . . . shall be fined under this title, imprisoned not more than 15 years, or both, and if the death of any person results, shall be imprisoned for any term of years or for life.

Title 18 U.S.C. Section 956 provides, in pertinent part:

> (a)(l) Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

Title 18 U.S.C. Section 2339A(b)(1) provides, in pertinent part:

> The term "material support" or resources means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

3

### THE INVESTIGATION

7.      On or about August 8, 2013, an FBI employee operating in an undercover capacity (UCE #2) met Wolfe's wife, Jordan Nicole Furr, a/k/a Jordan Wolfe (hereinafter "Wolfe's wife"). Wolfe's wife revealed that she wanted to perform hijrah[1] and that, as part of her hijrah, she wanted to support her husband's goal of traveling to perform a violent form of jihad. UCE #2 asked if she and Wolfe were making plans for hijrah. Wolfe's wife advised that as soon as they had the money, they intended to go. UCE #2 then asked Wolfe's wife if she and Wolfe had a particular destination in mind. Wolfe's wife indicated they wanted to go to an area that wasn't too secular, where the Muslim population respects the sharia [Islamic Law]. She acknowledged most of the areas that upheld sharia had problems, but she indicated that her husband didn't mind so much, "because his heart yearns to like go be with his brothers . . . protect them and fight with them and everything." Wolfe's wife further stated that, "[h]e (Wolfe) just wants to hop into Syria. He's just ready to die for his deen [religion]. He's ready to die for someone; for something."

8.      On or about October 26, 2013, Wolfe told anther FBI employee acting in an undercover capacity (UCE#1) that he believed that violent jihad overseas was permissible.

9.      On or about November 1, 2013, while discussing the difficulty of traveling abroad for jihad, Wolfe stated that if he was single, he would already have left, but that he felt that he could not leave his wife here in the United States. UCE #1 revealed to Wolfe that UCE #1 occasionally helped individuals who wanted to travel for jihad in Somalia and Syria. Wolfe responded that he believed the hardest part was finding the right contact.

---

[1] Based on my training and experience, and after consultation with other experienced FBI investigators, your affiant believes that the term "hijrah" in this context can be defined as a religious migration to Muslim lands to seek freedom or sanctuary.

10.     On or about December 6, 2013, Wolfe met with UCE #1. Wolfe revealed to UCE #1 that he had new eye glasses. Previously, on or about November 9, 2013, Wolfe advised UCE #1 that he needed a durable, thick pair of glasses with a head strap, noting that regular glasses wouldn't hold up on the battlefield, potentially causing him to inadvertently shoot a brother over there. Wolfe also expressed concerns about being stopped and questioned by law enforcement while traveling overseas.

11.     On or about January 4, 2014, Wolfe and UCE #1 discussed their plans to cover or disguise the actual nature of their travel by referring to these plans as attending a musical concert in Europe. Wolfe advised that he had researched itineraries and the cost of plane tickets to several European cities. UCE #1 and Wolfe discussed the possibility of raising up to $1000 by selling Wolfe's firearms and UCE #1's pistol to finance their travel.

12.     On or about January 10, 2014, in preparation for travel to conduct violent jihad overseas, Wolfe requested and paid the fee for certified copies of birth certificates for Wolfe and his two children.

13.     On or about January 15, 2014, UCE #1 met with Wolfe. Wolfe advised that his wife was still good with Wolfe's plans to travel, but that she brought up several concerns, all of which revolved around who would take care of her and the kids once Wolfe left. Wolfe also discussed the possibility of expediting the passport applications.

14.     On or about January 22, 2014, UCE #1 and UCE #2 met with Wolfe and his wife. Wolfe and his wife stated that they, along with their two children, had their passport photos taken earlier in the day. Wolfe indicated that he had learned that al Qaeda in Syria was training brothers from other countries (foreign fighters) and then sending those fighters back from Syria to their home countries to conduct terror attacks. Wolfe also explained that he and his wife had

5

been asking about certain things, such as what they would do to get a car or a job after they
arrived in Turkey. Wolfe said he reminded his wife that they were not going over there to have a
better work environment or pay cheaper rent.

15. On or about February 2, 2014, UCE #2 met with Wolfe and his wife. Wolfe had
the group watch a YouTube video from the Light Revelation series titled "Syria: Stories of
Conquest" regarding foreign fighters in Syria. While watching the video, Wolfe occasionally
stopped the video to explain the current allegiances of the various groups fighting in Syria,
including the Free Syrian Army, the Islamic Army of Iraq and As-Sham (Syria) (ISIS), Jabhat al-
Nusrah and a group calling themselves Dawla[2]. Wolfe indicated that Allah put jihad in front of
people to determine who the real men were. Wolfe also appeared excited about being part of the
prophecy related to Syria[3] and later restated his intentions to go to Syria. Wolfe and his wife
stated they would visit the Post Office the next morning to facilitate their passport applications.

16. On or about February 3, 2014, FBI agents observed and photographed Wolfe and
his wife, along with a small child, entering the U.S. Post Office located in, Austin, Texas, where
they applied for passports for themselves and their two children.

17. On or about March 17, 2014, Wolfe sent a text message to UCE #1 to advise that
they (Wolfe, his wife, and the children) had received their passports.

18. On or about April 16, 2014, UCE #1 met with Wolfe. UCE #1 advised Wolfe he
intended to leave Austin in two days and depart to Turkey within a week. UCE #1 also advised
Wolfe that he intended to rendezvous with a group of brothers in Turkey on or about May 19,

---

[2] Based on my training and experience and after consultation with other experienced counterterrorism investigators
and based on my review of the evidence in this case, your affiant believes that Wolfe's use of the word "Dawla" was
likely a reference to ISIS which is translated into Arabic phonetically as Ad-Dawla Al-Islamiyyah fee Iraq wa As-
Sham.
[3] Based on my training and experience and after consultation with other experienced counterterrorism investigators
and based on my review of the evidence in this case, your affiant believes Wolfe was referring to Islamic
apocalyptic scripture which describe significant fighting in Syria during the "End Times".

2014, and that, from there, he would prepare to cross into to Syria to commence training with the
al Nusrah Front. UCE #1 and Wolfe then began discussing news reports of infighting occurring
between al Qaeda affiliates, the al Nusrah Front and ISIS. As the conversation progressed,
Wolfe referred to the al Qaeda representatives as "righteous brothers." Wolfe then stated that he
and his wife were expecting a tax refund in the approximate amount of $5,000. Wolfe indicated
that he believed his wife wanted to give a portion of the refund to her mother, and implied that
the rest of the refund would be for their travel. Wolfe then claimed that he had researched airfare
for all four of his family members to fly to Denmark via Iceland Air. Wolfe indicated that the
cost would be approximately $1,500. UCE #1 and Wolfe agreed to use coded language when
referring to the mujahedeen during future communications. Additionally, Wolfe indicated he'd
recently obtained a "black shemagh," which he hoped could be shipped to him separately after he
departed.[4]

19.     On or about April 17, 2014, the U.S. Internal Revenue Service advised the FBI
that they had received the Wolfe family's 2013 income tax returns.

20.     On or about April 20, 2014, Wolfe contacted UCE #1 by telephone. Wolfe
indicated he was trying to price everything out and inquired how they would travel from their
first destination (Europe) to the "concert" – "concert" had previously been established as code
between UCE #1 and Wolfe for violent jihad in Syria. UCE #1 advised Wolfe they would
probably fly. Wolfe stated he was trying to earn some extra money by volunteering for a
medical study. Wolfe also noted that it was considerably cheaper to fly to Europe first instead of
trying to fly directly to where the "concert" would occur – meaning Turkey or Syria. Wolfe

---

[4] Based on my training and experience and after consultation with other experienced FBI investigators, your affiant
has learned that a "shemagh" is a length of clothing which is wrapped around the head, traditionally worn by Middle
Easterners to protect them from the sun. The shemagh has also been widely utilized by the mujahedeen, including
those in al Qaeda and their various franchises, to conceal their identities during terrorist operations, the production
of propaganda videos or periods of heightened media presence.

explained that he, his wife, and the children were planning on departing to Europe at the end of May 2014, but that those plans were dependent on the timely receipt of their tax refund.

21.    On or about April 29, 2014, UCE #1 and UCE #2 talked *via* telephone with Wolfe and his wife to advise them of their scheduled departure to Turkey.  Wolfe and his wife discussed their continued preparations for travel to Turkey, including researching airline tickets and visa requirements as well as getting their personal affairs in order.  They also discussed plans for UCE #1 to meet them in Denmark to facilitate their entry into Turkey.  In preparation for the "concert" – meaning jihad – Wolfe indicated he'd acquired a pair of hiking/running shoes.  Wolfe also discussed his physical preparations for jihad to include martial arts, running and Cross-Fit.  Wolfe advised that if he was interrogated he planned to say, "We're going to Copenhagen to go on a European tour."  Wolfe believed they would have enough "plausible deniability" to refute any allegations they intended to travel to Turkey.

22.    On or about May 2, 2014, UCE #2 called Wolfe's wife who confirmed that they had purchased their airline tickets to Denmark and were scheduled to depart from Houston, Texas on June 17, 2014.

23.    On or about May 10, 2014, UCE #1 called Wolfe.  They discussed the timing and method of future communications in relation to their anticipated travel date and rendezvous in Denmark.  Wolfe expressed concern about his family's travel and the lack of regular communication with UCE #1.  Wolfe and UCE #1 agreed to speak approximately every three days.  Wolfe explained that his wife's concerns about the details of their impending travel were causing tension.  Wolfe and UCE #1 discussed how Wolfe would obtain a visa to enter Turkey, and UCE #1, citing security concerns, suggested that Wolfe should apply for his visa after he arrived in Denmark.  Wolfe appeared to maintain his current plans to travel with his family.

8

24. On or about May 19, 2014, UCE#1 called Wolfe. Wolfe utilized coded language as he expressed concerns about traveling to join Jabhat al-Nusra based on information he'd learned about the group's recent activities. Wolfe indicated he was more in line with another group[5]. Wolfe stated that he had been researching the situation in Syria and he had seen the two groups make statements against each other. Wolfe indicated he still wanted to go for jihad, but did not want get caught in the in-fighting between the two groups, which had nothing to do with his agenda.

25. On or about May 23, 2014, UCE #1 called Wolfe. UCE#1 advised Wolfe that Wolfe had to decide for himself and his family about whether to travel and that "we are not going for a holiday." Wolfe stated, "It's not that I don't want to go, I just need to figure out the best situation." Wolfe discussed how his life seemed better than it was before, yet, "I would much rather leave than sit...I'm getting too comfortable sitting here." UCE#1 shared Wolfe's concerns about the infighting occurring between the two groups and indicated he would have an opportunity to determine if the members of Jabhat al-Nusra shared his beliefs. Wolfe opined that Jabhat al-Nusra would not simply let them leave and go to another group. Wolfe acknowledged that he had to make a final decision soon, otherwise he couldn't get his tickets refunded. Wolfe discussed the option of either waiting or moving closer to the conflict, thus making the conflict more available. Wolfe stated that the worst feeling would be to sit on the couch watching the "concert," wishing he was there. Wolfe indicated he would advise UCE#1 of his decision within a couple of days.

26. On or about May 30, 2014, UCE #1 called Wolfe. Wolfe inquired how far in advance UCE#1 would travel to Denmark to meet them on June 17, 2014. Wolfe also asked

---

[5] Based on the investigation to date, your affiant believes the other group referred to by Wolfe is the Islamic State of Iraq in Syria (ISIS).

UCE#1 for the address where they would stay. Using coded references, the two discussed the terrorist groups operating in Syria for some time. According to Wolfe, one of the brothers he was talking with had lots of information about "concerts" and he described one of the groups as being more accepting to outsiders. UCE#1 reaffirmed that there were lots of "concerts" in the area. UCE#1 advised Wolfe they would not stay in Denmark for long, as they would be going to the "concert" around the time of Ramadan[6]. Wolfe expressed an interest in "sticking together" after he and UCE#1 arrive at the concert. UCE #1 stated that the other person[7] traveling with them already had the respect of the brothers because he had referrals and recommendations. Wolfe explained that, given the demographics of their group, it would make sense to go to the other "performance[8]," as they wouldn't feel so out of place. Wolfe indicated he had struggled with whether to stay or go, and stated, "…but now...I'm back to going, so I'm kinda like scrambling..." with respect to financial issues.

27.     On or about June 6, 2014, UCE #1 called Wolfe. As they continued to speak in coded language, UCE#1 confirmed that some of the other groups fighting in the vicinity of Syria would be more accommodating than Jabhat al-Nusra. UCE #1 asked Wolfe whether he could get a yellow fever vaccination since they would be working with foreign fighters in Syria who might have previously been exposed to yellow fever. Wolfe told UCE #1 that he had purchased luggage and discussed how much it would cost to check it at the airport. Wolfe stated that everything, other than money, was sorted out for the trip. Wolfe stated said he wanted to just focus on saving enough money to last a month or so.

---

[6] According to open sources, Ramadan 2014 spans the timeframe June 28, 2014 – July 28, 2014.
[7] The person UCE#1 referred to is an FBI human source who was previously introduced to Wolfe as a jihadist whom UCE#1 assisted in traveling overseas for the purpose of participating in violent jihad.
[8] Based on the investigation to date, your affiant believes that Wolfe's discussion of the other "performance" was a reference to the Islamic State of Iraq in Syria (ISIS).

10

28.     On or about June 13, 2014, UCE #1, UCE #2, Wolfe and Wolfe's wife spoke again. UCE #1 and UCE #2 discussed their impending departure to Denmark, where they were ultimately to meet with Wolfe and his family. UCE #1 explained that they were leaving Turkey for Denmark and were going to the airport in approximately an hour. Wolfe asked for details about where they would be staying in Denmark and UCE #1 explained that Wolfe would be provided those details after UCE #1 arrived in Denmark. Wolfe discussed sending a package to himself in Turkey and UCE#1 gave Wolfe an address in Turkey to which the package could be sent. Wolfe's wife agreed to send their itinerary to UCE #2.

29.     On or about June 17, 2014, FBI surveillance observed Wolfe and his family enter the George Bush Intercontinental Airport, located in Houston, Texas. Wolfe was arrested on June 17, 2014, as he attempted to board flight #8112 to Toronto, Canada. Wolfe's ticketed itinerary had him traveling through Iceland and arriving in Copenhagen, Denmark on June 18, 2014, where he had arranged to meet with UCE #1. Based upon the investigation as well as recorded conversations with UCE#1, your affiant believes that Wolfe intended to ultimately travel to Syria through Turkey, and engage in violent jihad.

## CONCLUSION

Based on the above, I submit there is probable cause to believe that Wolfe has attempted to provide material support and resources to terrorists, including but not limited to personnel, including himself, knowing or intending that they be used in preparation for, or in carrying out, a crime of terrorism, including conspiracy to kill, kidnap, maim, or injure persons and damage property in a foreign country in violation of Title 18, United States Code, Section 956(a)(1), in violation of 18 U.S.C. Section 2339A.

11

Dated: 06/18/14

Special Agent Blake Crow
Federal Bureau of Investigation


Sworn to before me this 18th day of JUNE , 2014.

Honorable Mark Lane
United States Magistrate Judge

12

U.S. v. Avin Brown and Akba Jordan

14-cr-58 (E.D. N.C.)

AO 245B (Rev. 02/16)  Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of North Carolina

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**v.**<br><br>AVIN MARSALIS BROWN<br>a/k/a "Musa Brown" | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:  5:14-CR-58-1FL<br>USM Number:  58423-056<br><br>Christopher J. Locascio<br>─────────────────────<br>Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    Count 1

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC §2339A | Conspiracy to Provide Material Support to Terroists | 3/19/2014 | 1 |
| | | | |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

7/5/2016
─────────────────────
Date of Imposition of Judgment

*Louis W. F*
─────────────────────
Signature of Judge

Louise W. Flanagan, U.S. District Judge
─────────────────────
Name and Title of Judge

7/5/2016
─────────────────────
Date

AO 245B (Rev. 02/16)  Judgment in Criminal Case
Sheet 2 — Imprisonment

| | | Judgment — Page | 2 | of | 7 |

DEFENDANT:   AVIN MARSALIS BROWN a/k/a "Musa Brown"
CASE NUMBER:  5:14-CR-58-1FL

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

92 months

☑  The court makes the following recommendations to the Bureau of Prisons:

The court recommends that the defendant receive intensive substance abuse treatment, vocational training, and educational opportunities. The court recommends defendant receive a mental health assessment and mental health treatment while incarcerated.  The court recommends that he serve his term in FCI Williamsburg, SC.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

   ☐  at  _____  ☐ a m.  ☐ p m.  on  _____ .

   ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐  before 2 p m. on  _____ .

   ☐  as notified by the United States Marshal.

   ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

AO 245B  (Rev.  02/16) Judgment in a Criminal Case
Sheet 3 — Supervised Release

|  | Judgment—Page | 3 | of | 7 |

DEFENDANT:   AVIN MARSALIS BROWN a/k/a "Musa Brown"
CASE NUMBER:   5:14-CR-58-1FL

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

5 years

       The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☒   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☒   The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐   The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

       If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

       The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B  (Rev. 02/16) Judgment in a Criminal Case
Sheet 3B — Supervised Release

Judgment—Page  4  of  7

DEFENDANT:   AVIN MARSALIS BROWN a/k/a "Musa Brown"
CASE NUMBER:  5:14-CR-58-1FL

## ADDITIONAL STANDARD CONDITIONS OF SUPERVISION

The defendant shall provide the probation office with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation office.

AO 245B  (Rev. 02/16) Judgment in a Criminal Case
Sheet 3C — Supervised Release

Judgment—Page __5__ of __7__

DEFENDANT:  AVIN MARSALIS BROWN a/k/a "Musa Brown"
CASE NUMBER: 5:14-CR-58-1FL

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall consent to a warrantless search by a United States probation officer or, at the request of the probation officer, any other law enforcement officer, of the defendant's person and premises, including any vehicle, to determine compliance with the conditions of this judgment.

The defendant shall cooperate in the collection of DNA as directed by the probation officer.

The defendant shall submit a written weekly report to the probation office, if not regularly employed, of attempts to secure employment.

The defendant shall participate in a program of mental health treatment, as directed by the probation office.

The defendant shall participate in a vocational training program as directed by the probation officer.

AO 245B (Rev. 02/16) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

|  | Judgment — Page | 6 | of | 7 |

DEFENDANT:   AVIN MARSALIS BROWN a/k/a "Musa Brown"
CASE NUMBER:   5:14-CR-58-1FL

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $  100.00 | $  0.00 | $  0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $            0.00 | $            0.00 |  |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

   ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B  (Rev. 02/16) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT:   AVIN MARSALIS BROWN a/k/a "Musa Brown"
CASE NUMBER:  5:14-CR-58-1FL

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☐  Lump sum payment of $ _____ due immediately, balance due

       ☐ not later than _____ , or
       ☐ in accordance   ☐  C,  ☐  D,  ☐  E, or  ☐  F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑  Special instructions regarding the payment of criminal monetary penalties:

    The special assessment in the amount of $100.00 is due in full immediately.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO 245B (Rev. 02/16)  Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### Eastern District of North Carolina

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| | Case Number:  5:14-CR-58-2FL |
| AKBA JIHAD JORDAN | USM Number:  58427-056 |
| | Robert Hood Hale, Jr. |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    Count 1

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC §2339A | Conspiracy to Provide Material Support to Terrorists | 3/19/2014 | 1 |
| | | | |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Sentencing Location:
New Bern, NC

7/5/2016
Date of Imposition of Judgment

_Louise W. F_
Signature of Judge

Louise W. Flanagan, U.S. District Judge
Name and Title of Judge

7/5/2016
Date

AO 245B (Rev. 02/16)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page  2  of  8

DEFENDANT:   AKBA JIHAD JORDAN
CASE NUMBER:  5:14-CR-58-2FL

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

108 months

☑  The court makes the following recommendations to the Bureau of Prisons:

The court recommends that the defendant receive vocational training and educational opportunities. The court recommends defendant receive a mental health assessment and mental health treatment while incarcerated.  The court recommends that he serve his term in FCI Butner, NC.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  _____  ☐ a.m.  ☐ p.m.  on  _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on  _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

AO 245B  (Rev.  02/16) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page <u>3</u> of <u>8</u>

DEFENDANT:   AKBA JIHAD JORDAN
CASE NUMBER:   5:14-CR-58-2FL

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

5 years

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☑  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☑  The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐  The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐  The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B  (Rev. 02/16) Judgment in a Criminal Case
Sheet 3B — Supervised Release

Judgment—Page ___4___ of ___8___

DEFENDANT:   AKBA JIHAD JORDAN
CASE NUMBER:   5:14-CR-58-2FL

## ADDITIONAL STANDARD CONDITIONS OF SUPERVISION

The defendant shall provide the probation office with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation office.

AO 245B  (Rev. 02/16) Judgment in a Criminal Case
Sheet 3C — Supervised Release

Judgment—Page   5   of   8

DEFENDANT:  AKBA JIHAD JORDAN
CASE NUMBER: 5:14-CR-58-2FL

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall consent to a warrantless search by a United States probation officer or, at the request of the probation officer, any other law enforcement officer, of the defendant's person and premises, including any vehicle, to determine compliance with the conditions of this judgment.

The defendant shall cooperate in the collection of DNA as directed by the probation officer.

The defendant shall submit a written weekly report to the probation office, if not regularly employed, of attempts to secure employment.

The defendant shall participate in a program of mental health treatment, as directed by the probation office.

The defendant shall participate in a vocational training program as directed by the probation officer.

AO 245B (Rev. 02/16) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __6__ of __8__

DEFENDANT:   AKBA JIHAD JORDAN
CASE NUMBER:   5:14-CR-58-2FL

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $  100.00 | $  5,000.00 | $  0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| **TOTALS** | $ _____0.00 | $ _____0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the   ☑ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B  (Rev. 02/16) Judgment in a Criminal Case
Sheet 5A — Criminal Monetary Penalties

Judgment—Page ___7___ of ___8___

DEFENDANT:   AKBA JIHAD JORDAN
CASE NUMBER:   5:14-CR-58-2FL

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

Payment of the fine shall be due and payable in full immediately.  However, if the defendant is unable to pay in full immediately, the special assessment and fine may be paid through the Inmate Financial Responsibility Program (IFRP). The court orders that the defendant pay a minimum payment of $25 per month through the IFRP, if available.  The court, having considered the defendant's financial resources and ability to pay, orders that any balance still owed at the time of release shall be paid in installments of $100 per month to begin 60 days after the defendant's release from prison.  At the time of the defendant's release, the probation officer shall take into consideration the defendant's ability to pay the restitution ordered and shall notify the court of any needed modification of the payment schedule.

AO 245B   (Rev. 02/18) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT:   AKBA JIHAD JORDAN
CASE NUMBER:   5:14-CR-58-2FL

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ __5,100.00__ due immediately, balance due

    ☐ not later than _____ , or
    ☑ in accordance    ☐ C,    ☐ D,    ☐ E, or    ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:

    The special assessment in the amount of $100.00 and fine in the amount of $5,000.00 are due in full immediately.
    See Sheet 5A for additional payment instructions.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.   All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
    and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO 91 (Rev. 11/11)  Criminal Complaint

**FILED**

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

MAR **2 0** 2014

JULIE A. RICHARDS, CLERK
US DISTRICT COURT, EDNC
BY_____ DEP CLK

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| AVIN MARSALIS BROWN (aka Musa Brown) | ) Case No. 5:14-MJ-118(-WW |
| AKBA JIHAD JORDAN | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___in or about May 2013 to present___ in the county of ___Wake___ in the

___Eastern___ District of ___North Carolina___, the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 18 U.S.C. 2339A | Conspiracy to provide material support and resources, knowing and intending that they be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956 (conspiracy to kill or maim persons outside the United States) |

This criminal complaint is based on these facts:

Refer to attached Affidavit.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Joshua Cribbs, FBI Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 3/20/14

_____
_Judge's signature_

City and state:  Raleigh, North Carolina

Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT

I, Joshua Cribbs, being duly sworn, depose and say:

1. I have been a Special Agent of the Federal Bureau of Investigation (FBI) since October 2010. During that time, I have conducted investigations in counter-terrorism cases in the United States. I have received training conducting criminal and intelligence investigations, conducting searches and seizures, and effecting criminal arrests.

2. The facts set forth in this affidavit are based on knowledge obtained through my participation in this investigation and information provided to me by other law enforcement officers involved in the investigation. This affidavit is being submitted for the sole purpose of establishing probable cause to support the requested criminal complaint. I have set forth only the facts necessary to support this request for a criminal complaint, and I have not included every fact known to me concerning this investigation.

3. Based on the information set forth below, there is probable cause to believe that AVIN MARSALIS BROWN (aka MUSA BROWN) and AKBA JIHAD JORDAN conspired, in violation of Title 18, United States Code, Section 2339A, to provide

material support or resources knowing and intending that they be used in preparation for, or in carrying out, a violation of Title 18, United States Code, Section 956, which makes it a crime to conspire to kill or maim persons outside the United States in violation of Title 18, United States Code, Section 956. The terms "Material Support or resources" as defined by Title 18, United States Code, Section 2339A(b)(1), includes "any property tangible or intangible . . ., [and] personnel (1 or more individuals who may be or include oneself). . . ."

4. On May 27, 2013, BROWN contacted a Confidential Human Source (CHS #1) via email. Meanwhile, on June 7, 2013, another confidential source (CHS #2) met BROWN in person. Thereafter, on June 15, 2013, in response to an email from CHS #1, BROWN indicated that he wished to go overseas and fight, and asked CHS #1 what he should do to prepare to fight. During the course of the investigation, BROWN regularly communicated with CHS #1 using his email accounts and with CHS #2 using his email and social media accounts.

5. On July 15, 2013, BROWN informed CHS #1 via email that he had a few "brothers" who would be very helpful in fisabillah. (The Arabic term "fisabillah" literally means

"for the sake Allah."  Your affiant knows based on his training and experience that, among those espousing or pursuing violent jihad, "fisabillah" is a coded term for violent jihad.) In several in-person conversations with CHS #2 during the course of the investigation, BROWN stated that he wanted to go to either Syria or Yemen to fight. Over the course of several months, BROWN became even more insistent on his desire to fight overseas.

6.  During the course of the investigation, there were many conversations between CHS #2, BROWN and JORDAN in which they expressed a desire to fight the "kuffar" (non-Muslims) overseas.  For example, on September 6, 2013, JORDAN told CHS #2 that he wanted to go to Syria and fight. In many of the conversations, BROWN and JORDAN were both present.

7.  In numerous conversations, JORDAN discussed with BROWN the weapons that he has in his possession--including an AK-47--and described how he would not hesitate to use these weapons.  JORDAN allowed CHS #2 to handle the AK-47 as well as other weapons owned by JORDAN.  Moreover, JORDAN and BROWN frequently discussed weapons and the use of weapons in fighting the kuffar — both overseas and in the United States.

8. JORDAN repeatedly emphasized the need to be physically fit so they could fight overseas, and he conducted physical training for BROWN, the CHS #2 and another person. JORDAN also emphasized the need to train with firearms. JORDAN functioned as a type of physical fitness, firearms and tactics instructor to BROWN and CHS #2.

9. BROWN and JORDAN on numerous occasions discussed the need to obtain passports to travel overseas for purposes of violent jihad. For example, on October 30, 2013, BROWN told CHS #1 via email, that he learned that it takes 2-4 weeks for the passport to arrive.

10. On November 12, 2013, CHS #2 told JORDAN about Basit Sheikh's arrest on terrorism charges. (On November 2, 2013, Basit Sheikh was arrested at Raleigh Durham Airport prior to boarding a flight to Beirut; he is currently awaiting trial in the Eastern District of North Carolina on charges of attempting to travel to Syria to provide material support to a designated terrorist organization.) JORDAN remarked to CHS #2 that he might be next.

11. On November 24, 2013, CHS #2 met with JORDAN. JORDAN commented that he wants to go Syria because he

thinks the caliphate may start there and he wants to be a part of that.

12. On November 29, 2013, JORDAN told CHS #2 he wants to fight in Syria. JORDAN wants to buy bulletproof vests, supplies and more guns. JORDAN asked the CHS to find a place for them to go shooting.

13. On December 30, 2013, CHS #2 met with BROWN and JORDAN. BROWN said he is waiting for his passport. BROWN said he has been talking online to a "brother" in Sham (Syria) who was shot in the foot. BROWN also said he had been talking to another "brother" in Australia who told him to be careful because a lot of "brothers" have been getting caught. BROWN and JORDAN reiterated their desire to travel overseas for jihad. They also discussed their desire to get away from the kuffar here and how Muslims here in the U.S. do not practice true Islam.

14. On the same date, the group went to JORDAN's apartment. JORDAN went into his bedroom and returned to the living room with his AK-47 which he propped against a wall near him. JORDAN was wearing a vest that contained several loaded magazines for the AK-47. Thereafter, JORDAN went back into his bedroom and returned with the Mini-14 (assault rifle), more ammunition and a sword. JORDAN laid all the weapons on the floor to include the AK-47. JORDAN

showed BROWN how to break down the AK-47. JORDAN told BROWN about the capabilities of the weapons and let BROWN handle them. JORDAN told BROWN that he didn't know whether to go overseas for fisibillah or conduct fisabillah here. BROWN agreed with JORDAN. Finally, BROWN and JORDAN talked about getting physically fit and training to be stronger than the kuffar.

15. On numerous occasions in early 2014, BROWN and JORDAN continued discussing fighting in overseas locations and the best routes of travel to those locations. Syria and Yemen were the countries most frequently discussed. JORDAN emphasized the need to fight both overseas and in the United States—but was committed to fighting primarily overseas. BROWN and JORDAN discussed traveling together, but BROWN was always a little bit further along than JORDAN in his efforts to travel.

16. Again, on January 18, 2014, CHS #2 met with JORDAN and BROWN. BROWN, JORDAN and the CHS talked about traveling to Syria and using BROWN's connections to get them there.

17. On January 23, 2014, CHS #2 met with JORDAN at JORDAN's residence. JORDAN told CHS #2 that he wanted to buy more ammunition magazines, because he did not want to

run out of ammunition if he ever got into a fire fight. JORDAN indicated that he would have the money for the passport by the end of February, but may have to borrow money from his mother to pay for the passport. JORDAN told CHS #2 they needed to be careful and not let anyone know about their plans to travel. JORDAN told CHS #2 that if anyone asked about travel, they should say that they are going overseas for vacation or tourism. JORDAN informed CHS #2 he was sleeping on the floor in the kitchen on a blanket with his AK-47 and the Quran beside him like the "brothers" overseas.

18. In January 26, 2014, BROWN told CHS #2 that he had received a United States Passport. JORDAN said he was trying to secure the funds for his passport. JORDAN did, however, have a picture taken for a passport and made an appointment at the local United States Post Office for March 21, 2014, to apply for a passport.

19. In a conversation with CHS #2 on February 7, 2014, BROWN and JORDAN discussed how using the cover of a charity would make it easier to get into Syria.

20. During the course of investigation, both BROWN and JORDAN discussed persons who have been arrested traveling overseas to fight and talked about countermeasures to defeat criminal charges. For example,

they discussed the fact that a criminal case was all about intent and emphasized that they could assert they were traveling for charitable reasons.

21. On February 25, 2014, CHS #2 met with JORDAN outside of JORDAN's residence. JORDAN told CHS #2 that he has been doing research on patterns of "brothers" getting arrested. JORDAN discussed his view that, in Syria, the United States only sides with those fighting for democracy, not Sharia. JORDAN told CHS #2 that BROWN still wants to go to Yemen. JORDAN said he told BROWN that it is easier to get into Syria than Yemen. JORDAN said that if BROWN goes to Syria first he could establish contacts there to get to Yemen.

22. On March 7, 2014, CHS #2 told BROWN he had been watching videos and is uncertain about Syria. BROWN then asked CHS #2 when CHS #2 and JORDAN were supposed to get their passports. CHS #2 told BROWN it would be soon.

23. Later on March 7, 2014, CHS #2 and BROWN met with JORDAN. They spoke about Syria and Yemen and the merits and difficulties of traveling to both locations. JORDAN then stated that he wanted to go to Yemen. CHS #2 commented that the "brothers" in Yemen appear to be more structured. BROWN discussed smuggling methods for bringing

jihad fighters into Yemen from neighboring countries and noted that one needs a visa to enter Yemen.  BROWN said it is highly recommended that all Muslims go and fight jihad wherever it is needed.  BROWN concluded by saying they need to get out of the U.S., the land of the kuffar, and go fight.

24.  On March 9, 2014, CHS #2 went to JORDAN's house. JORDAN told CHS #2 that JORDAN and BROWN had discussed travel to Yemen.  JORDAN talked about the need to train for fisabillah.  CHS #2 said they do not know what kind of training will be provided if they travel.  JORDAN said that he wanted to go shooting but that there was a need to stay low key because of what they had been talking about. JORDAN stated that if they cannot get overseas then their training ground may need to be their battleground.  (Your affiant understands this to mean that if they cannot travel overseas for violent jihad then may have to conduct violent jihad in the United States.)  CHS #2 asked if JORDAN had enough money for his passport.  JORDAN said he did.

25.  On March 11, 2014, CHS #2 met with JORDAN and another person.  JORDAN said they should die in battle against the kuffar.  JORDAN then left with CHS #2 and told

CHS #2 that they need to be ready because it is the kuffar against Islam.

26.   On March 16, 2014, BROWN advised CHS #2 that he was leaving on Wednesday, March 19, 2014 for Syria.  BROWN did not provide his itinerary but disclosed that he had two contacts in Syria who he met online.

27.   On March 19, 2014, BROWN traveled to Raleigh Durham International (RDU) Airport and was arrested.  In a Mirandized interview, BROWN stated that he had purchased a ticket to fly to Turkey and that he intended to travel to Syria.

28. Based on the above, I submit that there is probable cause to believe that BROWN and JORDAN have conspired to provide material support and resources knowing and intending that they be used in preparation for, or in carrying out, a violation of Title 18, United States Code, Section 956, which makes it a crime to conspire to kill, or maim persons outside the United States, all in violation of Title 18, United States Code, Section 2339A.

Special Agent Joshua Cribbs
Federal Bureau of Investigation

Sworn to and subscribed to
before me this _____ day
of March, 2014.

WILLIAM A. WEBB
United States Magistrate Judge

# Exhibit J

**PALM BEACH COUNTY SHERIFF'S OFFICE**
**CENTRAL RECORDS**
**FSS EXEMPTIONS/CONFIDENTIAL**

☐ 119.071(2)(c) Active criminal intelligence/active criminal investigative Information

☐ 119.071(2)(e) Confession

☐ 365.171(15) Identity of 911 caller or person requesting emergency service

☑ 119.071(2)(d) Surveillance techniques, procedures, and personnel; inventory of law enforcement resources, policies or plans pertaining to mobilization, deployment or tactical operations

☐ 119.071(2)(I) Assets of crime victim

☐ 119.071(5)(a)(5) Social security numbers held by agency

☐ 119.071(5)(b) Bank account #, debit, charge and credit card numbers held by an agency

☐ 395.3025(7)(a) and/or 456.057(7)(a) Medical information

☐ 943.053/943.0525 NCIC/FCIC/FBI and in-state FDLE/DOC

☐ 119.07(4)(d) Extra fee if request is voluminous or requires extensive personnel, technology

☐ 119.071(5)(g)1 Biometric Identification Information (Fingerprints, palm prints, and footprints)

☐ 119.071(2)(f) Confidential Informants

☐ 316.066(5)(a) Crash reports are confidential for period of 60 days after the report is filed

☐ 119.071(2)(h)(1) Identity of victim of sexual battery, lewd and lascivious offense upon a person less than 16 years old, child abuse, sexual offense

☐ 985.04(1) Juvenile offender records

☐ 119.0712(2) Personal information contained in a motor vehicle record

☐ 119.071(2)(b) Criminal intelligence/investigative information from a non-Florida criminal justice agency

☐ 394.4615(7) Mental health information

☐ 119.071(4)(c) Undercover personnel

☐ 119.071(4)(d)(1) Home address, telephone, soc. security #, date of birth, photos of active/former LE personnel, spouses and children

Other:

| Case #: | Tracking #: 18-04-3645 | Clerk Name/ID #: SR/30931 | Date: 4/30/2018 |

## PALM BEACH CNTY SHERIFF'S OFFICE

### Inmate Classification

Jacket #: 0479731

ID #: 20160726048

Inmate Name: JACKSON, DORREN

| | | |
|---|---|---|
| Date: | 04/30/2018 |
| Time: | 2:23 PM |
| Page: | 1 of 2 |

| Primary Charge: | | Booking Date: 7/26/2016 | | Race: B | | | |
|---|---|---|---|---|---|---|---|
| ID Status: | | Release Date: 5/2/2017 | | Gender: M | | | |
| Birth Date: 9/20/1965 | | Age: 52 | | Height: 508 | 0 | Weight: 240 | |

| Date | Time | Classification By | Classification Type | Interview Result | Override | Override Reason | Facility | Assigned Cell |
|---|---|---|---|---|---|---|---|---|
| 7/26/2016 | 15:49 | Robin L Garcia | PRIMARY CLASS | MAX | | | M | M-S-06-D-01L-B |
| Notes: PLACED IN ADM. SEGREGATION W/ FULL RESTRICTIONS - 2 D/S ESCORT W/ SUPERVISOR PER CLASSIFICATION ADMINISTRATION | | | | | | | | |
| 7/26/2016 | 15:57 | Carmelo M Ferraro | CLASS INTERVIEW CON | MAX | | | M | M-S-06-D-01L-B |
| Notes: COOPERATIVE-APPEARS STABLE | | | | | | | | |
| 7/26/2016 | 16:30 | Kennibah A. Malone | ADMIN. SEGREGATION | MAX | | | M | M-W-01-B-20-B |
| Notes: INMATE REHOUSED PER CLASS ADMIN. 2-DEPUTY ESCORT W/ SUPERVISOR PER CLASSIFICATION ADMIN. NOTIFIED CSP HESTER. | | | | | | | | |
| 7/28/2016 | 15:50 | Gwendolyn Taegar | INFORMATIONAL | MAX | | | M | M-W-01-B-20-B |
| Notes: I/M BYSELF REC, VISO PER CLASS ADMINISTRATION | | | | | | | | |
| 12/7/2016 | 14:20 | Gwendolyn Taegar | PSYCHE | MAX | | | M | M-S-03-A-03-T |
| Notes: PER MENTAL HEALTH (RUTH OSBORNE) CSP GRAY TOLD OF 2 DS ESCORT WITH SUPERVISOR | | | | | | | | |
| 12/8/2016 | 13:02 | Telecia D. Dawson | CLR'D FOR GEN. POP. | MAX | | | M | M-W-01-B-31-B |
| Notes: CLRD FOR GENERAL POPULATION. INMATE WILL REMAIN ADMIN. CONFINEMENT 2D/S ESCORT WITH SUPERVISOR. | | | | | | | | |

## PALM BEACH CNTY SHERIFF'S OFFICE

### Inmate Classification

Jacket #: 0479731
ID #: 20160726048
Inmate Name: JACKSON, DORREN

Date: 04/30/2018
Time: 2:23 PM
Page: 2 of 2

| Primary Charge: | Booking Date: 7/26/2016 | Race: B | |
|---|---|---|---|
| ID Status: | Release Date: 5/2/2017 | Gender: M | |
| Birth Date: 9/20/1965 | Age: 52 | Height: 508    0 | Weight: 240 |

| Alert | Alert Description | Date | Entered By | Booking # |
|---|---|---|---|---|
| 49 | 2 DEPUTY ESCORT WITH SUPERVISOR | 07/26/2016 | Robin L Garcia | 20160726048 |
| 08 | CONTACT CAPT'S TUTKO AND BUSSEY UPON ANY MOVEMENT OUTSIDE FACILITY | 07/26/2016 | Robin L Garcia | 20160726048 |
| 38 | NO QUALIFYING CHARGES/NO CONVICTIONS | 07/26/2016 | Alicia E Myles | 20160726048 |

| Current Inmate Narrative | Date | Entered By | Booking # |
|---|---|---|---|
| ☐ WRISTBAND REPLACED-YELLOW | 02/15/2017 | Priscilla O. Smith | 20160726048 |

| Keep Separate From | Inmate # | Cell | Type | Date | Entered By | Booking # |
|---|---|---|---|---|---|---|